**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT RIVET** | : | **Case No. 1:02cv164** |
| | : | |
| **Plaintiff** | : | **Judge Dlott** |
| | : | |
| **vs.** | : | **PLAINTIFF'S MEMORANDUM** |
| | : | **IN OPPOSITION TO** |
| **FORD MOTOR COMPANY** | : | **DEFENDANT'S MOTION** |
| | : | **FOR SUMMARY JUDGMENT** |
| **Defendant** | : | |

## I.    INTRODUCTION

Ford fired Plaintiff Bob Rivet at the age of 49. After a successful 25-year career. Plaintiff received his first less than satisfactory appraisal in April of 2001. Two months later, he was recommended for termination. Plaintiff was fired without just cause and in retaliation for his refusal to accept a voluntary separation package.

Ford seeks summary judgment. As more fully argued below, Ford's motion is without merit. Whether there was an implied employment agreement that required just cause for Plaintiff's dismissal, and whether the contract was breached are questions for a jury. In addition, there are disputed issues of fact surrounding Plaintiff's age discrimination claim. Whether Plaintiff was qualified for his job, whether his termination allowed the retention of a younger employee, and whether Ford's stated reason for dismissal are pretextual are all contested issued for the jury. Finally, Plaintiff has raised material issues of fact regarding his claim that he was terminated in retaliation for refusing a voluntary severance package. There is evidence that Plaintiff's Regional Manager resented Plaintiff's decision to stay and downgraded his appraisals as a result.

In all events, Ford's motion should be denied and this case should proceed to trial.

## II.    FACTS

### A.    Background

Plaintiff was hired by Ford on October 16, 1975. He worked in various Customer Service management roles over the next several years. (Rivet Affidavit, attached as Appendix A, ¶ 3).

As of 1992, Plaintiff was working in Ford's Dealer Computer Services Division (DCS). On March 1, 1992 Ford sold DCS to Universal Computer Systems (UCS). Plaintiff was told that he could either he take a job with UCS or be terminated by Ford. (Id., ¶ 4). He chose a position with UCS. (Id.). Plaintiff always wanted to return to Ford and made continuous attempts to do so while at UCS. (Id., ¶ 5). In November of 1993, Plaintiff was terminated by UCS for failing to make his sales goal. (Id.).

In late 1993, Plaintiff returned to Ford in the Customer Service Division. (Rivet Aff. ¶ 6). He was credited for his prior service. Upon his return, Plaintiff was assigned to the position of Customer Service Manager. (Id.). The Regional Operations Manager was Walt McCrae. (Id.).

As acknowledged by Ford, between 1994 and 1998, Plaintiff's supervisors rated him "Excellent" or "Excellent Plus" on his annual appraisals.  (See Defendant's memo at 3 and Affidavit of Al Walls, Attached to Defendant's memo as Exhibit 1, ¶ 5).  In early 1997, Plaintiff was rated "Excellent Plus" by George Rivoli. (Rivet Aff., ¶ 8 and Ex. 1). In January of 1998, Plaintiff received an "Excellent" rating from Keith Ertel. (Deposition of Steve Jefferson, Appendix B, Exhibit 2).

### B.    Plaintiff Turns Down A Voluntary Termination Package

In late 1998,    Al Walls replaced McCrae as the Regional Operations Manager. (Rivet Aff. ¶ 8).  Plaintiff had very little contact with Walls. (Id.).

Shortly after Walls arrived, he met with Plaintiff. Despite the fact that Plaintiff's last appraisal rated him "Excellent" Walls told Plaintiff that Ford no longer wanted him and that he was being offered an "Enhanced Voluntary Resignation from Service" package (VRS). (Rivet Aff., ¶ 8). Plaintiff turned down the offer because there was too much to lose in retirement by leaving. (Id.). Plaintiff's decision was not supposed to lead to any adverse effects on his employment. The severance plan contained an express promise:

> "Your election to accept the 98 VRS offer and separate from Company employment is your voluntary decision. If you reject the company's offer, your employment will not be affected as a result of that decision. As always, however, the Company reserves the right to restructure and reorganize jobs."

(Richard Gross deposition Excerpt, Appendix C, Ex. 1). In addition, it is undisputed that retaliation against employees who decided not to accept a VRS was forbidden. (Gross depo. at 20-21).


### C.    Walls Attempts To Downgrade Plaintiff's Excellent Plus Rating

In February of 1999, Plaintiff was given an "Excellent Plus" review from Steve Jefferson. (Appendix B, Jefferson depo., Ex 1). Jefferson was a Dealer Operations Manager and Plaintiff's direct supervisor at the time. (Id.). Jefferson believed the rating was fully warranted. Plaintiff had gone above and beyond what was expected. (Jefferson depo. at 16-18). He had performed better than Jefferson's other Customer Service Managers. (Id. at 26-28).

Despite Jefferson's role as Plaintiff's direct supervisor and Walls' limited contact with Plaintiff, Walls wanted the rating downgraded to "Excellent." (Jefferson depo. at 24). Walls did not ask Jefferson to do the same for any of his other subordinates. (Id. at 26-28). Walls had warned his direct reports like Jefferson that any high ratings had to be fully justified. (Id. at 19, 25). Jefferson was able to do so. (Id. at 30). Jefferson felt so strongly that Plaintiff deserved an "Excellent Plus" rating that he offered his resignation if Walls did not accept his recommendation. (Jefferson depo. at

29-30, 34). Walls went along, but told Jefferson to tell Plaintiff that "he should have taken the package." (Jefferson depo. at 30-31).

### D.    Walls Reduces Plaintiff's 2000 Appraisal

Throughout 1999, Plaintiff covered two markets and reported to both Steve Jefferson and Jorge Castillego. Jefferson and Castillego discussed Plaintiff's rating for 1999 and agreed it should be "Excellent Plus." (Jefferson depo. at 37-41). Jefferson, who was off work due to a back injury, was under the impression that the EP rating had been submitted. (Id. at 38). However, he later learned that Walls stepped in and reduced Plaintiff's rating to "Excellent." (Id. at 41-43).

### E.    Plaintiff Is Transferred To A New Position

In early 2000, Plaintiff was laterally transferred to an inside position as Office Operations Specialist at Mason. (Rivet Aff. ¶ 11). Plaintiff was never given a written job description. (Id.). Joe Bingaman, who was about 32 years old, assumed Plaintiff's customer service job. (Id. and Appendix F, Declaration of Counsel).

On September 5, 2000, Plaintiff received an "Excellent" mid-year appraisal Lori Etchill, his new supervisor. (Id. ¶ 12). On December 1, 2000, Etchill gave Plaintiff another review prior to her transfer to Detroit. She rated him "Satisfactory Plus." (Id. ¶ 13). Plaintiff was never told that at that point he was put on a "declining" performance program. (Rivet Aff., ¶ 14).

After Etchill left, Jorge Castilego replaced her and became Plaintiff's supervisor. (Id. ¶ 15). On January 31, 2001, Castillego and Walls met with Plaintiff to deliver his performance appraisal for the year 2000. (Id.). Despite the fact that Etchill had rated Plaintiff "Excellent" and "Satisfactory Plus" in her two reviews of Plaintiff during 2000, and despite the fact that Castillego had supervised

Plaintiff in the Office Operations Specialist job for only the month of December in 2000, Castillego gave Plaintiff a "Satisfactory" rating and told him that it was in his interest to look for another job. (Rivet Aff. ¶ 16).

What followed was predictable. The die was cast and no matter what Plaintiff did, his successive ratings were lower. (<u>Id</u>. ¶ 17-18). Consistent with Ford's desire to remove Plaintiff, on April 10, 2001, Plaintiff was reviewed again and received a "Satisfactory Minus" rating. On June 25, 2001, Plaintiff was rated "Unsatisfactory" and Castillego made a recommendation for termination. (Appendix D, Ute aus dem Bruch depo., Ex 10). The recommendation for Plaintiff's termination included a reference to the fact that he had been offered and turned down a voluntary package in 1998. (<u>Id</u>.). Walls also mentioned this fact in a conversation with Ms. aus dem Bruch at about the time Plaintiff's termination was being discussed. (<u>Id</u>. at 96).

The recommendation for termination was reviewed by Ford human resource and labor relations officials in Dearborn, including Dick Gross who served as Ford's Personnel Relations Manager. (aus dem Bruch depo. at 93; Gross depo. at 5-6, 12-13). Although Mr. Gross approved the decision to fire Plaintiff, he admits he never spoke with Plaintiff to hear his side of the story. Mr. Gross acknowledges that he cannot recall ever speaking to Plaintiff or anyone else about the situation, and that he would not know Plaintiff if he saw him. (Gross depo. at 13-18).

On or about July 25, 2001, Plaintiff was notified of his termination. He was 49 years-old at the time. There was no discussion about any option to return to the field or to use Plaintiff's demonstrated talents in some other capacity at Ford. (Rivet Aff. ¶ 20).

## III.    ARGUMENT

### A.    The Summary Judgment Standard

Summary judgment is to be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 447 U.S. 317 (1986). A genuine issue of fact means that from the evidence offered at trial a reasonable jury can draw inferences and return a verdict to either party. See, Anderson v. Liberty Lobby, Inc., 447 U.S. 2424 (1985); First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). The threshold inquiry is "[w]hether there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 447 U.S. at 250. If evidence offered at the summary judgment stage of the litigation could lead a rational trier of fact could find for the party opposing summary judgment, summary judgment should not be granted. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1484 (6th Cir. 1989); Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 231 (6th Cir. 1990).

The court evaluating a summary judgment motion must construe the evidence in the record and all inferences to be drawn from it in the light most favorable to the party opposing the motion. United States v. Diebold, 369 U.S. 654, 655 (1962); 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987); and Blakeman v. Mead Co. Containers, 779 F.2d 1146, 1150 (6th Cir. 1985). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury not required to believe." Reeves v. Sanderson Plumbing Products Inc., 120 S.Ct 2097, 2110 (2000). Disputed facts are to be resolved in favor of the non-moving party. Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 231 (6th Cir. 1990).

The court should not resolve factual disputes by weighing conflicting evidence. It is the jury's role to assess to probative value of the evidence. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Kraus</u>, 915 F.2d 230. Credibility questions should not be decided on summary judgment. <u>Anderson</u>, supra at 249; <u>Bayer v. U.S. Department of Treasury</u>, 956 F.2d 330, 334 (D.C. Cir. 1992). Questions of motive, intent and state of mind are rarely appropriate for summary disposition. <u>60 Ivy Street</u>, supra; <u>Proffit v. Anacomp</u>, 747 F. Supp 421, 427 (S.D. Ohio 1990). <u>United States Postal Service v. Aikens</u>, 460 US 711, 716 (1983); <u>Kand Medical, Inc. v. Freund Medical Products, Inc.</u>, 963 F.2d 125 (6th Cir 1992); <u>Courtney v. Biosound, Inc.</u>, 42 F.3d 414, 421 (7th Cir. 1994)(summary judgment standard is applied with added rigor in discrimination cases where intent and credibility are crucial issues); and <u>Gill v. Reorganized School District</u>, 32 F.3d 376, 378 (8th Cir. 1994)(applying summary judgment standard with caution in employment cases because intent is inevitably the central issue.").

**B.     Whether There Was An Implied Contract Limiting
         Defendant's Right to Terminate Plaintiff Is
         <u>A Disputed Issue For The Jury</u>**

**1.     Ford's Practices Amounted to a "Just Cause" Limitation**

In Ohio, employment is presumed to be at-will. However, the Ohio Supreme Court has recognized that this presumption can be overcome by evidence that the parties intended to limit the right to fire for "just cause". This "implied contract" exception to the employment at will doctrine was first recognized in <u>Mers v. Dispatch Printing Co.</u>, 19 Ohio St.3d 100 (1985). There, the Court stated:

> "Employee handbooks, company policy, and oral representations have been recognized in some situations as comprising components or evidence of the employment contract. E.g., *Hedrick v. Center for Comprehensive Alcoholism Treatment* (1982), 7 Ohio App. 3d 211; *Helle v. Landmark, Inc.* (1984), 15 Ohio App.3d 1.

> *A priori*, the facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, <u>can be considered by the trier of fact or order to determine the agreement's explicit and implicit terms concerning discharge.</u>

Id at 104-105. (emphasis ours).

The foregoing principle has been cited repeatedly by the Ohio Supreme Court. See <u>Kelly v. Georgia Pacific Co.</u>, 46 Ohio St.3d 134 (1989); <u>Helmick v. Cincinnati, Work Processing, Inc.</u>, 45 Ohio St.3d 131 (1989); and <u>Wright v. Honda of America</u>, 73 Ohio St.3d 134 (1995). An implied contract limiting the employer's right to fire-at-will can arise in two ways. There can be an agreement that employment is for a fixed term. See <u>Henckle v. Education Research Council</u>, 45 Ohio St.2d 249 (1976). Alternatively, the parties can agree that while there is no specific duration, termination will not occur absent just cause. See <u>Mers</u>, <u>Helmick</u>, <u>Kelley</u> and <u>Wright</u>, supra. This case involves an implied agreement of indefinite duration.

Ford's practice is to terminate employees only when there is just cause. In her deposition, Ute aus dem Bruch, who served as a Cincinnati's human resources contact,   acknowledged that while Ford considers employees to be "at-will", terminations are not taken lightly and Ford believes in treating its employees fairly. (aus dem Bruch depo. at 18-19). As a result, Ford's practice is to coach and counsel employees to insure that they have a fair amount of time to improve their performance. (<u>Id</u>. at 15-20). Even employees who engage in misconduct are not automatically fired. (<u>Id</u>. at 20).

A system of progressive discipline creates a reasonable expectation of fair treatment. In <u>Towns v. Emery Air Freight</u>, 3 IER Case 911 (SD Ohio 1988) (attached as Appendix F), Judge Rice held:

> "While the employment manual in this case does <u>not</u> explicitly state that an employee may only be terminated for cause, an employee could reasonably infer

8

from the sections of the manual dealing with corrective action policy that employees may only be terminated for cause... In fact, there is evidence that Plaintiff did draw such an inference. Thus, the Court concludes that there is a genuine issue of material fact as to whether the parties intended the employment relationship to be terminable at-will or whether the parties contracted to the contrary".

(Id. at 913)(emphasis in original). In <u>Bidwell v. Children's Hospital</u>, 97 LW-4937 (2nd), 13 IER Cases 896, 901 (Mtg. Cty. 1997)(copy attached as Appendix G), the court held:.

In the present case, while the written procedure does say that "generally" disciplinary action follows a three-step procedure, CMC's president testified that these procedures are for the protection of employees, and that the procedures are expected to be followed. <u>Additionally, the disciplinary procedure emphasizes that the purpose of the progressive discipline policy is to correct performance problems before an employee's position at the medical center is jeopardized. Under the circumstances, we believe this statement in the disciplinary policy is a promise on CMC's part that employees will not be discharged without just cause.</u>

(Id. at 6)(emphasis ours).

What Ms. aus dem Bruch describes amounts to a clear practice of terminating employees only when there is just cause. As demonstrated by Defendant's arguments regarding its alleged fair treatment of Plaintiff and attempts to document his poor performance, Defendant does not fire employees at-will and for no reason. It is settled that such a practice is sufficient to create an implied contract only to terminate for just cause. Plaintiff believed he would be treated fairly and would be transferred and would not be terminated, even in the face of his alleged problems. In nineteen years of employment, Jefferson was aware of only two terminations, and one of those was Plaintiff. (Jefferson depo. at 53).

<u>Atkinson v. International Technegroup, Inc.</u>, 106 Ohio App3d 349 (Ham. Cty 1995) in on point. There, the handbook provided that employment was at-will. However, there was testimony that it was the company's policy "to treat its employees fairly" and to "have good reason before terminating an employee." <u>Id.</u> at 361. The decision in <u>Atkinson</u> is consistent with <u>Mers</u>, where the Court expressly stated that "custom" i.e. practice, was a relevant fact for the jury to consider in determining the terms of the agreement. 19 Ohio St. 3d at 104. A practice of terminating employees only for cause conflicts with the proposition that Defendant could fire employees at-will, and is one

of the surrounding "facts and circumstances" for the jury to review in determining the "agreement's explicit and implicit terms concerning discharge." <u>Mers</u>, supra, 100 Ohio St.3d at 104.    In light of the foregoing, reasonable jurors could find a contractually binding practice that employees will not be terminated unless there is just cause.

Ford argues that Plaintiff was employed at-will because he signed an "acknowledgement" to that effect when he was hired. (Defendant's memo at 25). Ford does not identify where the acknowledgement appears in the record. Even if such a disclaimer exists, it does not bar Plaintiff's claim. Under <u>Atkinson</u>, supra, there would still be an issue for the jury regarding whether Defendant intended to retain the right to terminate at-will. Defendant's practice of fair treatment and its review of termination decisions clearly conflicts with any reservation of the right to fire at-will.

In <u>Kelly v. Georgia Pacific</u>, supra, the Supreme Court of Ohio held that an employee's claim for breach of an implied contract should have been decided by a jury.   In <u>Kelly</u>, the evidence included a manual that promised fair and just treatment; an assumption by the employee noted on an appraisal that he would be treated fairly; and favorable comments from a vice president at the company.   46 Ohio St.3d at 135-36.   Significantly, in <u>Kelly</u>, the manual disclaimed any contractual content. <u>Id</u>. at 135. The evidence in this case is equally compelling.  There is an admitted practice of fair treatment and review of termination decisions that amounted to a "just cause" limitation of Ford's right to fire Plaintiff.

In addition to the authority mentioned above, many other Ohio appellate cases correctly hold that where there are subsequent oral representations or other facts that conflict with the disclaimer, the jury may determine the effect, if any, of the disclaimer. See <u>Helle v. Landmark Inc.</u>, 15 Ohio App.3d 1, 472 N.E. 2d 765, 775 (Lucas Cty. 1984); <u>Pond v. Devon Hotels, Inc.</u>, 55 Ohio App.3d 268 (Franklin Cty. 1988); and <u>Mercurio v. Therm-O-Disc, Inc.</u>, 92 Ohio App. 3d 131, 634 N.E.2d 633 (Richland Cty. 1993).

This case presents conflicting evidence of Defendant's intent. On the one hand, a purported "acknowledgement" may contain language that employment is "at-will." However, employees are admittedly afforded a system of progressive discipline and counseling. These items and Defendants' own treatment of Plaintiff, are inconsistent with the notion that Defendant retained the right to terminate Plaintiff for no reason. As a result, a jury issue is present regarding the existence of a "just cause" contract.

### 2.    Ford Breached Its Contract

Whether the contract was breached is a question for the jury. See <u>Sowards v. Norbar Inc.</u>, 78 Ohio App.3d 545, 552 (1992). In this case, there is a genuine dispute regarding whether Plaintiff's performance was so poor as to warrant termination. Plaintiff had a successful history of demonstrated "Excellent" or better performance. The predicted outcome was clear in January of 2001 when Castillego told Plaintiff to find another job. Had he and Walls truly been interested in helping Plaintiff, such a comment would not have been made.

In addition, there is evidence that Ford failed to follow the proper procedures for counseling of Plaintiff. Ford's own documents describe its obligations. Once an employee is rated "Satisfactory Minus," it is recognized that "The employee may possess the talent to earn a higher rating if special training and counseling are given <u>or if the employee is transferred to a more suitable position</u>." (See e.g. Jefferson depo. Ex 1)(emphasis ours). Even when an Unsatisfactory rating is given, "Upon consultation with the local Industrial Relations Manager, the employee will either <u>be reassigned to a position of lesser responsibility</u> or terminated." (<u>Id</u>.)(emphasis ours). Ford failed to present any option to Plaintiff other than termination. (Rivet Aff. ¶ 20). Yet, its own documents include consideration of transfer to a more suitable position or one with less responsibility. Whether Ford violated its own procedures is for the jury. See

Mecurio v. Therm-O-Disc, supra, 92 Ohio App.3d at 137.

Jurors should decide if Plaintiff's performance warranted termination and whether Ford used subjective criticisms and criteria to justify his termination. Jurors should also decide if there was just cause and whether Ford followed its own policies.

### C.    There Is A Prima Facie Case Of Age Discrimination

Plaintiff has asserted age discrimination in violation of the ADEA, 29 U.S.C. § 621 et seq, O.R.C. § 4112.02(A), and the public policy of the state of Ohio. (See Amended Complaint, ¶ 14).

Plaintiff's initial burden is to make out a prima facie case, either through direct or circumstantial evidence. Under McDonnell-Douglas v. Green, 411 U.S. 792 (1973) and Kohmescher v. Kroger Co., 61 Ohio St.3d 501, 505-506 (1991), absent direct evidence of discrimination, Plaintiff must generally prove:  (1) that he was a member of the protected class; (2) he was qualified for the job; (3) that he suffered an adverse employment action; and (4) that he was either replaced by a younger person or that his termination allowed the retention of a younger employee. See also Bellian v. Bicran Corp., 69 Ohio St.3d 517, 520 (1994).

There is no dispute that Plaintiff was in the protected class or that he suffered an adverse employment action. (Defendant's memo at 11). Ford asserts that Plaintiff cannot show that he was qualified for his job or that his termination allowed the retention of a younger employee. (Id.).

### 1.    Plaintiff Was Qualified For His Job

An employee is qualified when he or she performs at a level that meets the employer's legitimate expectations.  Chappel v. GTE Products Co., 803 F.2d 261, 266 (6th Cir. 1986). In Cline v. Catholic Diocese of Toledo, 206 F.3d 651 (6th Cir. 2000), the plaintiff proved she was qualified

by demonstrating a two-year record of success and a recent positive appraisal. Id. at 666. Despite Plaintiff's long and successful record, Ford says he was not "qualified" for his Office Operations Specialist position because he did not meet Ford's expectations. (Defendant's memo at 11). Ford is wrong. Plaintiff clearly satisfies the Chappel test. He had over 25 years of experience with Ford. Until April of 2001, he never received an appraisal that was less than "satisfactory."

Ford says that Plaintiff admits that his appraisals indicated areas for improvement. (Ford's memo at 11-12). However, in Plaintiff's experience, it was not uncommon to note areas for improvement even for very favorable appraisals. (Rivet Aff. ¶ 21). Ford also asserts that Plaintiff believes he was qualified for the OOS position based on his past performance. (Ford's memo at 12). Although Plaintiff's history of excellent performance demonstrates his ability to perform at a better-than-expected level, Plaintiff's appraisals in the OOS job were "Excellent" and "Satisfactory Plus" before Castillego took over and made it clear in January of 2001 he did not want Plaintiff at Ford. Etchill's ratings clearly show that Plaintiff was performing to Ford's expectations. These facts raise a question for the jury regarding whether Plaintiff was a poor performer or whether his appraisals in 2001 were tainted as part of a desire to terminate him.

In addition, as in Cline, Ford has improperly merged the issues of qualification and pretext. In Cline, the Court noted that the McDonnell Douglas test requires that the determination of whether the employee is qualified is to be made independent of the employer's non-discriminatory justification for the decision at issue. Ford says that Plaintiff's alleged shortcomings in the Office Operations Specialist job made him not qualified. Defendant also asserts that his same performance problems constituted its non-discriminatory reason for Plaintiff's termination. (Defendant's memo at 15). The Sixth Circuit has rejected this "conflated" argument that seeks to thwart the establishment of a prima facie case. 206 F.3d at 660-661, 664. See also EEOC v. Horizon/CMS

Healthcare Corp., 220 F.2d 1184, 1194 (10th Cir. 2000)(objective employer criteria imposed by employer that have no bearing on the applicant's ability to perform the job sought are more properly considered at the second stage of the McDonnel Douglas analysis, and a plaintiff's failure to meet such qualifications cannot be used to defeat the prima facie case.).

Defendant's authority on this point is unpersuasive. Gregory v. Interface Flooring Systems, Inc., No. 93-4261, 1996 U.S. App. LEXIS 36182 (6th Cir. Sept 8, 1995) is an unreported Sixth Circuit case that predates the more relevant Cline decision. The facts presented in Moon v. Compass Group USA, Inc., No. C-980927 Ohio App. LEXIS 3951 (Hamilton Cty. August 27, 1999) are inapposite. Unlike Moon, Plaintiff was never threatened with termination until April of 2001, two months before the recommendation to dismiss him was made.

It is undisputed that after doing the OOS job for several months, Plaintiff received an Excellent rating from Lori Etchill. Even upon Ms. Etchill's departure in December of 2000, Plaintiff was still rated "Satisfactory Plus." In late January of 2001, after he received a "Satisfactory" appraisal, Plaintiff was told he should leave Ford, and his ratings continued to decline. Jurors could conclude that the poor ratings were designed to justify Plaintiff's dismissal and were not an accurate reflection of his work. At a minimum, whether Plaintiff was qualified is a question for the jury.

### 2. Plaintiff's Termination Allowed The Retention and Promotion of a Younger Employee

There is no dispute that Walt Murphy was older than Plaintiff and that he replaced Plaintiff when he returned to his former job as the Office Operations Specialist. However, Plaintiff's termination paved the way for the promotion of Matt Ignatowski, who was 29 years-old. (See aus dem Bruch depo. at 109 and Appendix E, Declaration of Counsel, ¶ 3).

On August 1, 2001, Mr. Ignatowski was promoted from a Zone Manager of Vehicle Sales to the position of    Dealer Operations Manager (DOM).  (Rivet Affidavit, Ex 2). Ignatowski was a grade 7 before he was promoted. (Id.) He had only been with Ford since 1996. (Id.). When he was promoted, Ignatowski advanced two levels, to a grade 9 position. Plaintiff was a grade 8. He had performed very well as a Customer Service Manager. He has been with Ford for over 25 years. He had been ready to move into a DOM job for years. He had a successful career at Ford that was marked by "Excellent Plus" evaluations in 1997 and 1999.

Plaintiff had performed well in the field. Rather than considering the obvious move of simply having Plaintiff and Walt Murphy switch jobs, Ford chose to terminate Plaintiff and fill the slot that was created by Murphy with an employee who was less than 30 years old.

### 3.    Defendants' Stated Reasons For Plaintiff's Termination Are Pretextual

Ford says Plaintiff was terminated for poor performance. Under Reeves, pretext is established by showing that the stated reason for the employer's decision is "false." An employer's articulated reason for termination is false or pretextual when it:  (1) has no basis in fact; (2) was insufficient to motivate the decision; or, (3) did not motivate the decision.  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  A prima facie case plus a showing that Defendant's articulated reason is false is sufficient for Plaintiff to prevail.  St. Mary's Honor Center v. Hicks, 509 US 502, 509-510 (1993); Kline v. Tennessee Valley Authority, 128 F.3d 337, 347 (6th Cir. 1997).

The issue in this case is whether Plaintiff's alleged performance problems were sufficient to motivate his termination.  As outlined above, reasonable jurors could find that Ford's concerns were

exaggerated and that all of the criticism directed at Plaintiff was designed to carry out the goal of terminating him once a perfunctory coaching and counseling process occurred.

In Wells v. New Cherokee Corp., 58 F.3d 233 (6th Cir. 1995), the court reviewed a similar situation and affirmed a jury's verdict where the plaintiff had been transferred to a new and more difficult position 18 months prior to her termination for poor performance. Id. at 235-36. There is no dispute that despite after over 25 years of good performance, and despite language on the appraisal reflecting Ford's willingness to transfer an underperforming employee to a more suitable or lesser position, no one at Ford made any attempt to move Plaintiff to a different position that was more in line with his demonstrated skills.

In addition, jurors could find much of the criticism directed at Plaintiff to be based on subjective rather than objective factors. When objective measures were used, Plaintiff did well. (See page 1 of Exhibits C and D to Castillego's affidavit, which is attached as Exhibit 2 to Defendant's memo.) The Sixth Circuit has cautioned that subjective decision-making, while not per se discriminatory, provides a ready vehicle for discrimination. See Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 93 (6th Cir. 1982). See also Grano v. Dept. of Development of City of Columbus, 637 F.2d 1073 (6th Cir. 1983); and Farber v. Massilon Board of Education, 917 F.2d 1391 (6th Cir. 1990).

Finally, jurors could find Defendant's explanation of its conduct is simply unreasonable. In Wexler v. White's Fine Furniture, Inc., 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit accepted the notion that in reviewing the issue of pretext, a jury can consider the unreasonableness of the employer's stated reasons for its conduct. The Wexler decision summarized Sixth Circuit authority showing that evidence the employer's business explanation is lacking in merit and unreasonable can prove pretext:

"This court has held that <u>the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.</u>

. . .

"Several of our sister circuits have similarly concluded that <u>the reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation</u>. (emphasis added).

. . .

"*Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (<u>"Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness."</u>); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext . . . .")."

(emphasis added).  317 F.3d at 577 (6th Cir. 2003).

Jurors reviewing the facts in a light most favorable to Plaintiff could questions how a long-term employee who received "Excellent Plus" ratings could suddenly become a terrible and unsatisfactory performer. They could question why and how in the time period between January 30, 2001 and June 25, 2001 Plaintiff would have changed all of his workhabits, developed poor communication skills, and demonstrated all of the other alleged negative traits that Steve Jefferson never saw. (Compare Jefferson depo. at 56-57 and Castillego's comments on Plaintiff's review dated January 31, 2001, attached as Exhibit B to Castillego's Affidavit). Jefferson was not the only DOM who gave Plaintiff high marks. Plaintiff also received an "Excellent Plus" appraisal from George Rivoli in 1997.  Jurors could also question why Castillego and Walls told Plaintiff to find another job in January of 2001 if it was not their goal to fire him.

In addition, in light of the favorable treatment Ford gave to Matt Ignatowski by promoting him to a position that Plaintiff was qualified to perform, jurors could find that Plaintiff's age was a

factor in Ford's decision to terminate him and its failure to consider a clear alternative such as a transfer to the DOM job that was given to Ignatowski.

There is a factual dispute regarding whether Plaintiff's performance was the true motivation for Ford's desire to terminate him. See <u>Manzer</u>, supra at 1084. There is conflicting evidence on this material point and a summary judgment is not appropriate under the circumstances. Because there is sufficient proof on the statutory claim of discrimination, the same result should follow for Plaintiff's public policy action.

### D.    DEFENDANT VIOLATED 29 U.S.C. § 1140 BY TERMINATING PLAINTIFF

ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. Contrary to Ford's arguments, Plaintiff's claim is not that he was terminated to avoid paying additional pension benefits to Plaintiff. Rather, as stated in the complaint, the claim is that Ford discriminated against Plaintiff in violation of 29 U.S.C. § 1140 for exercising his rights under the VSR program to refuse the voluntary separation package he was offered in 1998.   (Amended Complaint ¶ 16).

### 1.    There Is A *Prima Facie* Case

To state a *prima facie* case, an employee must show that there was:  "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled."  Plaintiff does not have to show that Ford's sole purpose in discharging him was to interfere with his rights under the plan. Instead, he can prevail by showing either that it was "a motivating factor" in the decision or that the proferred reason for his

firing is unworthy of credence.  <u>Shahid v. Ford Motor Co.</u>, 76 F.3d 1404, 1411-1413 (6th Cir. 1996); <u>Smith v. Ameritech</u>, 129 F.3d 857, 865 (6th Cir. 1997).  Plaintiff can satisfy each of these requirements.

There is no dispute that Plaintiff was discharged and that an adverse action was therefore taken against him. There is also no dispute that Plaintiff had the right to refuse to accept the VRS package that was offered to him and that he chose to reject it. (See Gross depo. Ex 1 and Gross depo. at 20-21).

In addition, despite the Plan's express language and testimony of Mr. Gross that retaliation was prohibited, there is evidence that Al Walls resented the fact that Plaintiff refused the voluntary separation package and retaliated against him as a result. When he wanted Steve Jefferson to downgrade Plaintiff's "Excellent Plus" appraisal in February of 1999, he told Jefferson to tell Plaintiff he "should have taken the package." (Jefferson depo. at 30-31). According to Jefferson, Walls reduced what Jefferson believed was to be another "Excellent Plus" rating for Plaintiff in 2000 to an "Excellent."  (<u>Id</u>. at 37-43). When the recommendation for Plaintiff's termination was discussed and submitted to the home office, the fact that Plaintiff had refused a voluntary package in 1998 was again mentioned by Walls. (aus dem Bruch depo. at 96 and Ex. 10). Plaintiff's refusal to accept the VRS package continued to surface. Yet, according to Richard Gross, who ultimately approved the termination, this was an "irrelevant" fact that should not have been mentioned. (Gross depo. at 20).

Given Walls' comment to Jefferson about Plaintiff's refusal to leave Ford voluntarily, and the repeated mention of that fact in discussions surrounding Plaintiff's termination, it is reasonable to infer that Plaintiff's decision to reject the separation package was a motivating factor in the decision.

### 2.    Ford's Stated Reason for Dismissal is Pretextual

As argued above, Ford's articulated reason for Plaintiff's termination is a pretext. Terminating a 25-year veteran shortly after his first and contrived unsatisfactory appraisal raises questions about the true motive for the decision at issue.

## V.    <u>CONCLUSION</u>

As demonstrated above, there are disputed factual issues regarding each claim that should be decided by the jury. Reasonable jurors could find that Plaintiff was terminated without just cause and that Ford retaliated against him for refusing the VRS. They could also conclude that Plaintiff's age was a determining factor in Ford's decision to terminate him.

Defendant's motion should be denied and this case should proceed to trial.

Respectfully submitted,

s/ David Torchia
David Torchia– 0015962
Tobias, Kraus & Torchia
911 Mercantile Library Building
414 Walnut Street
Cincinnati, Ohio 45202
(513) 241-8137
Fax (513) 241-7863
davet@tktlaw.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have served a copy of this document by hand delivery to Jeffery L. VanWay, Esq., Baker & Hostetler, LLP, 312 Walnut Street, Suite 3200, Cincinnati, Ohio 45202.


s/ David Torchia
David Torchia