Exhibit C

LEXSEE 2003 U.S. APP. LEXIS 15319

**ROBIN B. MURPHY, Plaintiff-Appellant, v. UNIVERSITY OF CINCINNATI, et al., Defendants-Appellees.**

No. 01-3376

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*2003 U.S. App. LEXIS 15319*

**July 29, 2003, Filed**

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO. 91-00276. Weber. 03-12-01.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff assistant coach sued defendant university and athletic officials, alleging sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. The United States District Court for the Southern District of Ohio granted defendants summary judgment on the discrimination claim and denied a new trial request on the jury's verdict on the retaliation claim. The assistant coach appealed.

**OVERVIEW:** The district court properly found that the assistant coach failed to establish that she was qualified for her position because she continually failed to meet the university's expectations after she was hired. Specifically, the evidence showed that she had a bad attitude, poor work ethic, had violated NCAA rules, and constantly challenged the head coach's orders. Even if the assistant coach was qualified for the position, she failed to show that she was treated worse than a similarly-situated male. The assistant coach also failed to present direct evidence of discrimination because the statements made by the head coach bore no relation to her termination and did not evidence a bias against women. The district court also correctly denied the assistant coach's motion for a new trial on the retaliation claim as the jury's responses to the questions posed did not reflect inconsistent answers or a lack of understanding. Particularly, it was well within the range of possibilities that the assistant coach failed to prove unlawful discrimination and the university failed to prove legitimate nondiscriminatory reasons for the termination.

**OUTCOME:** The judgment was affirmed.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Civil Procedure > Summary Judgment > Summary Judgment Standard Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] The appellate court reviews orders for summary judgment de novo. Moreover, it weighs all evidence in favor of the non-moving party.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions*
[HN2] In order to show a prima facie case of sex-based discrimination, a plaintiff must show: (1) she is a member of a protected class; (2) there was an adverse employment action; (3) she was qualified for her job; and (4) a similarly-situated male was treated more favorably

for the same or similar conduct. This fourth factor is also characterized as whether the plaintiff was replaced by a non-member of her class.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions*
[HN3] In the context of a sex-based discrimination claim, the test used by the United States Court of Appeals for the Sixth Circuit for whether an employee was qualified for her position is whether she met the employer's legitimate expectations.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions*
[HN4] Similarly-situated," as a term of art in sex-based discrimination claims, means similarly situated in all relevant aspects.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions*
[HN5] Courts hold that a woman who holds a unique position may stretch the bounds of the "similarly-situated male" rules to compare herself with men with different job characteristics for purposes of establishing a prima facie case of sex-based discrimination.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions*
[HN6] Direct evidence in a sex-based discrimination context usually comes in the form of an unequivocal assertion that a woman was fired because of her gender. Moreover, the alleged discriminatory statement must bear some kind of connection to the adverse employment action.

*Civil Procedure > Relief From Judgment > Motions for New TrialCivil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN7] The appellate court reviews denials of motions for a new trial under an abuse of discretion standard.

*Civil Procedure > Jury Trials > Province of Court & Jury*
[HN8] The United States Court of Appeals for the Sixth Circuit holds that juror answers should be held irreconcilable only where there exists absolutely no way that they can be read together.

**COUNSEL:** For ROBIN J. MURPHY, Plaintiff - Appellant: Marc D. Mezibov, Michael N. Budelsky, Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH.

For UNIVERSITY OF CINCINNATI, MONTY HOPKINS, GERALD O'DELL, Defendants - Appellees:

Doreen Canton, Kerry P. Hastings, Taft, Stettinius & Hollister, Cincinnati, OH.

**JUDGES:** BEFORE: BOGGS, SUHRHEINRICH, and CLAY, Circuit Judges. BOGGS, Circuit Judge, concurring. CLAY, Circuit Judge, dissenting.

**OPINIONBY:** SUHRHEINRICH

**OPINION:**

SUHRHEINRICH, Circuit Judge. Plaintiff-Appellant Robin Bente Murphy appeals from the order entered on July 23, 1999 in the United States District Court for the Southern District of Ohio, granting partial summary judgment in favor of Defendants-Appellees University of Cincinnati, [*2] Head Swimming Coach Monty Hopkins, and Athletic Director Gerald O'Dell (collectively, "UC"), dismissing Murphy's allegations of sex-based discrimination arising out of her dismissal as UC's assistant swimming coach. Murphy also appeals from the jury verdict and judgment entered February 18, 2000 in favor of UC, denying Murphy's allegations of improper retaliation under *Title VII*, and from the order denying Murphy's motion for a new trial entered on March 12, 2001.

Murphy raises two assignments of error. First, she claims the district court erred in entering partial summary judgment because she had presented either a prima facie case or direct evidence of sex-based discrimination. Second, she argues the jury verdicts were inconsistent and against the weight of the evidence. Accordingly, she argues it was error that her motion for a new trial was denied.

We affirm the decision of the district court. First, summary judgment was proper because Murphy has failed to present either direct or prima facie evidence of sex-based discrimination. Furthermore, Murphy has not demonstrated that a similarly-situated male would have been treated differently. Second, the district court did not abuse [*3] its discretion by denying Murphy's motion for a new trial because the jury's answers to specific interrogatories were plausible and not inconsistent.

**I. Background**

Murphy was hired by UC Head Swimming Coach Monty Hopkins prior to the 1995-96 school year as an assistant swim coach. Murphy had been a high school classmate of Hopkins and a varsity swimmer at Miami University, but she had no prior coaching experience on the collegiate level.

Hopkins and Murphy began to work together, but their relationship became increasingly tense. Eventually there came a point where Hopkins and Murphy could no

longer work together. Murphy became increasingly agitated at the way she felt she was being treated by Hopkins and sought consultation with UC officials.

At some point during the week of November 1, 1995, Murphy voiced her concerns to UC ombudsman Mitzi Cole, who directed her to talk to O'Dell. On November 6, Murphy and O'Dell met, at which time O'Dell informed her that he would look into her concerns and that she should not return to work. The next day, O'Dell sent Murphy a letter indicating that she was being placed on administrative leave.

On November 28, O'Dell met with Hopkins and [*4] informed him of his meeting with Murphy. In turn, Hopkins expressed his concerns with Murphy's attitude and refusal to follow his direction, and requested permission to fire her. O'Dell granted the permission and Murphy was summarily fired on December 8, 1995, for insubordination.

On March 20, 1997, Murphy filed a pro se complaint against UC in the district court below. She retained representation and filed an amended complaint on October 9, 1997, adding Hopkins and O'Dell as defendants.

Murphy filed a four count complaint. Principally, she claimed discrimination and improper retaliation under Title VII. *42 U.S.C. § 2000e, et seq.* On May 12, 1999, a magistrate judge issued a report and recommendation granting UC's motion for summary judgment and dismissing Murphy's sex-based discrimination claims, but preserving her retaliation claim against all defendants. On July 23, 1999, the district court accepted the recommendation and issued an order incorporating the magistrate judge's report.

The retaliation claims were heard by a jury. The jury returned its verdict against Murphy on February 18, 2000. On March 6, 2000, Murphy filed a motion for a new trial, claiming [*5] that the jury verdicts were inconsistent and against the weight of the evidence. On March 12, 2001, the district court denied the motion.

Murphy filed a notice of appeal on April 10, 2001. Accordingly, Murphy's case is timely before this Court, pursuant to *Fed. R. App. P. 4(a)(1)(B)*.

## II. Standard of Review

Murphy claims that the district court erred in granting UC summary judgment on her sex-based discrimination claim. [HN1] We review orders for summary judgment de novo. See *Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 910 (6th Cir. 1995)*. Moreover, we weigh all evidence in favor of the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*.

## III. Discrimination Claim

Murphy contends that she was fired solely because she is a woman. In support of her allegation, Murphy presents several instances that she believes demonstrate Hopkins' discriminatory intent. First, Murphy claims Hopkins would make her stand next to him at practice, doing nothing, causing her to feel awkward. Moreover, she cites instances where Hopkins sent her out of practice because she was disturbing [*6] his concentration, embarrassing her in front of the team. She says that Hopkins would walk ahead of her and continually fail to introduce her to other coaches and officials at meets. Moreover, Murphy claims Hopkins would change Murphy's evaluations of swimmers and regrade them based on his own criteria, thereby stripping her of what responsibility she did have. Murphy claims that Hopkins would also direct her not to assist swimmers during workouts because he said it interfered with their preparation, again leaving her to stand idly by with nothing to do. Moreover, Murphy took exception to Hopkins unilaterally changing times of practice without informing her or gaining her consent.

In short, Murphy claims Hopkins did not seek her advice in running the team or give her the level of responsibility that she had anticipated.

Further, Murphy presents what she believes to be verbal evidence of Hopkins' discriminatory tendencies. Murphy alleges that Hopkins called a seminar on affirmative action a "waste of time." She also claims that Hopkins expressed disdain over the fact that he was being forced to hire a woman while good men were left "begging for a job." Lastly, Murphy claims that Hopkins [*7] once told her not to "get fat like the last girl," supposedly referring to the female assistant who preceded Murphy.

To survive summary judgment, Murphy must either show a prima facie case of sex-based discrimination or direct evidence thereof.

### A. Murphy's Prima Facie Claim

[HN2] In order to show a prima facie case, Murphy must show: 1) she is a member of a protected class; 2) there was an adverse employment action; 3) she was qualified for her job; and 4) a similarly-situated male was treated more favorably for the same or similar conduct. *Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992)*; see also *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*; *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1972)*; *Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir.*

2002) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). This fourth factor has also been characterized as whether the plaintiff was replaced by a non-member of her class. *See Mitchell*, 964 F.2d at 583. [*8]

First, Murphy, as a woman, is a member of a protected class. *See, e.g., Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542, 544 (6th Cir. 1999), cert. denied, 529 U.S. 1019, 146 L. Ed. 2d 313, 120 S. Ct. 1421 (2000). Second, Murphy is correct that being fired constitutes an adverse employment action. *Cf. Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996) (stating that an adverse action is one that is "materially adverse," evidenced by a loss in pay or benefits).

Next, Murphy must show that she is qualified for the position. Murphy insists that because she was hired, she is necessarily qualified for her position. Hopkins claims that Murphy is not qualified because she had failed to meet his expectations once her employment commenced, and that if she was treated rudely, it was not because she is a woman, but because of her bad attitude and poor work ethic. He states that Murphy constantly challenged his coaching technique, telling him that she disagreed with his coaching style and that he taught the athletes incorrectly. She once suggested that she wanted to "change" Hopkins. Hopkins asserts that he took exception [*9] to this because Murphy was a subordinate who lacked any degree of collegiate coaching experience.

Hopkins also indicates that Murphy had violated NCAA rules. He asserts, and Murphy conceded, that within two weeks of her hire, she was asked by Hopkins to pick up a recruit from the airport and bring her to campus. On the way, Murphy stopped and purchased a meal for the recruit, in violation of NCAA rules. Hopkins told Murphy to report herself to UC's compliance officer, but otherwise chose not to discipline her.

Hopkins also maintains that Murphy constantly challenged his orders. He asserts that, at one point, he asked Murphy to drive the team home from a road trip in Indiana, because he was going elsewhere to attend a wedding reception. Although she drove the team, she took exception to the request, and demanded that Hopkins give her prior notice of such requests in the future. Both parties agree that there was a confrontation and Hopkins told Murphy that if she was "too stupid" to find her way home, he would have somebody else drive the team in the future. Moreover, Hopkins claims Murphy told him that she would refuse to perform any tasks she deemed to be "unreasonable." This included [*10] routine maintenance of team equipment, such as sanding a weight rack. Hopkins claims that such routine maintenance was expected of the assistant.

Murphy further told Hopkins that she did not consider the assistant coach position to be a full-time, twenty-four hour per day job. Accordingly, she made a blanket refusal to make herself available, citing lack of adequate compensation and interference with collateral employment. Hopkins indicates that he considers the assistant position to be a twenty-four hour per day job and insists that he made that clear to Murphy during the interview process, and made her agreement to that a prerequisite to employment. He further contends that he told Murphy that, due to the hours required by the assistant position, she was not permitted to engage in collateral employment without consent.

Lastly, Hopkins asserts that Murphy failed to show signs that she was improving and learning on the job. He points to an instance when, several months into her employment, Murphy informed Hopkins that she had never learned how to operate the swimmers' timing system. Altogether, Hopkins claims that he fired Murphy because she was not qualified for the job in that [*11] she continually failed to meet the standards to which he holds his assistant.

The district court found that Murphy failed to establish that she was qualified for her position because she continually failed to meet Hopkins's expectations. Murphy argues that the standard used by the district court was "absolutely incorrect," claiming that, under a discrimination analysis, the criteria used by an employer to judge his subordinates must be objective, and not merely subjective. For this proposition, Murphy cites *McCrory v. Kraft Food Ingredients*, 1996 U.S. App. LEXIS 26305, No. 94-6505, 1996 WL 571146, at *4 (6th Cir. Oct. 3, 1996) (stating that "qualified in this case means objectively qualified, such as proper training, credentials, etc.").

To begin, [HN3] the test in this Circuit for whether an employee was qualified for her position is whether she met the employer's *legitimate* expectations. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (stating that in order to show qualification, an employee must show that he was "performing his job at a level which met his employer's legitimate expectations" at the time of his dismissal) (citations omitted); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548-49 (6th Cir. 1991) [*12] (referring only to employer's expectations). *McCrory* is distinguishable on its facts. There, an elderly chemist was fired. The employer claimed McCrory was terminated because he had not met legitimate expectations. We found that McCrory had established he was "qualified" for purposes of making out a prima facie case of age discrimination

because, in addition to presenting evidence that he had received the requisite training as a chemist, McCrory presented evidence of favorable reviews, awards, and commendations from his employer. Therefore, it was obvious that McCrory had met his employer's expectations, and we found that the employer's stated reasons that McCrory's performance was substandard was little more than a pretext for his dismissal.

Like McCrory, Murphy may have met her employer's initial qualifications at hiring. However, unlike McCrory, Murphy has provided no evidence, nor does she even contend, that Hopkins was ever happy with her performance once she commenced employment. Murphy would have us hold that once a woman is objectively qualified through proper training, licensure, or output requirements, she can never be found unqualified, regardless of her actual performance. [*13] Since Murphy does not dispute Hopkins' basic assertions that she refused to do what was asked of her, we find that Murphy has not provided sufficient evidence to show that she was qualified for the position and she has failed to overcome UC's summary judgment motion.

Even if we had found that Murphy was qualified for the position, she has not demonstrated that she was treated worse than a similarly-situated male. Murphy claims that Charlie Casuto, the UC diving coach, is a similarly-situated male, because each was an assistant coach under Hopkins. However, this factor cannot be examined in a vacuum. " [HN4] Similarly-situated," as a term of art, means similarly situated in all relevant aspects. *See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).* In comparing herself to Casuto, Murphy is comparing herself to a man who was in his twenty-second year at UC, had earned eight various coach of the year awards, had coached nineteen all-americans, and one olympian. Furthermore, Casuto did all the recruiting for the diving team, independent of the swimmers. Hopkins neither set Casuto's hours nor directed his style. Moreover, Murphy has not presented evidence [*14] to suggest that Casuto ever challenged Hopkins' authority or his coaching techniques, or violated NCAA rules.

However, even if Casuto and Murphy do not share the same responsibilities and the same title, Murphy seeks to compare herself with Casuto because her position is unique. [HN5] Courts have held that a woman who holds a unique position may stretch the bounds of the "similarly-situated male" rules to compare herself with men with different job characteristics. *Cf. Johnson v. Zema Sys. Corp., 170 F.3d 734, 743 (7th Cir. 1999)* (allowing comparison to males with different job titles because there was otherwise no relevant difference in status). However, Murphy's reliance on *Johnson* is misplaced. *Johnson* proposes that a woman with a unique position can only compare herself to a man in a different position if she is similarly-situated to that man in all other respects. Murphy's lack of experience prevents her from comparing herself to Casuto.

As stated above, the fourth factor has also been characterized as whether the plaintiff was replaced by a non-member of the protected class. *See Mitchell, 964 F.2d at 583; McCrory, 1996 U.S. App. LEXIS 26305, 1996 WL 571146* [*15] at *4. We find this reframing necessary in situations like this where the plaintiff has no similarly-situated male counterpart. Otherwise, a woman's legitimate claim of sex-based discrimination could be defeated simply because she has no male to whom she can compare herself. However, at least as far as the record before us, *all* of Hopkins's assistants, including his current one, have been women. Accordingly, Murphy has failed to show a prima facie case of sex-based discrimination.

### B. Murphy's Direct Claim

Nonetheless, Murphy is correct that her discrimination claim can still stand if she can otherwise show *direct* evidence of discrimination. *See Terbovitz v. Fiscal Court of Adair County, 825 F.2d 111, 113 (6th Cir. 1987).* [HN6] Direct evidence in a sex-based discrimination context usually comes in the form of an unequivocal assertion that a woman was fired because of her gender. *See Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998)* (giving as example of direct evidence an employer telling a handicapped person, "I fired you because you are disabled."); *Terbovitz, 825 F.2d at 113* (indicating that plaintiff was denied [*16] employment and told that employer would not hire a woman). Moreover, the alleged discriminatory statement must bear some kind of connection to the adverse employment action. *See, e.g., Cesaro v. Lakeville Cmty. Sch. Dist., 953 F.2d 252, 254 (6th Cir. 1992)* (requiring that an employer's discriminatory comments be related to the ultimate adverse action).

Murphy claims several statements made by Hopkins constitute direct evidence that she was fired because she is a woman. First, Hopkins called an affirmative action meeting a "waste of time." However, this statement does not relate to the adverse employment action of firing Murphy. If anything, we find that this statement cuts against Murphy's claim because it shows a proclivity to judge each applicant on her merits, and not to provide a preference to, nor discriminate against, *anyone* in hiring.

Next, Murphy claims that Hopkins told Murphy "not to get fat like the last girl." Granted, we find this statement objectively rude and insensitive, but we find it offensive mainly to obese people, in general, and the former assistant in particular. This statement does not necessarily evidence a bias against women. And the

[*17] singular use of the term "girl" does not constitute action sufficient to meet the standard for persistent or sever harassment. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 754, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

Lastly, Murphy presents Hopkins's statement that he hired Murphy because she was a woman while "good men were left begging for the job." This statement, if made, was made in connection with Murphy's hiring, not her firing. Accordingly, this statement fails as direct evidence of discriminatory intent in Murphy's dismissal under the proximity rule set forth in *Cesaro*.

In sum, we believe, even viewing the evidence in the light most favorable to Murphy, she has not shown direct or prima facie evidence of discrimination based on sex, but simply a personality conflict with Hopkins, which is not actionable. Accordingly, we affirm the summary judgment order below.

**IV. Retaliation Claim**

Murphy seeks a new trial [*18] because she believes the jury verdict on the issue of retaliation was against the manifest weight of the evidence. The district court denied the motion. [HN7] We review denials of motions for a new trial under an abuse of discretion standard. *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 675 (6th Cir. 2000).

Question # 1 submitted to the jury was "Did plaintiff Robin Murphy prove by a preponderance of the legal evidence that she opposed an employment practice which she in good faith believed to be unlawful discrimination?" The jury returned an answer of "no." Murphy now claims this answer is against the weight of the evidence. Murphy alleges that information contained in the trial record proves that the answer to this question must be "yes" because she had shown that she complained to the ombuds office, and that she cited sex-based discrimination in her complaints. However, Question # 1 specifically asked about the subjective factor of "good faith." Based on the evidence in the record, and as explained above, there is no evidence that indicates the existence of sex-based discrimination. Accordingly, it is not unreasonable that a jury might have found Murphy's allegations [*19] to be fabricated and not in good faith. Therefore, the district court did not abuse its discretion in finding that the jury did not return an answer against the manifest weight of the evidence.

Similarly, Question # 2 asked the jury, "Did plaintiff Robin Murphy prove by a preponderance of the legal evidence that the decision makers knew plaintiff had opposed an employment practice which she in good faith believed to be unlawful discrimination?" Again, this question contains the subjective factor of "good faith," and the answer returned was "no." Moreover, Hopkins expressly questioned Murphy's motivations in the letter he wrote to O'Dell requesting permission to terminate Murphy. In the letter, he stated that "[Robin] introduced irrelevant issues (sexual discrimination has absolutely nothing to do with this situation)," thereby indicating he did not acknowledge that her complaint was made in good faith. Accordingly, we find it not against the manifest weight of the evidence that the jury answered "no" to Question # 2.

Moreover, Murphy argues that a new trial is warranted because the jury answers to Questions # # 3-5 are inconsistent and show a degree of juror confusion. [HN8] We have [*20] held that juror answers should be held irreconcilable only where there exists absolutely no way that they can be read together. *See, e.g., Waggoner v. Mosti*, 792 F.2d 595, 597 (6th Cir. 1986) (indicating that answers should be reconciled if at all possible). Here, the jury answered "no" to Question # 3, "Did plaintiff Robin Murphy prove by a preponderance of the legal evidence that plaintiff's opposition to an employment practice which she in good faith believed to be unlawful discrimination was a motivating factor in the decision of defendant to terminate her employment?" The jury answered "no" to Question # 4, "Did plaintiff Robin Murphy prove by a preponderance of the legal evidence that the reason given by defendant University of Cincinnati for her termination is a lie and a pretext for unlawful retaliation?" And lastly, the jury answered "no" to Question # 5, "Did defendant University of Cincinnati prove by a preponderance of the legal evidence that it would have terminated plaintiff's employment for legitimate nondiscriminatory reasons even if plaintiff had not opposed an employment practice which she in good faith believed to be unlawful discrimination?" Murphy [*21] contends that negative answers to Questions # 3 and # 5 are inconsistent because if Murphy had not proved that her opposition to UC's practices was a reason for her firing, then UC must have proved that it had fired Murphy for nondiscriminatory reasons. Murphy's claim is without merit because Question # 5 shifts the burden of proof to UC. So, even if Murphy did not prove her case under Question # 3, it does not necessarily follow that UC proved its reasons under Question # 5. It is well within the range of possibility that neither side proved anything. Accordingly, there exist situations in which the answers are not inconsistent. *Cf. Chesapeake & Ohio Ry. Co. v. Barnaby*, 414 F.2d 309, 310 (6th Cir. 1969) (indicating that searching for inconsistencies runs afoul of the *Seventh Amendment*). Therefore, the jury responses do not reflect inconsistent answers or a lack of understanding by the jury that would warrant a new trial.

Murphy also claims inconsistency in Questions # # 6-8. In Question # 6, the jury concluded that Murphy was not entitled to back pay. In Question # 7, it concluded that UC proved that Murphy did not exercise diligence in mitigating her damages. Finally, [*22] in Question # 8, the jury concluded that Murphy's damages should be reduced by $ 18,500. These answers are not inconsistent if examined from the point of view that Murphy did not prove her case. If the jury found that Murphy did not properly mitigate, it is proper for it to determine the amount that Murphy could reasonably have been expected to mitigate in Question # 8. The jury concluded that she was expected to mitigate $ 18,500 (presumably through subsequent employment) and therefore her award should be granted only if the amount of damages exceeds that amount. Via Question # 6, damages were not awarded, rendering Question # 8 moot. But mootness in light of the negative answer to Question # 6 does not equate to inconsistency with that question.

Lastly, Murphy claims that the jury showed confusion warranting a new trial when it asked the district court for clarification of the standard of proof. At most, we find that a request for clarification evidences initial confusion which had presumably been remedied. Since the jurors did not elicit further clarification, we can only infer that the standard was understood and properly invoked. We find no evidence to suggest otherwise. Accordingly, [*23] we hold that there is no abuse of discretion, and Murphy's motion for a new trial was properly denied.

### IV. Conclusion

For all the foregoing reasons, we **AFFIRM** the decision of the district court granting summary judgment to UC on the sex-based discrimination issue, and the jury verdict finding for UC on the retaliation issue.

CONCURBY: BOGGS

CONCUR:

**BOGGS, Circuit Judge, concurring.** I concur in Judge Suhrheinrich's opinion, but I write separately to emphasize that even if Murphy could be deemed "qualified" for the position at the time of her firing (based on her original qualification and her possession of satisfactory objective qualifications), the district court would nevertheless have been correct in granting summary judgment to the University on her claim of gender discrimination.

Proceeding under the familiar burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, discussed at length in this opinion, Murphy must demonstrate under the fourth step that she was either replaced by a person outside her protected group, or was treated less favorably than a similarly situated male. *Johnson v. University of Cincinnati, 215 F.3d 561, 572-73*. [*24] Murphy was replaced by another female. And, as Judge Suhrheinrich ably demonstrates, at pp.8-9, she could not, to any reasonable juror, be considered similarly situated to the long-serving and nationally recognized diving coach.

DISSENTBY: CLAY

DISSENT:

**CLAY, Circuit Judge, dissenting.** With respect to the majority's analysis of Murphy's *prima facie* claim of gender discrimination, I respectfully dissent. Pursuant to the Supreme Court's opinions in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1972)* and *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*, a plaintiff can establish a *prima facie* case of discrimination by establishing that (1) she belonged to a protected class; (2) she received a discharge or suffered an adverse employment action; (3) she possessed the qualifications necessary for the position; and (4) a similarly-situated unprotected employee received better treatment. *Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885-87 (6th Cir. 1996); Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992)*. [*25] The majority properly concludes that Murphy, as a woman, is a member of a protected class, *see Dobbs-Weinstein v. Vanderbilt University, 185 F.3d 542, 544 (6th Cir. 1999)*, and that her firing was an adverse employment action, *see Kocsis, 97 F.3d at 885-86*. Since Murphy raised a genuine issue of material fact as to her qualifications and the relative treatment of a similarly-situated male, summary judgment was inappropriate.

### I.

An employee has the qualifications necessary for her position if she can perform (or performed) her job at a level that met the employer's legitimate expectations. *McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990)*. The majority proceeds to recite six different reasons why Murphy failed to meet Defendants' legitimate expectations: she (1) violated NCAA rules; (2) challenged Hopkins' coaching technique; (3) challenged Hopkins' orders; (4) refused to perform those duties Hopkins gave her; (5) refused to make herself available as Hopkins required; and (6) failed to demonstrate improvement to Hopkins. Other than the NCAA violation, each alleged example of professional

inadequacy depends on [*26] Hopkins' subjective evaluation.

Consider the NCAA violation first. Two weeks after she began working at the University. Murphy picked up a recruit from the airport and bought her a meal *en route* to campus. This violated NCAA regulations, although neither Hopkins nor the University chose to discipline Murphy for this apparently minor infraction. More important, Defendants have never contended that their decision to fire Murphy had anything to do with the NCAA issue. The "evaluation document" that the University provided Murphy gave reasons for her firing, but did not mention the NCAA violation. *(Id.)* The University justified its decision by describing Murphy's performance as "inadequate" based on her alleged refusal to perform assigned duties and disrespect for Hopkins' authority. (J.A. at 486.)

University officials, of course, got that idea from Hopkins, which raises the fundamental question of whether Hopkins' litany of grievances can provide a basis for summary judgment. The strength of the majority's conclusion depends on the strength of their ability to justify their decision to credit Hopkins' claims.

The majority implies that an employer can easily respond to a Title [*27] VII plaintiff's allegations by claiming her job performance was unsatisfactory according to the employer's subjective criteria. Yet as we noted in an unpublished opinion, if courts applied an analysis based exclusively upon an employer's subjective evaluation, "most plaintiffs in discrimination cases will be barred from pursuing their claims before ever getting to the employer's conduct." *McCrory v. Kraft Food Ingredients, 1996 U.S. App. LEXIS 26305, No. 94-6505, 1996 WL 571146,* at *14 (6th Cir. Oct. 3, 1996).

The majority's effort to distinguish *McCrory* misses the crux of Murphy's position. They correctly explain that the plaintiff in *McCrory* "presented evidence of favorable reviews, awards, and commendations from his employer." McCrory could do this because he had worked at defendant Kraft Foods for thirty-two years. *McCrory, 1996 U.S. App. LEXIS 26305, 1996 WL 571146* at *2. Under *McCrory*, courts should skeptically view a series of negative subjective evaluations that immediately precede a firing but follow many positive subjective evaluations. Unlike Murphy, however, the plaintiff in *McCrory* had the opportunity to develop years worth of positive subjective reviews.

McCrory's greatest [*28] relevance to the instant case is in reminding the Court to view subjective evaluations with healthy skepticism. *See 1996 U.S. App. LEXIS 26305, [WL]* at *4; *see also McCullough v. Real Foods, Inc., 140 F.3d 1123, 1128 (8th Cir. 1998)* ("Subjective criteria ... are particularly easy for an employer to invent in an effort to sabotage a plaintiff's claim and mask discrimination.") (quoting *Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir. 1997)).* The majority's analysis dodges the key question, which is how Title VII law will handle situations in which the alleged discrimination occurred so early in the plaintiff's employment that she never had the opportunity to accumulate favorable evaluations. n1

---

n1 The majority also entirely fails to explain why Hopkins' opinions as to Murphy's subjective inadequacy implicate the *prima facie* analysis at all. The *prima facie* case is the first stage of the *McDonnell Douglas-Burdine* framework. *Kocsis, 97 F.3d at 885-87; Toledo Hosp., 964 F.2d at 582-83.* In the second step, after a plaintiff establishes a *prima facie* case, the burden of production (though not the burden of persuasion) shifts and the defendant must offer legitimate reasons for its decision. In the third stage, the plaintiff has an opportunity to show that the employer's proferred reasons are a pretext for discrimination. "'Subjective' qualifications should be considered in the second and third stages of the *McDonnell Douglas/Burdine* analysis." *Fowle v. C & C Cola, 868 F.2d 59, 64 (3d Cir. 1989). See also Thomas v. Denny's Inc., 111 F.3d 1506, 1510 (10th Cir. 1997); Beinkowski v. American Airlines, Inc., 851 F.2d 1503, 1506 (5th Cir. 1988); Jayasinghe v. Bethlehem Steel Corp., 760 F.2d 132, 135 (7th Cir.1985); Grano v. Dep't of Dev. of Columbus, 699 F.2d 836, 837 (6th Cir. 1983)* (considering subjective evaluations at the second and third stage of the *McDonnell* process). It makes sense to evaluate subjective qualification assessments at the pretext stage because "subjective decision making provides an opportunity for unlawful discrimination." *Burrus v. United Tel. Co., 683 F.2d 339, 342 (10th Cir. 1982).*

---

[*29]

The majority's opinion gives employers *carte blanche* to discriminate against an employee as long as they downgrade her through subjective evaluations and fire her quickly. Even though an employer in such a situation has an obvious incentive to lie, the employee has no hope for redress as long as the person responsible for making the subjective evaluations is the same person who is discriminating. The majority claims that to decide otherwise would require "us [to] hold that once a woman is objectively qualified through proper training, licensure, or output requirements, she never be found unqualified, regardless of her actual performance." This

is a ridiculous caricature of Murphy's position. It works by assuming the truth of the majority's conclusion--that no genuine issue of material fact exists as to whether Murphy performed adequately. I merely suggest that Murphy should have the chance to prove she performed adequately when the only evidence otherwise is Hopkins' own assertions. Numerous decisions have warned against blindly accepting subjective evaluations. *See, e.g. McCullough*, 140 F.3d at 1128 (8th Cir. 1998); *Denny's*, 111 F.3d at 1510; [*30] *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("Subjective evaluations 'are more susceptible of abuse and more likely to mask pretext.'") (quoting *Fowle v. C & C Cola*, 868 F.2d 59, 64-65 (3d Cir.1989)); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (5th Cir.1985) ("Subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal."); *Grano v. Dep't of Dev. of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983) (per curiam) (collecting cases).

The only other basis that the majority offers for its decision to reject Murphy's position and accept Hopkins' story is that, the majority claims, "Murphy does not dispute Hopkins' basic assertions that she refused to do what was asked of her." In her deposition, Murphy expressly testified that "I did everything that was asked of me." (J.A. at 436.)

When considering the majority's decision to accept Hopkins' account, it is also worthwhile to remember that--although no one corroborates Hopkins' reports that Murphy was an awful employee--two witnesses other than Murphy [*31] testified that Hopkins made disparaging comments about female workers. Murphy claims Hopkins said he was "upset" he had to hire her. (J.A. at 302.) According to Murphy, Hopkins told her "many qualified men ... were begging for this job but he was forced to hire a woman because of affirmative action." (*Id.*) Ann Bournett Kreiger, the woman who had previously held Murphy's job, also testified that Hopkins discussed with her how he had no choice but to hire a woman. n2 (J.A. at 378.) Chris Murphy, Plaintiff's husband, knew Hopkins from the local swim club. According to Chris Murphy, Hopkins said "women were unfit because of their gender and physiology to serve effectively in the military." (J.A. at 61.) Plaintiff's husband also reported that Hopkins made similar remarks about members of minority groups. (*Id.*) In fact, as Chris Murphy explained in his affidavit, Hopkins asked for his permission to hire his wife. (*Id.*) The majority's recitation of the facts fails to include any of this important testimony.

 n2 Krieger resigned after experiencing problems at work similar to those Murphy described.

[*32]

It is extraordinarily hard to accept that no genuine issue of material fact exists as to whether Murphy failed to meet Hopkins' *legitimate* expectations. To find for Murphy on this issue, a jury would merely have to decide to disbelieve Hopkins. When this Court engages in *de novo* review of summary judgment, we must remember to weigh all evidence in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). By choosing to adopt Defendants' entirely uncorroborated claims, the majority ignores the Supreme Court's instructions on the proper appellate review of summary judgment.

II.

The other disputed component of the *McDonnell Douglas-Burdine* test is whether a similarly-situated male employee received better treatment. *See Kocsis*, 97 F.3d at 885-87; *Toledo Hosp.*, 964 F.2d at 582-83. The majority claims that Murphy failed to demonstrate "that she was treated worse than a similarly-situated male."

They err by interpreting the "similarly situated" requirement so strictly as to prevent individuals with unique jobs from ever establishing [*33] a *prima facie* case. n3 This Court has already rejected an attempt to require the "comparable" employee be identical to the plaintiff. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). We reasoned that requiring a plaintiff to find someone identical would prevent plaintiffs in unique positions from ever establishing *prima facie* cases without direct evidence. *Id.*

 n3 Judge Boggs' concurrence merely reiterates the majority's mistake. As the concurrence would have it, only those lucky few "long-standing and nationally recognized" diving coaches could *ever* state a Title VII claim. Contrary to that fallacious conclusion, Congress never awarded uniquely qualified individuals a license to discriminate.

Murphy held a position at least somewhat comparable to that of the only other assistant swim coach, Charles Casuto, who coached the diving team. There are several [*34] important points of similarity. First, both Murphy and Casuto held the position of

"assistant swim coach." (J.A. at 460.) The majority's suggestion otherwise is incorrect, at least insofar as the respective positions are currently named. Second, Hopkins was responsible for supervising both Casuto and Murphy, and both Casuto and Murphy reported directly to Hopkins. Third, both Murphy and Casuto were covered by the identical job description that the Ombuds Office developed following Murphy's complaint. Prior to the development of the common written description, both Murphy and Casuto had very similar duties: both were responsible for coaching, transporting athletes to competitions, recruiting, evaluating athletes' performance, and completing practice logs.

Any reasonable observer would have to concede that Casuto had dramatically more experience than Murphy. Casuto had also accumulated various impressive accolades. It is possible, and perhaps even reasonable, that Hopkins treated Casuto better because of his substantial experience, not his gender. Nevertheless, Murphy established more than a "mere allegation" that Casuto's job has enough in common with hers to provide the jury with [*35] a meaningful basis for comparison. See *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Failing to interpret the *prima facie* requirement in such a manner as to render Casuto adequate for Murphy's purposes creates a situation in which Hopkins--and anyone with a like role in another workplace--will have free reign to discriminate. The Supreme Court cautioned that the four-pronged *McDonnell Douglas* formula "was not intended to be an inflexible rule." *Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978)*. If the facts of a particular case make an inflexible application of the four-part test difficult, a plaintiff may establish a *prima facie* case by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under [Title VII]." *Id. at 576* (quotation omitted). The majority chooses to apply precisely the sort of rigidity *Furnco* rejects.

As it now stands, this decision will make it easer for employers to avoid [*36] federal antidiscrimination law entirely in circumstances when (1) the employee's position is unique; (2) the discrimination and firing occurred before the employee had the opportunity to secure legitimate positive evaluations; and--most important--(3) when the employee's lone evaluator is himself the discriminator. The majority thus attempts to weaken Title VII jurisprudence.

### III.

I also respectfully dissent from the portion of Part IIIB of the majority opinion which claims Hopkins' statement that affirmative action meetings are a "waste of time" is evidence *against Murphy*. The majority found that "this statement cuts against Murphy's claim because it shows a proclivity to judge each applicant on her merits, and not to provide a preference to, nor discriminate against, *anyone* in hiring." (emphasis in original.) The majority's statement implies that someone opposed to affirmative action necessarily treats her employees in a truly color-blind and gender-neutral way. I have no doubt that members of the Klan and the American Nazi Party all think affirmative action is a "waste of time," but that belief would not reflect "a proclivity to judge each applicant on her merits. [*37] "

I do not mean to suggest that people opposed to affirmative action are likely to discriminate--to draw that conclusion would be just as unfair as what the majority has done. Many people who oppose affirmative action still abide by the law and treats everyone fairly. Nevertheless, it defies logic to conclude that opposition to affirmative action *necessarily* indicates a preference for nondiscrimination.

For the aforementioned reasons, I respectfully dissent.