UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **ROBERT RIVET** | : | **Case No. 1:02cv164** |
| | : | |
| Plaintiff | : | Judge Watson |
| | : | |
| vs. | : | |
| | : | **PLAINTIFF'S TRIAL BRIEF,** |
| **FORD MOTOR COMPANY** | : | **PROPOSED FINDINGS OF FACT** |
| | : | **AND CONCLUSIONS OF LAW,** |
| Defendant | : | **AND WITNESS LIST** |

## I.  INTRODUCTION

This case arises under Section 510 of the Employee Retirement Security Act of 1974 (ERISA), 29 U.S.C. §1140.  Plaintiff Bob Rivet had a successful 25-year career with Ford.  In April of 2001, he received his first less than satisfactory appraisal. Two months later, he was recommended for termination. Plaintiff was fired without just cause and in retaliation for his refusal to accept a voluntary separation package.

## II. FACTS

The facts that will be established at trial are as follows:

### A. Background

Plaintiff was hired by Ford on October 16, 1975. He worked in various Customer Service management roles over the next several years.

As of 1992, Plaintiff was working in Ford's Dealer Computer Services Division (DCS). On March 1, 1992 Ford sold DCS to Universal Computer Systems (UCS). Plaintiff was told that he

1

could either he take a job with UCS or be terminated by Ford. He chose a position with UCS. Plaintiff always wanted to return to Ford and made continuous attempts to do so while at UCS. In November of 1993, Plaintiff was terminated by UCS for failing to make his sales goal.

In late 1993, Plaintiff returned to Ford in the Customer Service Division. He was credited for his prior service. Upon his return, Plaintiff was assigned to the position of Customer Service Manager. The Regional Operations Manager was Walt McCrae. .

Plaintiff's supervisors rated Plaintiff "Excellent" or "Excellent Plus" on each annual appraisal between 1994 and 1998. In early 1997, Plaintiff was rated "Excellent Plus" by George Rivoli. In January of 1998, Plaintiff received an "Excellent" rating from Keith Ertel.

### B.    Plaintiff Turns Down A Voluntary Termination Package

In late 1998, Al Walls replaced McCrae as the Regional Operations Manager. Plaintiff had very little contact with Walls.

Shortly after Walls arrived, he met with Plaintiff. Despite the fact that Plaintiff's last appraisal rated him "Excellent" Walls told Plaintiff that Ford no longer wanted him and that he was being offered an "Enhanced Voluntary Resignation from Service" package (VRS). Plaintiff turned down the offer. Leaving Ford would have reduced his anticipated retirement significantly. According to the express terms of the Plan there was to be no retaliation:

> "Your election to accept the 98 VRS offer and separate from Company employment is your voluntary decision. **If you reject the company's offer, your employment will not be affected as a result of that decision.** As always, however, the Company reserves the right to restructure and reorganize jobs."

(emphasis ours). Richard Gross, a top Human Resource official at Ford will also testify that retaliation against employees who decided not to accept a VRS was forbidden. (Gross depo. at 20-21).

2

### C.   Walls Attempts To Downgrade Plaintiff's Excellent Plus Rating

In February of 1999, Plaintiff was given an "Excellent Plus" review for his performance in 1998 from Steve Jefferson. Jefferson was a Dealer Operations Manager and Plaintiff's direct supervisor at the time. Jefferson believed the rating was fully warranted. Jefferson believed Plaintiff had gone above and beyond what was expected and had performed better than Jefferson's other Customer Service Managers.

Despite Jefferson's role as Plaintiff's direct supervisor and Walls' limited contact with Plaintiff, Walls told Jefferson he wanted the rating downgraded to "Excellent." Walls did not ask Jefferson to do the same for any of his other subordinates. (Id. at 26-28). Walls had warned his direct reports like Jefferson that any high ratings had to be fully justified. Jefferson was able to do so. Jefferson felt so strongly that Plaintiff deserved an "Excellent Plus" rating that he offered his resignation if Walls did not accept his recommendation. Walls went along, but told Jefferson to tell Plaintiff that "he should have taken the package."

### D.   Walls Reduces Plaintiff's 2000 Appraisal

Throughout 1999, Plaintiff covered two markets and reported to both Steve Jefferson and Jorge Castillego. Jefferson and Castillego discussed Plaintiff's rating for 1999 and agreed it should be "Excellent Plus." Jefferson, who was off work due to a back injury, was under the impression that the EP rating had been submitted. However, he later learned that Walls stepped in and reduced Plaintiff's rating to "Excellent."

3

### E.    Plaintiff Is Transferred To A New Position

In early 2000, Plaintiff was laterally transferred to an inside position as Office Operations Specialist at Mason. Plaintiff was never given a written job description. Joe Bingaman assumed Plaintiff's customer service job. Plaintiff then reported directly to Lori Etchill.

On September 5, 2000, Plaintiff received an "Excellent" mid-year appraisal from Ms. Etchill. On December 1, 2000, Etchill gave Plaintiff another review prior to her transfer to Detroit. She rated him "Satisfactory Plus."

After Etchill left, Jorge Castillego replaced her and became Plaintiff's supervisor. On January 31, 2001, Castillego and Walls met with Plaintiff to deliver his performance appraisal for the year 2000. Despite the fact that Etchill had rated Plaintiff "Excellent" and "Satisfactory Plus" in her two reviews of Plaintiff during 2000, and despite the fact that Castillego had supervised Plaintiff in the Office Operations Specialist job for only the month of December in 2000, Castillego gave Plaintiff a "Satisfactory" rating and told him that it was in his interest to look for another job.

What followed was predictable. Consistent with Ford's stated desire to remove Plaintiff, on April 10, 2001, Plaintiff was reviewed again and received a "Satisfactory Minus" rating. On June 25, 2001, Plaintiff was rated "Unsatisfactory" rating and Castillego made a recommendation for termination. Notably, the recommendation for Plaintiff's termination included a reference to the fact that he had been offered and turned down a voluntary package in 1998. . Walls also mentioned this fact in a conversation with Ms. aus dem Bruch at about the time Plaintiff's termination was being discussed.

The recommendation for termination was reviewed by Ford human resource and labor relations officials in Dearborn, including Dick Gross, who served as Ford's Personnel Relations Manager. Although Mr. Gross approved the decision to fire Plaintiff, he admits he never spoke

4

with Plaintiff to hear his side of the story. Mr. Gross will acknowledge that he cannot recall ever speaking to Plaintiff or anyone else about the situation, and that he would not know Plaintiff if he saw him.

On or about July 25, 2001, Plaintiff was notified of his termination. He was 49 years-old at the time. There was no discussion about any option to return to the field or to use Plaintiff's demonstrated talents in some other capacity at Ford.

### III. ARGUMENT

#### A. DEFENDANT VIOLATED 29 U.S.C. § 1140 BY TERMINATING PLAINTIFF

The sole claim before the Court is whether Defendant violated the anti-retaliation provision of ERISA when it fired Plaintiff. ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. Plaintiff's claim is that Ford discriminated against Plaintiff in violation of 29 U.S.C. § 1140 for exercising his rights under the VSR program to refuse the voluntary separation package he was offered in late 1998.

##### 1. There Is A *Prima Facie* Case

To state a *prima facie* case, an employee must show that there was: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Plaintiff does not have to show that Ford's sole purpose in discharging him was to interfere with his rights under the plan. Instead, he can prevail by

5

showing either that it was "a motivating factor" in the decision or that the proferred reason for his firing is unworthy of credence. <u>Shahid v. Ford Motor Co.</u>, 76 F.3d 1404, 1411-1413 (6th Cir. 1996); <u>Smith v. Ameritech</u>, 129 F.3d 857, 865 (6th Cir. 1997). Plaintiff can satisfy each of these requirements.

There is no dispute that Plaintiff was discharged and that an adverse action was therefore taken against him. There is also no dispute that Plaintiff had the right to refuse to accept the VRS package that was offered to him and that he chose to reject it.

In addition, despite the Plan's express language and testimony of Mr. Gross that retaliation was prohibited, there is evidence that Al Walls resented the fact that Plaintiff refused the voluntary separation package and retaliated against him as a result. When Walls wanted Steve Jefferson to downgrade Plaintiff's "Excellent Plus" appraisal in February of 1999, he told Jefferson to tell Plaintiff he "should have taken the package." According to Jefferson, Walls reduced what Jefferson believed was to be another "Excellent Plus" rating for Plaintiff in 2000 to an "Excellent." When the recommendation for Plaintiff's termination was discussed and submitted to the home office in 2001, the fact that Plaintiff had refused a voluntary package in 1998 was again mentioned by Walls. Plaintiff's refusal to accept the VRS package continued to surface. Yet, according to Richard Gross, who ultimately approved the termination, this was an "irrelevant" fact that should not have been mentioned.

Given Walls' comment to Jefferson about Plaintiff's refusal to leave Ford voluntarily, and the repeated mention of that fact in discussions surrounding Plaintiff's termination, it is reasonable to infer that Plaintiff's decision to reject the separation package was a motivating factor in Ford's decision.

6

### 2. Ford's Stated Reason for Dismissal is Pretextual

Ford will maintain at trial that Plaintiff was terminated for poor performance. Under Reeves, v. Sanderson Plumbing, Inc., 530 U.S. 133 (2000), pretext is established by showing that the stated reason for the employer's decision is "false." An employer's articulated reason for termination is false or pretextual when it: (1) has no basis in fact; (2) was insufficient to motivate the decision; or, (3) did not motivate the decision. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). A prima facie case plus a showing that Defendant's articulated reason is false is sufficient for Plaintiff to prevail. St. Mary's Honor Center v. Hicks, 509 US 502, 509-510 (1993); See also Kline v. TVA, 128 F.3d 337, 347 (6th Cir. 1997). The fact-finder's disbelief of the employer's stated reasons, together with the *prima facie* case, may suffice to show intentional discrimination. Schwartz v. Gregori, 45 F.3d 1017, 1021 (6th Cir. 1995).

The issue in this case is whether Plaintiff's alleged performance problems were sufficient to motivate his termination. As outlined above, Ford's concerns were exaggerated. All of the criticism directed at Plaintiff was designed to carry out the goal of terminating him once a perfunctory coaching and counseling process occurred.

In Wells v. New Cherokee Corp., 58 F.3d 233 (6th Cir. 1995), the court reviewed a similar situation and affirmed a jury's verdict where the plaintiff had been transferred to a new and more difficult position 18 months prior to her termination for poor performance. Id. at 235-36. There is no dispute that despite after over 25 years of good performance, and despite language on Ford's appraisals reflecting Ford's willingness to transfer an underperforming employee to a more suitable or lesser position, no one at Ford made any attempt to move Plaintiff to a different position that was more in line with his demonstrated skills.

In addition, much of the criticism directed at Plaintiff was based on subjective rather than objective factors. When objective measures were used, Plaintiff did well. The Sixth Circuit has cautioned that subjective decision-making, while not <u>per se</u> discriminatory, provides a ready vehicle for discrimination. See <u>Rowe v. Cleveland Pneumatic Co.</u>, 690 F.2d 88, 93 (6th Cir. 1982). See also <u>Grano v. Dept. of Development of City of Columbus</u>, 637 F.2d 1073 (6th Cir. 1983); and <u>Farber v. Massilon Board of Education</u>, 917 F.2d 1391 (6th Cir. 1990).

Finally, Defendant's explanation of its conduct is simply unreasonable. In <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit accepted the notion that in reviewing the issue of pretext, a jury can consider the unreasonableness of the employer's stated reasons for its conduct. The <u>Wexler</u> decision summarized Sixth Circuit authority showing that evidence the employer's business explanation is lacking in merit and unreasonable can prove pretext:

> "This court has held that <u>the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.</u>
>
> . . .
>
> "Several of our sister circuits have similarly concluded that <u>the reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation</u>. (emphasis added).
>
> . . .
>
> "*Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (<u>"Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness."</u>); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext . . . .")."

(emphasis added). 317 F.3d at 577 (6th Cir. 2003).

8

It is unreasonable to conclude that a long-term employee who received "Excellent Plus" ratings could suddenly become a terrible and unsatisfactory performer. It is unreasonable to believe that between January 30, 2001 and June 25, 2001 Plaintiff would have changed all of his work-habits, developed poor communication skills, and demonstrated all of the other alleged negative traits that Steve Jefferson never saw. Jefferson was not the only DOM who gave Plaintiff high marks. Plaintiff also received an "Excellent Plus" appraisal from George Rivoli in 1997. The Court could also question why Castillego and Walls told Plaintiff to find another job in January of 2001 if it was not their goal to fire him.

As argued above, Ford's articulated reason for Plaintiff's termination is a pretext. Terminating a 25-year veteran shortly after his first and contrived unsatisfactory appraisal raises questions about the true motive for the decision at issue.

### B.   PLAINTIFF IS ENTITLED TO FULL RELIEF

The purpose of anti-discrimination laws is to make the victim whole. <u>Suggs v. ServiceMaster</u>, 72 F.3d 1228, 1223 (6th Cir. 1996). Plaintiff seeks reinstatement in this case. ERISA entitles a plaintiff to equitable relief. The Sixth Circuit has held that reinstatement is the presumptively favored equitable remedy. <u>Gutzweiler v. Fenick</u>, 860 F.2d 1317, 1333 (6th Cir. 1988); <u>Henry v. Lenox Industries</u>, 768 F.2d 746, 752-53 (6th Cir. 1985). In addition to reinstatement, Plaintiff should be compensated for his lost income.

An award of backpay should completely redress the economic injury the plaintiff has suffered. It should include salary Plaintiff would have received, as well as fringe benefits. <u>Gutzwiller v. Fenik</u>, 860 F.2d 1317, 1333 (6th Cir. 1988).

### 1. Plaintiff has made reasonable attempts to mitigate his damages

There is no dispute that a plaintiff has a duty to mitigate damages. The burden is on Defendant to prove that Plaintiff has failed to do so. Rasimas v. Michigan Dept. for Mental Health, 714 F.2d 614, 624 (6th Cir. 1983). The mitigation requirement contains the general element of reasonableness. "An employee is not required to go to heroic lengths to mitigate his damages, but only to take reasonable steps to do so." Ford v. Nicks, 866 F.2d 865, 873 (6th Cir. 1989), citing Rasimas, at 624.

Plaintiff is required only to accept a job substantially equivalent job. Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982). To be "substantially equivalent" the new position must afford the claimant "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. Shore v. Federal Express Corp., 42 F.3d 373, 378 (6th Cir. 1994). Plaintiff is not required to be successful in mitigation. Rasimas at 695. He is only required to make reasonable efforts. Plaintiff has done so. He will produce hundreds of pages of job search records.

### 2. Substantial front pay is appropriate

Compensation for back pay and benefits falls far short of the goal of making Plaintiff whole. See Albermarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975) and Suggs v. ServiceMaster, 72 F.3d 1228, 1233 (6th Cir. 1996). If reinstatement is not available, front pay is appropriate.

Front pay is to "aid in ending illegal discrimination and rectifying the harm it causes." Shore v. Federal Express Corp., 777 F.2d 1155, 1159 (6th Cir. 1985), aff'd 875 F.2d 867 (6th Cir. 1989). Front pay is also designed to place the plaintiff in a position comparable to that which she would have occupied had no unlawful discrimination occurred. Spears v. Bd. of Educ., 843 F.2d 882, 886 (6th Cir. 1988); Suggs, supra at 1234.

Front pay is also appropriate in breach of contract cases. In Worrell v. Multipress Inc., 45 Ohio St.3d 241 (1989), the Court looked to federal law and set forth the following the factors to be considered in determining front pay: (1) The age of the employee and his or her reasonable prospects of obtaining comparable employment elsewhere; (2) Salary and other tangible benefits, such as bonus and vacation pay; (3) Expenses associated with finding new employment; and (4) The replacement value of fringe benefits, such as an automobile and insurance for a reasonable time until new employment is obtained. Id. at 247. (footnotes omitted). If these factors are considered, front pay awards are routinely upheld on appeal. See Suggs, 72 F.3d at 1235 (citations omitted) ("This Court affirms awards of front pay where they are warranted and where the finder of fact has considered the factors necessary to set the amount of the award."); See also Fite, 861 F.2d at 893; Schwartz v. Gregori, 45 F.3d 1017, 1023 (6th Cir. 1995); and Wells, 58 F.3d at 238-39.

In calculating front pay, courts "will assume, absent evidence to the contrary, that the illegally discharged employee would have continued working for the employer until he or she reached normal retirement age." Gibson v. Mohawk Rubber Co., 695 F.2d 1093, 1100-01 n. 8 (8th Cir. 1982). See also Blum v. Witco Chemical Corp., 829 F.2d 367, 374 (3rd Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement."). In Shore v. Federal Express Corp., 42 F.2d 373, 379 (6th Cir. 1994) the court upheld a front pay award that extended from the date of judgment to normal retirement age even though plaintiff had gotten another job. Id. at 376. The court cited with approval the district court's holding that plaintiff would never be able to get a job comparable to the one from which she was illegally discharged based on her experience and formal education. Id. Therefore, the district court held the discriminatory effects of the wrongful termination would last until plaintiff retired. Id.

In <u>Diggs v. Pepsi Cola Metro. Bottling Co.</u>, the Sixth Circuit upheld a front pay award of 26.5 years. 861 F.2d 914, 922-24 (6th Cir. 1988). In the <u>Jackson v. City of Cookeville</u>, 31 F.3d 1354, 1358-61 (6th Cir. 1994) the court upheld an 11-year front pay jury verdict in an ADEA case because the jury was properly instructed on the <u>Shore</u> factors. The front pay in <u>Jackson</u> was measured from the date of trial to the plaintiff's expected retirement age.

Plaintiff should be reinstated. If he is not, he should receive substantial front pay and benefits.

### III. PROPOSED FINDINGS OF FACT

1. Plaintiff was hired by Ford on October 16, 1975.

2. Plaintiff served in various Customer Service management roles over the next several years.

3. As of 1992, Plaintiff was working in Ford's Dealer Computer Services Division (DCS).

4. On March 1, 1992 Ford sold DCS to Universal Computer Systems (UCS). Plaintiff was told that he could either he take a job with UCS or be terminated by Ford. He chose a position with UCS.).

5. Plaintiff always wanted to return to Ford and made continuous attempts to do so while at UCS.

6. In November of 1993, Plaintiff was terminated by UCS for failing to make his sales goal.

7. In late 1993, Plaintiff returned to Ford in the Customer Service Division. . He was credited for his prior service. Upon his return, Plaintiff was assigned to the position of Customer Service Manager. The Regional Operations Manager was Walt McCrae.

8. In early 1997, Plaintiff was rated "Excellent Plus" by George Rivoli.

9. In January of 1998, Plaintiff received an "Excellent" rating from Keith Ertel.

10. In late 1998, Al Walls replaced McCrae as the Regional Operations Manager. Plaintiff had very little contact with Walls.

11. Shortly after Walls arrived, he met with Plaintiff. Despite the fact that Plaintiff's last appraisal rated him "Excellent" Walls told Plaintiff that Ford no longer wanted him and that he was being offered an "Enhanced Voluntary Resignation from Service" package (VRS).

12. Plaintiff turned down the offer. Leaving Ford would have reduced his anticipated retirement significantly. According to the express terms of the Plan there was to be no retaliation:

13. In February of 1999, Plaintiff was given an "Excellent Plus" review from Steve Jefferson, a Dealer Operations Manager and Plaintiff's direct supervisor at the time. Jefferson believed the rating was fully warranted. Jefferson believed Plaintiff had gone above and beyond what was expected and had performed better than Jefferson's other Customer Service Managers.

14. Despite Jefferson's role as Plaintiff's direct supervisor and Walls' limited contact with Plaintiff, Walls told Jefferson he wanted the rating downgraded to "Excellent."

15. Jefferson felt so strongly that Plaintiff deserved an "Excellent Plus" rating that he offered his resignation if Walls did not accept his recommendation. Walls went along, but told Jefferson to tell Plaintiff that "he should have taken the package."

16. Throughout 1999, Plaintiff covered two markets and reported to both Steve Jefferson and Jorge Castillego. Jefferson and Castillego discussed Plaintiff's rating for 1999 and

agreed it should be "Excellent Plus." Jefferson, who was off work due to a back injury, was under the impression that the EP rating had been submitted. However, he later learned that Walls stepped in and reduced Plaintiff's rating to "Excellent."

17. In early 2000, Plaintiff was laterally transferred to an inside position as Office Operations Specialist at Mason. He then reported to Lori Etchill. Plaintiff was never given a written job description..

18. On September 5, 2000, Etchill rated Plaintiff received an "Excellent" during his mid-year appraisal.

19. On December 1, 2000, Etchill gave Plaintiff another review prior to her transfer to Detroit. She rated him "Satisfactory Plus."

20. After Etchill left, Jorge Castillego replaced her and became Plaintiff's supervisor.

21. On January 31, 2001, Castillego and Walls met with Plaintiff to deliver his performance appraisal for the year 2000. Despite the fact that Etchill had rated Plaintiff "Excellent" and "Satisfactory Plus" in her two reviews of Plaintiff during 2000, and despite the fact that Castillego had supervised Plaintiff in the Office Operations Specialist job for only the month of December in 2000, Castillego gave Plaintiff a "Satisfactory" rating and told him that it was in his interest to look for another job.

22. Consistent with Ford's desire to remove Plaintiff, on April 10, 2001, Plaintiff was reviewed again and received a "Satisfactory Minus" rating. On June 25, 2001, Plaintiff was rated "Unsatisfactory" and Castillego made a recommendation for termination. The recommendation for Plaintiff's termination included a reference to the fact that he had been offered and turned down a voluntary package in 1998. Walls also mentioned this fact in a conversation with Ms. aus dem Bruch at about the time Plaintiff's termination was being discussed.

14

23. The recommendation for termination was reviewed by Ford human resource and labor relations officials in Dearborn, including Dick Gross who served as Ford's Personnel Relations Manager.

24. Although Mr. Gross approved the decision to fire Plaintiff, he admits he never spoke with Plaintiff or anyone else about the situation, and that he would not know Plaintiff if he saw him.

25. On or about July 25, 2001, Plaintiff was notified of his termination. There was no discussion about any option to return to the field or to use Plaintiff's demonstrated talents in some other capacity at Ford.

## IV. PROPOSED CONCLUSIONS OF LAW

1. Section 510 of ERISA, 29 U.S.C §1140, prohibits discrimination against any participant in a plan from for exercising a right the employee has under the Plan.

2. To state a *prima facie* case, an employee must show that there was: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Plaintiff does not have to show that Ford's sole purpose in discharging him was to interfere with his rights under the plan. Instead, he can prevail by showing either that it was "a motivating factor" in the decision or that the proferred reason for his firing is unworthy of credence. Shahid v. Ford Motor Co., 76 F.3d 1404, 1411-1413 (6th Cir. 1996); Smith v. Ameritech, 129 F.3d 857, 865 (6th Cir. 1997).

3. Plaintiff exercised his right to refuse to accept Ford's offer of a voluntary separation package in late 1998.

4. Defendant thereafter engaged in a pattern of retaliatory actions for Plaintiff's refusal to accept the VRS, including the following:

15

      (a)      Walls' request of Jefferson in early 1999 to downgrade Plaintiff's rating from "Excellent Plus" to "Excellent";

      (b)      Walls reduction of Plaintiff's rating from Excellent Plus to Excellent in early 2000;

      (c)      Ford's statement that Plaintiff should seek employment outside of Ford in early 2001 despite his "Satisfactory" appraisal;

      (d)      Ford's decision to terminate Plaintiff in June of 2001.

5.      Ford was motivated, at least in part, by Plaintiff's refusal to accept the VRS as evidenced by the following:

      (a)      Wall's comment to Jefferson that Plaintiff "should have taken the package" when he requested a downgrade of Plaintiff's appraisal in early 1999;

      (b)      Defendant's repeated reference to Plaintiff's refusal to take the package when it was considering his termination, despite the fact that, according to Mr. Gross, that it should have been "irrelevant."

      (c)      the failure to consider transferring Plaintiff to a position that was more in line with the skills he demonstrated over his long career with Ford; and

      (d)      the lack of any objective or measurable criteria that would appear to justify the decision to terminate Plaintiff.

**V.**    <u>**WITNESSES**</u>

Plaintiff will call the following witnesses at trial:

<u>Plaintiff</u>:      Will testify regarding his claim and damages.

<u>Steve Jefferson</u>: Will testify regarding his observations of Plaintiff's work and conversations with Al Walls, and as set forth in his deposition.

<u>Richard Gross</u>: Will testify regarding his involvement in the decision to terminate Plaintiff, and as set forth in his deposition.

<u>Ute aus dem Bruch</u>: Will testify regarding her involvement in the decision to terminate Plaintiff, and as set forth in her deposition.

Respectfully submitted,

s/ David Torchia
David Torchia – 0015962
Tobias, Kraus & Torchia
911 Mercantile Library Building
414 Walnut Street
Cincinnati, Ohio 45202
(513) 241-8137
Fax (513) 241-7863
davet@tktlaw.com
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and the court will serve a copy of this document upon Ronald Linville, Esq., Baker & Hostetler, LLP, Capital Square, Suite 2100, 65 East Broad Street, Columbus, Ohio 43215-4260.

s/ David Torchia
David Torchia