UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Robert Rivet, | : |
|     Plaintiff, | : Case No. C-1-02-164 |
| v. | : |
| Ford Motor Company, | : Judge Michael A. Watson |
|     Defendant. | : |

## TRIAL BRIEF OF
## DEFENDANT FORD MOTOR COMPANY

### I.    INTRODUCTION

Plaintiff Robert Rivet ("Plaintiff") was an employee of Defendant Ford Motor Company ("Ford") in the Cincinnati region of Ford's Customer Service Division. Effective August 10, 2001, Plaintiff's employment with Ford terminated as a result of his poor job performance. On March 8, 2002, Plaintiff filed a Complaint against Ford alleging that Ford violated the Age Discrimination in Employment Act ("ADEA"), Ohio Revised Code Sections 4112.02(A), 4112.02(N), and 4112.99, the Public Policy of the State of Ohio, and Section 510 of the Employee Retirement Income Security Act ("ERISA") when it terminated his employment. On June 7, 2002, Ford filed an Answer denying these allegations.

On November 1, 2002, Plaintiff filed a Motion for Leave to Amend the Complaint with Proposed Amended Complaint. On December 3, 2002, the Court granted Plaintiff's Motion to Amend the Complaint. In addition to the claims pled in Plaintiff's Complaint, Plaintiff's First Amended Complaint added a cause of action for breach of an implied employment agreement. On December 18, 2002, Ford filed an Answer to the First Amended Complaint denying these

allegations. On July 20, 2004, Judge Susan J. Dlott granted summary judgment to Ford on all of Plaintiff's claims except for his claim under ERISA.

Plaintiff's ERISA claim is based upon 29 U.S.C. § 1140, which provides that "it shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . ." In this case, Plaintiff alleges that when Ford terminated his employment effective August 10, 2001, Ford "discriminated against Plaintiff in violation of 29 U.S.C. Section 1140 for his refusal to accept a voluntary separation package [1998 Enhanced VRS] offered to employees." (*See* Amended Complaint, ¶ 3). Plaintiff will be able to present no evidence that even remotely suggests that Ford terminated his employment in violation of ERISA. As a result, Ford is entitled to judgment on the ERISA claim brought pursuant to 29 U.S.C. § 1140.

## II.    TRIAL COUNSEL

Trial counsel for Ford in this matter shall be Ronald G. Linville (0025803) and William R. Post (0072655) of Baker & Hostetler LLP, 65 East State Street, Suite 2100, Columbus, Ohio 43215.

## III.    PROPOSED FINDINGS OF FACT

1.    Ford hired Plaintiff on October 16, 1975, in its Pittsburgh, Pennsylvania Parts and Service Division. For approximately the first six months of Plaintiff's employment, Plaintiff worked in the office. Thereafter, Ford made Plaintiff a Parts and Service Zone Manager, and Plaintiff's job duties included calling dealers in his assigned district to counsel them about their parts and service business.

2. In 1984, Plaintiff voluntarily transferred to the Dealer Computer Services Division ("DCS") in Pittsburgh, Pennsylvania. In his DCS position, Plaintiff had responsibility for selling, installing, and servicing Spitfire Automation at Ford dealerships, as well as selling computer hardware and software to Ford dealers to ensure better communications with Ford.

3. In 1988, Plaintiff accepted a voluntary transfer to the DCS in Cincinnati, Ohio, where he performed the same duties he performed in Pittsburgh.

4. In February 1992, Ford sold DCS to Universal Computer Systems ("UCS"). At the time of that sale, Ford advised Plaintiff that his employment at Ford would not continue following the sale. As such, in February 1992, Plaintiff left Ford's employment and began working for UCS.

5. Plaintiff worked at UCS for approximately 21 months – until November 1993. At that time, UCS fired Plaintiff for reasons related to his job performance. Specifically, Plaintiff failed to meet his sales objective.

6. Ford rehired Plaintiff in December 1993 as a Customer Service Manager in Ford's Custom Services Division ("FCSD"). Plaintiff's responsibilities as a Customer Service Manager included counseling approximately twenty (20) dealers located between Columbus, Ohio and Cincinnati, Ohio on their parts and service business (essentially the same job that he had at Ford prior to November 1984). These responsibilities regularly required Plaintiff to personally visit the various dealerships with which Plaintiff worked.

7. Despite Plaintiff's break in service with Ford as a result of his employment with UCS, Ford allowed Plaintiff to return to employment with Ford without any loss of benefits (although he did not accrue benefits during the year and ten months he worked for UCS).

8. From the time Ford rehired Plaintiff until his termination, Plaintiff worked in the Cincinnati region.

9. Plaintiff understood that salary increases at Ford were tied to performance evaluations. After returning to Ford in 1993 and until his discharge in 2001, Plaintiff always received a below average percentage increase in salary.

10. Between the rehiring of Plaintiff in 1993 and the termination of his employment in 2001, Plaintiff received the following overall performance ratings:

| Date Signed | Performance Rating |
| --- | --- |
| 12/07/94 | Excellent |
| 01/09/96 | Excellent |
| 01/31/97 | Excellent Plus |
| 01/22/98 | Excellent |
| 02/05/99 | Excellent Plus |
| 01/14/00 | Excellent |
| 09/05/00 | Excellent |
| 12/01/00 | Satisfactory Plus |
| 01/30/01 | Satisfactory |
| 04/10/01 | Satisfactory Minus |
| 07/26/01 | Unsatisfactory |

11. From 1994 to September 2000, the Cincinnati region had significant "grade inflation" and, during this time period, no employee in the Cincinnati region received below an "Excellent" rating. The Manager of the Cincinnati region for much of this time period was Walt McCrae.

12. In fact, Plaintiff's evaluations during this time period were at the bottom compared to his peers in the Cincinnati region. For example, the evaluation he received on January 9, 1996 gave Plaintiff an overall rating of "Excellent," but had a number of deficiencies noted. Plaintiff's supervisor at the time, Frank Ligon ("Mr. Ligon"), noted that: "Mr. Rivet has experienced some difficulty in obtaining the respect and confidence of his dealers. This is in part due to his inability to successfully prioritize his workload and focus on the issues most impacting

4

customer satisfaction. Mr. Ligon also noted that, with regard to Plaintiff's organizing skills, Plaintiff undertook "minimum planning without considering objectives or priorities." With regard to other areas of job performance, Mr. Ligon went on to state that Plaintiff "does not generate any new ideas; has difficulty accepting new ideas developed by others," and that he does not adequately follow instructions and procedures, does not respond in a timely manner to requests from supervisors on progress of work, and has unacceptable attendance and/or punctuality.

13. In 1997, Plaintiff's evaluation rating of "Excellent" showed Plaintiff to be one of the three lowest rated employees in the Cincinnati region. In fact, 22 of the 24 employees in the Cincinnati region had ratings of "Excellent Plus" or "Outstanding." In contrast, Plaintiff as well as another Ford employee, Joy Williams ("Ms. Williams"), were rated "Excellent." In addition, Michael Gilson ("Mr. Gilson") had transferred into the Cincinnati region in February 1998 and he too had an "Excellent" rating.

14. In 1997, Joe Bingamen ("Mr. Bingamen"), as part of the Ford College Graduate ("FCG") program, was assigned to Plaintiff during his six-month training. During the time that Plaintiff was supposed to be helping Mr. Bingamen learn the intricacies of the job, Plaintiff refused to answer any of Mr. Bingamen's questions, worked only half days, and conducted no real work. In addition, Plaintiff made disparaging remarks about Ford.

15. In 1998, Al Walls ("Mr. Walls") became the Regional Manager of the Cincinnati region. Before transferring to this job, Mr. Walls had little, if any, contact with Plaintiff. Shortly after he became Regional Manager, Mr. Walls reviewed the prior year's evaluations for all of the Ford employees in his region. In contrast to what he had seen in other regions, Mr. Walls

noticed that all employees in the Cincinnati region received ratings of "Outstanding," "Excellent Plus," or "Excellent."

16. In 1998, Ford adopted the 1998 Enhanced Voluntary Resignation from Service Program ("VRS Program"). This program was an effort to reduce the size of its white collar work force by offering lower rated employees incentives to resign. The VRS Program incentives included a severance payment with the amount of the payment based on years of service, the opportunity to purchase a Ford vehicle at a reduced price, specified health care coverage benefits, an allowance of $5,000 for expenses such as retraining or relocation, as well as other outplacement assistance.

17. In the fall of 1998, Ford instructed Mr. Walls to offer the three lowest rated employees in the Cincinnati region the VRS Program package. Consistent with Ford's direction, Mr. Walls offered the VRS Program package to Plaintiff, Ms. Williams and Mr. Gilson.

18. When Mr. Walls offered Ms. Williams, Mr. Gilson and Plaintiff the VRS Program package, he gave them forty-five days to accept or reject the VRS Program package. Ms. Williams and Mr. Gilson elected to accept the package, while Plaintiff decided to reject the offer.

19. In December 1998/January 1999, supervisory employees in the Cincinnati region prepared proposed reviews of employees. Before the review process began, Mr. Walls instructed those with supervisory responsibility in the Cincinnati region that they had been giving out too many "Outstanding," "Excellent Plus," and "Excellent" ratings and that they should not turn in such reviews unless they could substantiate the evaluations. Mr. Walls issued these directions in a general meeting, and they were not directed at any specific employees.

20. Steve Jefferson ("Mr. Jefferson"), who became Plaintiff's supervisor in the fall of 1998, completed Plaintiff's review for his performance in 1998. Mr. Jefferson evaluated

Plaintiff's overall performance as "Excellent Plus." During a telephone conversation prior to the time that Mr. Jefferson presented Plaintiff with his performance evaluation, Mr. Walls reminded Mr. Jefferson of the need to justify an "Excellent Plus" evaluation. Mr. Walls also indicated his belief that, based on his own observations of Plaintiff's work, Plaintiff did not deserve an "Excellent Plus" rating. In a follow-up conversation, Mr. Walls told Mr. Jefferson he did not agree with the "Excellent Plus" evaluation of Plaintiff and asked for his reasons for his appraisal. Mr. Jefferson objected to downgrading the evaluation and offered an explanation for the "Excellent Plus" rating. Therefore, Mr. Walls deferred to Mr. Jefferson's judgment to keep Plaintiff's evaluation at a rating of "Excellent Plus."

21. In 1999, Plaintiff had two supervisors – Mr. Jefferson and Jorge Castillejo ("Mr. Castillejo") – because he was covering two regions. Mr. Castillejo had moved to the Cincinnati region and became the Dealer Operations Manager of this region. Like Plaintiff, Mr. Castillejo earlier in his career had worked for the dealer computer services at Ford until the sale of that division in 1992. Like Plaintiff, Mr. Castillejo then went to work for UCS for a short period of time. Mr. Castillejo then rejoined Ford in 1994. Despite these similarities, Mr. Castillejo did not know Plaintiff prior to 1999. According to Mr. Castillejo, shortly after his arrival, Plaintiff told him "his entire history," including his dissatisfaction of being identified as a poor performer.

22. In late 1999, Mr. Jefferson went on medical leave and remained on medical leave until the summer of 2000 when he returned to work for about seven weeks. After he returned to work, he "started falling down, losing functioning in my legs, and went back on medical leave and was on medical leave from that time until 2002, November, 2002."

23. While he was on medical leave, Mr. Jefferson spoke with Mr. Castillejo about Plaintiff's performance review for the 1999 performance year. Mr. Castillejo wanted to give

Plaintiff at most a "Satisfactory Plus," but Mr. Jefferson objected that such an evaluation was not consistent with the past history of grading in the Cincinnati region, and requested that Plaintiff be given a rating of "Excellent Plus." Mr. Castillejo and Mr. Jefferson compromised by giving Plaintiff an "Excellent" rating.

24. In early 2000, in light of the fact that Jefferson was out on a medical leave, Ford promoted Walter Murphy ("Mr. Murphy"), one of Ford's Office Operations Specialists, into Mr. Jefferson's position, thereby leaving an Office Operations Specialist position unoccupied. As a result, in March 2000, Mr. Castillejo informed Plaintiff that he would be transferred in the Office Operations Specialist position vacated by Mr. Murphy. Plaintiff considered this transfer to be a good opportunity. This transfer did not result in any reduction in Plaintiff's pay or benefits.

25. In this new position, Lori Etchill ("Ms. Etchill," now Lori Dunn) became Plaintiff's supervisor. According to Plaintiff, he got along "great" with Ms. Etchill.

26. As an Office Operations Specialist, Plaintiff was responsible for working with Customer Service Managers, handling customer and legal concerns, and working with outside counsel representing Ford in dealer disputes.

27. Prior to September, 2000, Ms. Etchill expressed frustration to Mr. Walls with Plaintiff's job performance, including the level of supervision that Plaintiff required, incomplete assignments, and timing of completion of projects. In an interim performance review signed by Plaintiff in September 2000, Ms. Etchill gave Plaintiff an overall performance evaluation of "Excellent." The review also includes a list of counseling items she discussed with Plaintiff at that review. Additionally, Ms. Etchill began coaching and counseling Plaintiff following this review to help improve his performance.

28. In approximately November 2000, Ms. Etchill advised Ute aus-dem Bruch ("Ms. aus-dem Bruch"), a Ford Human Resources Planner in Ford Marketing, Sales, and Service, that she had problems with Plaintiff's performance.

29. In December, 2000 Ford transferred Ms. Etchill to its Headquarters in Dearborn, Michigan. At that time, Ms. Etchill still had some frustrations and concerns about Plaintiff's performance. Prior to leaving for her new position, Ms. Etchill evaluated all of her subordinates one final time in December 2000. At that time, Ms. Etchill gave Plaintiff a rating of "Satisfactory Plus," based on a number of performance problems she had observed. Even though Plaintiff was admittedly worried about this rating, he took no steps to have the performance evaluation reviewed by Ms. Etchill's supervisor, and admitted that he did not dispute the areas of improvement Ms. Etchill noted on the evaluation.

30. Ms. Etchill had no knowledge that Plaintiff had been offered or rejected the VRS Program two years earlier in 1998.

31. Mr. Castillejo once again became Plaintiff's supervisor after Ms. Etchill transferred to Michigan, and he attended the meeting where Ms. Etchill gave Plaintiff the December 2000 review of his performance. At that meeting, Ms. Etchill told Plaintiff that his performance was "subpar and that we had a focused approach to improvement." According to Mr. Castillejo, Ms. Etchill told Plaintiff that his performance would again be reviewed in 60 days.

32. Approximately two months later, on January 30, 2001, Plaintiff received his annual review for the 2000 performance year as well as the 60-day planned follow-up. That review, completed by Mr. Castillejo, rated Plaintiff's overall performance as "Satisfactory." According to Mr. Castillejo, he was disappointed in Plaintiff's "unfocused approach, a reactive

approach" as well as with his skill level in terms of technology and noted a number of performance problems. In light of Plaintiff's continuing failure to improve his performance, the January 2001 review states, "[f]ailure to improve within the next 60 days may result in a Satisfactory Minus Rating."

33. Mr. Walls, who was also present during the January 2001 review, asked Plaintiff if there was anything that was affecting his ability to do his job. Plaintiff did not identify any such barrier.

34. At some point following the meeting where Mr. Castillejo gave Plaintiff his performance evaluation, Plaintiff complained about his salary and Mr. Castillejo suggested that he should consider looking outside of Ford.

35. Also during this time, Plaintiff was responsible for helping to coordinate the Firestone Tire Recall. Jim Meadors ("Mr. Meadors"), who was responsible thirty dealerships during this time period, had to rely on information given to him by Plaintiff to implement the recall. According to Mr. Meadors, Plaintiff was completely ineffective in his job, never answered any of Mr. Meadors' questions, was disorganized, and had poor communication skills. As a result, Mr. Meadors gave up trying to get information from Plaintiff and, instead, worked with Plaintiff's supervisor, Mr. Castillejo. Other co-workers in the Cincinnati region had similar observations about Plaintiff's job performance.

36. On April 10, 2001, Plaintiff received a "Satisfactory Minus" review. Plaintiff received this rating because he failed to improve in the areas listed on his previous performance evaluation, and because Plaintiff was not viewed as a credible resource for complex issues, was inconsistent in his responsiveness to field requests, and was unable to master the required software tools necessary to perform his job. Ford gave Plaintiff another sixty days to improve

his performance, and informed Plaintiff that failure to improve would result in an "Unsatisfactory" rating and could result in the termination of Plaintiff's employment. Once again, during this sixty day period, Plaintiff received coaching, counseling and training.

37. Plaintiff did not improve after the April 10, 2001 review. As a result, Mr. Castillejo prepared a "draft copy" of Plaintiff's "final performance review" that is dated June 25, 2001. That review rates Plaintiff's overall performance as "Unsatisfactory."

38. Ms. aus-dem Bruch prepared a "Proposal for Release – Unsatisfactory Performance" that also is dated June 25, 2001. Prior to preparing this document, Ms. aus-dem Bruch received verification that Plaintiff had received substantial coaching and counseling but had failed to respond. The proposed document contains the following statement: "In the fall of 1998 Mr. Rivet was identified as one of the three lowest rated employees in the Region. As a result, he was offered a separation package, which he turned down." These notes follow a detailed delineation of Plaintiff's failure to respond to coaching, counseling and written reviews and his steadily declining performance. Ms. aus-dem Bruch included this information to provide a historical account of Plaintiff's performance history and make it clear that in 1998 Plaintiff had been one of the three lowest performers in the region.

39. In July 2001, Ford advised Plaintiff that his employment at Ford would be terminated. Ford terminated Plaintiff's employment effective August 10, 2001. Plaintiff's termination by Ford had absolutely no connection to his refusal to accept the VRS Program almost 3 years earlier.

40. In connection with his termination, Plaintiff received from Ford a severance package that includes an amount equal to a year's salary, without the request of a release.

41.  Since the termination of his employment with Ford in 2001, Plaintiff has received many job offers that he has not accepted. Plaintiff testified that he has been offered "many" positions but these were for jobs that "are just not what I'm looking for." Additionally, Plaintiff was employed by "HR Profile" from April 1, 2004 to April 6, 2004 when he was terminated.

### IV.  PROPOSED CONCLUSIONS OF LAW

1.  ERISA Section 510 has two primary components: (1) the discrimination component, which states that a person cannot discharge, fine, suspend, expel, discipline or otherwise discriminate against a participant for exercising any right to which he is entitled under a plan or under ERISA; and (2) the interference with benefits component, which states that a person cannot discharge, fine, suspend, expel, discipline or otherwise discriminate against a participant for purposes of interfering with the attainment of any right to which such participant is, or may become, entitled to under a plan or under ERISA. The instant case falls under the discrimination component.

2.  In order to state a claim under ERISA Section 510, Plaintiff must produce direct evidence that the employer had the "specific intent" to violate ERISA Section 510. *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir. 1996). If Plaintiff cannot show direct evidence that the employer had the specific intent to violate ERISA Section 510, the Court should apply a version of the burden-shifting analysis as set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether Plaintiff has stated a claim under ERISA Section 510. Under the burden-shifting analysis, Plaintiff must first establish a *prima facie* case by showing: (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled. *Humphreys v. Bellaire Corp.*, 966 F.2d 1037 (6th Cir. 1992). If Plaintiff can establish a *prima facie* case, the burden of production shifts to the employer to establish evidence of a

legitimate, nondiscriminatory reason for its challenged action. *Id.* If an employer can establish a legitimate, nondiscriminatory reason, the "presumption of wrongful action drops from the case, and the plaintiff must either prove that the interference with pension benefits was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." *Id.*

       3.     Plaintiff cannot establish a *prima facie* case of discrimination in violation of Section 510 because he simply cannot show that Ford retaliated against him for his refusal to accept the Enhanced Voluntary Resignation from Service Program with the specific intent to violate ERISA. While most courts do not appear to distinguish between the discrimination and interference types of ERISA Section 510 claims in applying the burden-shifting test set forth above, the Seventh Circuit has provided some clarification on the issue. In *Larimer v. International Business Machines Corp.*, 370 F.3d 698 (7th Cir. 2004), the plaintiff claimed that the defendant fired him (i.e., retaliated against him) for heavily exercising his rights under the defendant's welfare benefit plan after the birth of twins at only 29 weeks of gestation. The Seventh Circuit noted that in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002), it authorized the following adaptation of *McDonnell Douglas* to the retaliation context:

> "the plaintiff [must] show that after filing the charge [in the present case, after applying for atypically large benefits] only he, and not any similarly situated employee who did not file a charge [in this case, did not apply for atypically large benefits], was subjected to an adverse employment action even though he was performing his job in a satisfactory manner."

*Larimer*, 370 F.3d at 702.

In adapting this standard to the ERISA Section 510 claim presented in *Larimer*, the Seventh Circuit applied the standard as follows:

> Had [the plaintiff] identified a similarly situated employee of [the defendant] who had not applied for substantial welfare benefits yet had been treated better than he, he would have made out a prima facie case of retaliation under *Stone*--provided, as in any *McDonnell Douglas* case, that he also showed that he was performing his job in a manner that satisfied his employer's legitimate expectations. *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178-79 (7th Cir. 1997). He strikes out on both counts. Declining ostrich-like to mention, let alone try to distinguish, *Stone*, even though his opponent relies heavily on it, he makes no effort to identify a comparable employee of [the defendant] who did not apply for atypically large welfare benefits and was treated better than [the plaintiff] was, though it would be easy to find such an individual if one existed. Nor does he show that he was performing up to his employer's expectations--in fact he was fired because he did *not* perform up to those expectations. . . . His discharge had nothing to do with the expense incurred by [the defendant] with respect to his daughters.

*Id.* at 703.

Furthermore, the Seventh Circuit noted that:

> It is true that one finds courts saying that the plaintiff in an ERISA retaliation case must show that the defendant had a "specific intent" to punish him for asserting rights under the plan. But all that this means is that since the forbidden retaliation is retaliation for claiming ERISA benefits, the plaintiff cannot prevail unless he shows that there was an ERISA plan and presents evidence from which the trier of fact can infer that the defendant's motivation in taking the adverse action of which the plaintiff is complaining was indeed to thwart his right to benefits. That is the ultimate question and is separate from what must be shown to establish merely the prima facie case.

*Id.* at 702 (internal citations omitted).

Applying the analysis in *Larimer* to the instant case, Plaintiff would need to demonstrate that, after rejecting the VRS Program, only he, and not any other employee who rejected the VRS Program, was fired even though he was performing his job in a satisfactory manner. Since Plaintiff cannot make this showing, he cannot establish a *prima facie* case for retaliation in violation of ERISA Section 510.

    4.    Even if Plaintiff could establish a *prima face* case for retaliation in violation of ERISA – which he clearly cannot – as discussed fully above, Ford has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment; namely, that his performance

continued to decline until he was no longer performing his job in accordance with Ford's legitimate expectations.

5. Plaintiff cannot establish that Ford's legitimate, nondiscriminatory reason for the termination of his employment is a pretext for discrimination. Plaintiff's decision not to take the offered VRS Program occurred a full three years prior to the termination of his employment. This three-year lapse of time unequivocally shows that there is simply no causal connection between Plaintiff's decision to turn down the VRS Program and the termination of his employment. *See, e.g., Almond v. ABB Industrial Systems, Inc.*, No. C2-95-707, 2001 U.S. Dist. LEXIS 6507, at **48-49 (S.D. Ohio March 6, 2001) (attached as Exhibit 1) (granting summary judgment to employer on plaintiff's ERISA claim because the fact that plaintiff's preserved early retirement benefits "would have vested in another one and one-half years is insufficient to raise an inference that [employer's] decision to terminate [plaintiff] was motivated, at least in part, by its desire to interfere with that particular benefit."). Because Plaintiff cannot show that Ford's legitimate, nondiscriminatory reason for terminating Plaintiff's employment is a mere pretext for discrimination in violation of Section 510, Ford is entitled to judgment on Plaintiff's Section 510 cause of action.

## V. EXHIBIT LIST

Counsel for Plaintiff and counsel for Defendant will meet to eliminate any duplication of exhibits. Consistent with the Court's Order, exhibit books will be delivered on Friday, September 30, 2005.

## VI.     WITNESS LIST

1. Joe Bingamen

2. Jorge Castillejo

3. Keith Ertel

4. Lori Etchill

5. Gregory Ghilardi

6. Richard Gross

7. Jim Meadors

8. Walt McRae

9. Sherrie Mullen

10. Walt Murphy

11. Mary Sissen

12. Ute aus-dem Bruch

13. Al Walls

14. Any witnesses listed on Plaintiff's witness list.

15. Ford reserves the right to call rebuttal witnesses in response to testimony presented by Plaintiff or his witnesses.[1]

---

[1]    Based upon counsel for Ford's telephone conference with Ms. Gass, staff attorney for this Court, remedies have not been discussed in this Trial Brief, as remedies are to be discussed in briefs filed following the trial of this matter.

        Respectfully submitted,

s/Ronald G. Linville
Ronald G. Linville (0025803) Trial Attorney
rlinville@bakerlaw.com
William R. Post (0072655) Of Counsel
wpost@bakerlaw.com
BAKER & HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
(614) 228-1541
(614) 462-2616 (facsimile)

Attorneys for Defendant
Ford Motor Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 28, 2005, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Additionally, the undersigned hereby certifies that a copy of the foregoing was served upon David Torchia, counsel for Plaintiff, 414 Walnut Street, Cincinnati, Ohio 45202, via facsimile, this 28th day of September 2005.

s/Ronald G. Linville
Ronald G. Linville