EXHIBIT

tabbies

LEXSEE 2001 U.S. DIST. LEXIS 6507

**RANDY ALMOND, et al., Plaintiffs, v. ABB INDUSTRIAL SYSTEMS, INC., et al., Defendants.**

**Case No. C2-95-707**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 6507; 25 Employee Benefits Cas. (BNA) 2362*

**March 6, 2001, Decided**
**March 6, 2001, Filed**

**DISPOSITION:** [*1] Defendant ABB Limited's renewed motion to dismiss GRANTED. Defendant's motions for summary judgment on the claims of plaintiffs Michael Richardson, Brewie Gibson, Ira Johnson, Randy Almond, and Karsten Koester GRANTED. Plaintiffs' motion in limine to exclude the trial testimony of Brian Sullivan MOOT.

**LexisNexis(R) Headnotes**

**COUNSEL:** For RANDY ALMOND, KURT KOESTER, MICHAEL RICHARDSON, IRA JOHNSON, BREWIE GIBSON, plaintiffs: Russell Allen Kelm, Law Offices of Russell Kelm, Columbus, OH.

For ABB INDUSTRIAL SYSTEMS INC, ASEA BROWN BOVERI LTD, defendants: James M. L. Ferber, Littler Mendelson PC, Columbus, OH.

For ASEA BROWN BOVERI LTD, defendant: David Anthony Kadela, Daniel W Srsic, Littler Mendelson PC, Columbus, OH.

**JUDGES:** John D. Holschuh, Judge, United States District Court. Magistrate Judge Kemp.

**OPINIONBY:** John D. Holschuh

**OPINION:**

### MEMORANDUM AND ORDER

Plaintiffs Randy Almond, Karsten Koester, Michael Richardson, Ira Johnson, and Brewie Gibson filed suit against their former employer, ABB Industrial Systems, Inc., and related companies, alleging violations of the Age Discrimination in Employment Act, *29 U.S.C. § 621 et seq.* ("ADEA"), and the Employee Retirement Income Security [*2] Act, *29 U.S.C. § 1001 et seq.* ("ERISA").

This matter is currently before the Court on several motions: (1) Defendant ABB Limited's renewed motion to dismiss (Record at 42); (2) Defendant ABB Industrial Systems, Inc.'s motion for summary judgment on Richardson's ADEA claim (Record at 68); (3) Defendant ABB Industrial Systems, Inc.'s motion for summary judgment on Gibson's ERISA claim (Record at 69); (4) Defendant ABB Industrial Systems, Inc.'s motion for summary judgment on Johnson's ADEA and ERISA claims (Record at 70); (5) Defendant ABB Industrial Systems, Inc.'s motion for summary judgment on Almond's ADEA claim (Record at 71); (6) Defendant ABB Industrial Systems, Inc.'s motion for summary judgment on Koester's ADEA claim (Record at 72); and (7) Plaintiffs' motion *in limine* to preclude trial testimony of expert witness Brian P. Sullivan (Record at 75).

### I. Background

Defendant ABB Industrial Systems, Inc., located in Columbus, Ohio, designs, manufactures, sells, and services process automation and control equipment and quality control systems. n1 It is a wholly-owned subsidiary of ABB, Inc., located in Stamford, Connecticut. n2 In turn, [*3] ABB Inc. is a wholly-owned subsidiary of Defendant ABB Limited, the Swiss parent corporation.

n1 ABB Industrial Systems' predecessor corporations include ABB Process Automation, Combustion Engineering, AccuRay, and Industrial Nucleonics. To avoid confusion, the Court will refer to the corporations collectively as ABB Industrials Systems, Inc.

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

n2 ABB Inc. was also named as a defendant. However, on July 27, 1998, this Court granted ABB, Inc.'s motion for summary judgment, finding that it was not sufficiently interrelated with ABB Industrial Systems, Inc. to warrant imposing liability.

Between 1990 and 1995, in an effort to reduce its operating budget and remain competitive, ABB Industrial Systems, Inc. (hereinafter "ABB") gradually cut its workforce by more than half. (Morris Dep. at 14, 34-35, 88). In January of 1990, ABB had 1,136 employees; by January of 1995, only 539 remained. (Def.'s Mot. Summ. J. on Koester's ADEA Claim at 5). Once upper management determined how many employees in each department needed [*4] to be laid off each year in order to stay within the established budget, individual supervisors were responsible for selecting employees for termination. n3 (Cooper Aff. P 3). There were no uniform standards for determining which employees in each department should be terminated as part of the reduction in force. ABB has no policy which permits an employee who has been laid off to "bump" or displace an employee with a shorter length of service, and has no formal method of recalling employees who have been laid off. (Bradley Aff. P 9).

n3 Although the adverse employment action at issue is called a "layoff," for all practical purposes, plaintiffs were "terminated" because there was little or no chance that they would be called back to work. The Court will use the terms "layoff" and "termination" interchangeably.

Each of the five plaintiffs in this case had been a long-term employee of ABB and its predecessors, but was terminated as part of this large reduction in force. These gentlemen were all qualified for the [*5] positions they held and each had received satisfactory performance evaluations in the past. Each plaintiff was over forty years old at the time of his termination.

**A. Randy Almond**

Plaintiff Randy Almond was born on January 11, 1942. He worked at ABB from July 26, 1967 until he was terminated on November 26, 1993. (Almond Aff. PP 3-5). At 51 years old, he claims to have been the oldest employee in his department at the time of his termination. (Id. P 19). His was the only position in his department eliminated at that time. Almond had been employed as a senior electronics technician in the manufacturing area and had consistently received good performance evaluations. (Id. P 2). As a technician, he had been on stand-by to repair electronic test equipment as needed. He was the only employee in his department assigned to this task. ABB determined that it would be more efficient to have the productions operators that used the equipment be responsible for most repairs; an outside contractor could be called in for more complex problems. ABB therefore eliminated Almond's position, giving him thirty-three weeks' severance pay.

**B. Karsten Koester**

Plaintiff Karsten Koester [*6] was born on July 31, 1938. He began working at ABB on March 17, 1977. (Koester Aff. PP 3-4). He worked in the research and development group as a senior development engineer, helping to develop new products. He was the only employee in his department registered as a professional engineer. (Id. P 8). n4 Throughout his employment at ABB, he never received an unacceptable performance evaluation. (Id. P 2). In the eighteen months before he was laid off, he worked almost exclusively on what was known as the GT caliper project. n5 (Id. P 5). That project was coming to an end about the same time that the research and development group was instructed to make budget cuts. The research and development management team of Dan Landis, Robert Pfeifer, and John Thornton determined which products it could develop with the money available, identified the qualifications required to complete those projects, and matched employees' skills with the requisite qualifications. (Thornton Dep. at 42-46, 60-64).

n4 Koester admitted at his deposition that the type of work that employees in his department were doing did not require a license as a professional engineer. (Koester Dep. at 132).

[*7]

n5 ABB later applied for a patent on this project and Koester signed the patent application.

Dan Landis was Koester's immediate supervisor and was responsible for determining which employees in his department should be terminated as part of the reduction in force. Landis determined that the upcoming projects required the use of CAD-CAM (Computer Aided Design and Computer Aided Manufacturing). Koester was the only engineer in the department who was not proficient at CAD-CAM. (Koester Dep. at 86-87). Koester, also the oldest employee in his department, was terminated on November 26, 1993, and was given twenty-eight weeks' severance pay. (Id. at 43).

**C. Michael Richardson**

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 3 of 22

Page 3

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

Plaintiff Michael Richardson was born on September 14, 1949. He worked in the manufacturing area at ABB from October 16, 1972 until his termination on November 26, 1993. (Richardson Aff. P 2). At the time of his termination, he was 44 years old, and was the second oldest employee in his department. Like Koester, he had received favorable performance evaluations. In the fall of 1992, Richardson was initially scheduled [*8] to be laid off from his position as a master scheduler when ABB decided to reduce the number of master schedulers from five to three. (Richardson Dep. at 208-09). However, instead of laying him off, his supervisor John Marbry moved him to another position as an order entry clerk.

In 1993, Marbry was again directed to reduce his department's budget. He decided to eliminate two positions, including one of the two order entry clerk positions then held by forty-four year old Michael Richardson and thirty-four year old Wayne Somerfeldt. Richardson worked with the purchase order engineers on AccuRay parts, while Somerfeldt worked alone on what were known as MOD products. (Richardson Dep. at 227). Marbry determined that, since Richardson already worked with other purchase order engineers, it was more efficient to allocate Richardson's duties to them. n6 (Marbry Aff. PP 8-9). In addition, although Somerfeldt had less overall seniority than Richardson, he had been employed as an order entry clerk for six to eight years, while Richardson had been in that position for less than one year. Michael Richardson was therefore terminated, receiving thirty weeks' severance pay.

n6 Each of the purchase order engineers who assumed Richardson's duties was over forty years old.

[*9]

**D. Ira Johnson**

Plaintiff Ira Johnson was born on August 25, 1948. He began working at ABB in Rochester, New York on October 1, 1979. He was transferred to Columbus in February of 1991. (Johnson Aff. PP 2-3). He was a test engineer in the manufacturing department. His duties consisted of testing certain computer equipment and training technicians. (Johnson Dep. at 43-44). Like the other plaintiffs, he had always received good performance ratings. (Johnson Aff. P 5).

In an effort to cut costs, ABB decided to cease manufacturing this particular computer equipment and purchase it from another manufacturer instead. The result of ABB's decision to outsource this particular task was that the entire department in which Johnson worked was

eliminated. (Morris Dep. at 93-94, 158; Morris Aff. P 8). Johnson was terminated on November 26, 1993; he was 45 years old at the time. Although he continued to work on a temporary basis through Tailored Management, as a liaison between ABB and the new manufacturer, this work ended in the Spring of 1994.

**E. Brewie Gibson**

Plaintiff Brewie Gibson was born on August 18, 1944. He began working at ABB on October 28, 1968. (Gibson Aff. P 2). Most [*10] recently, he worked in the research and development group as a mechanical designer. He spent much of his time on a project known as Project Washington, which was winding down in 1992. Dan Landis was Gibson's immediate supervisor and was responsible for deciding which employees in his department should be terminated as part of the reduction in force in 1992. He matched his employees' skills with the requisite qualifications for the upcoming projects. Landis ranked his employees based on product knowledge, design capability, tool utilization, CAD capability, and overall performance. He then recommended that the four lowest-ranked employees be laid off. (Landis Dep. at 19-22). Gibson was one of those four. He admittedly worked more slowly than other employees and was not as proficient as his co-workers in using the CAD-CAM system. (Gibson Dep. at 169-70, 193-94). Gibson was terminated on December 31, 1992. He was 48 years old at the time.

**F. Procedural History**

After being laid off, each plaintiff filed charges of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and was issued a right-to-sue letter. On July 18, 1995, they filed this suit as a class action, [*11] alleging violations of ERISA and the ADEA. Plaintiffs claim that they were illegally targeted for termination based upon their age and years of service. They alleged that ABB sought to retain younger employees, and to prohibit employees from further vesting in ABB's pension and other benefit plans. After this Court denied the motion for class certification, Plaintiffs continued the litigation of their individual claims.

On June 1, 1998, the Court granted Defendants' motion for summary judgment as to the ERISA claims of Almond, Koester, and Richardson, and as to Gibson's ADEA claim. Therefore, the claims that remain pending are as follows: (1) ADEA claims of Plaintiffs Almond, Koester, and Richardson; (2) ADEA and ERISA claims of Plaintiff Johnson; and (3) ERISA claim of Plaintiff Gibson. Defendants have now moved for summary judgment on these remaining claims.

**II. Asea Brown Boveri Limited's Motion to Dismiss**

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 4 of 22

Page 4

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

As noted earlier, ABB Industrial Systems, Inc. is a wholly-owned subsidiary of ABB Inc. which, in turn, is a wholly-owned subsidiary of ABB Limited. ABB Limited is a Swiss corporation whose headquarters and principal place of business is in Zurich, Switzerland. In [*12] May of 1996, ABB Inc. filed a motion for summary judgment, which the Court later granted. At the same time, ABB Limited filed a motion to dismiss, claiming that it had never been properly served, that the Court lacked subject matter jurisdiction and personal jurisdiction, and that Plaintiffs had failed to state a claim upon which relief could be granted.

On March 31, 1998, the Court denied ABB Limited's motion to dismiss. It found that it did have subject matter jurisdiction over Plaintiffs' claims. It also found that personal jurisdiction might exist, provided that Plaintiffs could show that ABB Limited had control over, and directed the activities of, ABB Industrial Systems, Inc. The Court therefore determined that, at the initial pleading stage, Plaintiffs' allegations that ABB Limited controlled and directed the activities of ABB Industrial Systems, Inc. were sufficient to give it personal jurisdiction over ABB Limited. However, at that time, the Court agreed that Plaintiffs had failed to effect proper service on ABB Limited as required by *Fed. R. Civ. P. 4(f)*. The Court, therefore, gave Plaintiffs an additional forty-five days to effect proper service on ABB Limited. (See [*13] March 31, 1998 Memorandum and Order at 14-15). Service was finally effected on May 27, 1998. On June 2, 1998, the Court issued an Order stating that if Defendant ABB Limited believed that service had not been properly effected in compliance with the Court's March 31, 1998 Order, it could renew its motion to dismiss within twenty days.

On June 24, 1998, Defendant ABB Limited filed its renewed motion to dismiss, claiming that Plaintiffs had failed to effect service of process within the forty-five days allotted. Defendant also again claimed that the Court lacked personal jurisdiction and that Plaintiffs had failed to state any claims upon which relief could be granted. ABB Limited claims to be a separate and distinct corporate entity from both ABB Industrial Systems, Inc. and from ABB Inc. ABB Limited claims that it did not employ Plaintiffs, and did not play any part in the decision to terminate their employment. ABB Limited therefore claims that, since it did not control and direct the actions of ABB Industrial Systems, Inc., it should not be liable for damages in this case.

In support of its renewed motion, Defendant ABB Limited submitted the affidavit of Timothy Powers, ABB Inc. [*14] 's Senior Vice President and Chief Financial Officer, who states that ABB Limited and ABB Industrial Systems, Inc. operate as separate legal entities, having separate officers, directors, employees, operations,

real estate holdings, personal property, bank accounts, and labor relations policies. (Ex. 1 to Renewed Mot. to Dismiss). Defendant also submitted the affidavit of John Cooper, ABB Industrial Systems' Director of Human Resources, stating that the decision to cut the workforce and to lay off certain employees was made solely by ABB Industrial Systems, Inc. (Ex. 7 to Renewed Mot. to Dismiss). In addition, Defendant submitted portions of the Plaintiffs' depositions in which they admit that they were supervised only by ABB Industrial Systems' personnel. (Exs. 2-6 to Renewed Mot. to Dismiss). Finally, Defendant claims that since Plaintiffs filed EEOC charges only against ABB Industrial Systems, Inc., Plaintiffs are barred from asserting ADEA claims against ABB Limited.

In response to the renewed motion to dismiss, Plaintiffs claimed that since Defendant was now relying on matters outside the pleadings, the renewed motion should be treated as a motion for summary judgment pursuant [*15] to *Fed. R. Civ. P. 12(b)*. Plaintiffs further claimed that in order to establish that ABB Limited was sufficiently interrelated with ABB Industrial Systems, Inc., they needed responses to earlier discovery requests and needed to conduct depositions. Defendant disputed that further discovery was needed. Defendant also pointed out that, to the extent that the motion to dismiss is based on a lack of personal jurisdiction and insufficient service of process, the Court need not convert the motion to a motion for summary judgment, since Rule 12(b) requires a conversion only when defendants have argued that the complaint should be dismissed for failure to state a claim upon which relief can be granted.

On March 31, 1999, the Court issued a Memorandum and Order denying the renewed motion to dismiss without prejudice. The Court found that, although ABB Limited was not served with the summons and complaint until twelve days after the Court-imposed deadline, this was no basis for dismissal since Rule 4 must be liberally construed. As to the matter of personal jurisdiction, the Court granted Plaintiffs thirty days to conduct written discovery on the narrow issue of ABB Limited's purported control [*16] over ABB Industrial Systems, Inc., and to file a memorandum and evidence to support the assertion of personal jurisdiction over ABB Limited. This matter is now fully briefed.

### A. Relevant Law

As the Court noted in its March 31, 1998 Memorandum and Order, the plaintiff bears the burden of establishing that the Court has personal jurisdiction over the defendant. *Welsh v. Gibbs, 631 F.2d 436, 438 (6th Cir. 1980)*, cert. denied, *450 U.S. 981, 67 L. Ed. 2d 816, 101 S. Ct. 1517 (1981)*. In this circuit, personal jurisdiction can be established over a nonresident defendant if: (1)

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 5 of 22

Page 5

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

the defendant has purposefully availed himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action arises from the defendant's activities there; and (3) the acts of the defendant or the consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1299 (6th Cir. 1989),* cert. denied, *494 U.S. 1056, 108 L. Ed. 2d 764, 110 S. Ct. 1525 (1990)* [*17] (citing *Southern Machine Co., Inc. v. Mohasco Indus., 401 F.2d 374, 381 (6th Cir. 1968)).*

The Due Process Clause of the Fifth Amendment dictates that a federal court has personal jurisdiction over a nonresident defendant only if the defendant has "certain minimum contacts" with the chosen forum and maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945).* Foreign parent corporations may become subject to personal jurisdiction because of the local activities of their subsidiaries if the corporate separation is fictitious, if the parent has held the subsidiary out as its agent, or if the parent exercises an undue degree of control over the subsidiary. *Velandra v. Regie Nationale des Usines Renault, 336 F.2d 292, 296 (6th Cir. 1964).*

The federal rules governing service of process must also be considered in determining whether personal jurisdiction exists. *Federal Rule of Civil Procedure 4(k)(1)* grants a court personal jurisdiction over any defendant who can be reached under the forum state's long-arm [*18] statute. n7 Subsection 4(k)(2) also grants a court personal jurisdiction over a defendant for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law, but is without sufficient contacts to satisfy the due process concerns of the long arm statute of any particular state. *World Tanker Carriers Corp. v. Mv Ya Mawlaya, 99 F.3d 717, 720 (5th Cir. 1996).*

n7 In pertinent part, Ohio's long-arm statute grants personal jurisdiction over individuals transacting business in Ohio or contracting to supply goods or services here. *Ohio Revised Code § 2307.382(A)(1)* & (2).

**B. Discussion**

Plaintiffs acknowledge that ABB Limited has no operations or employees in Ohio and is not registered to do business in Ohio. Nevertheless, they claim that ABB Limited "controlled and directed" the actions of ABB Industrial Systems, Inc., thereby engaging in conduct in the United States sufficient to subject ABB Limited to this [*19] Court's personal jurisdiction. Defendant contends that Plaintiffs have no factual basis for this allegation.

Plaintiffs' own deposition testimony shows that ABB Limited had no involvement in the direct supervision of their work, delegating work assignments, training employees, conducting performance evaluations, determining salary increases, or setting other terms and conditions of employment. These managerial tasks were all handled exclusively by ABB Industrial Systems, Inc. personnel. (Almond Dep. at 72-73, 90, 92, 96, 178-79; Koester Dep. at 27-29, 153; Gibson Dep. at 232-33; Johnson Dep. at 114, 123-27; Richardson Dep. at 125, 131, 258-59). ABB Limited has also presented evidence that the decisions to layoff employees and to restructure the organization of ABB Industrial Systems, Inc. were made by the upper level management of ABB Industrial Systems, Inc. (Cooper Aff. P 3, Ex. 7 to Defs.' Renewed Mot. to Dismiss). As noted earlier, ABB Limited has also submitted the affidavit of Timothy Powers, stating that ABB Limited operates as a separate and distinct entity from both ABB Inc. and ABB Industrial Systems, Inc. in every relevant aspect. (Powers Aff. PP 4-7, Ex. 1 to Defs.' Renewed [*20] Mot. to Dismiss). Defendant therefore claims that Plaintiff has failed to show that ABB Limited has sufficient contacts with either Ohio or the United States to subject it to the personal jurisdiction of this Court.

Since Defendant submitted evidence to support its argument that this Court lacks personal jurisdiction over it, Plaintiffs must "by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991)*(citing *Weller v. Cromwell Oil Co., 504 F.2d 927, 930 (6th Cir.1974)).* Despite the Court's Order granting additional time for written discovery concerning the personal jurisdiction issue, Plaintiffs did not submit any written discovery requests to Defendants. Instead they "accumulated various pieces of evidence from independent sources which explain the corporate structure of ABB, Ltd." (Pls.' Mem. in Opp'n to Defs.' Renewed Mot. to Dismiss at 1). Plaintiffs submitted Randy Almond's affidavit, in which he purports to authenticate twelve attached exhibits. ABB Limited claims that seven of the twelve exhibits (A, B, D, E, F, H, and I) are inadmissible hearsay copies [*21] of magazine articles and book excerpts. n8 Plaintiff did not file a motion for leave to file a surreply to address Defendant's objections.

n8 Hearsay is defined as "a statement, other than one made by the declarant while testifying at

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 6 of 22

Page 6

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Fed. R. Ev. 801(c)*. Hearsay is generally inadmissible and cannot be considered in evaluating pending motions. *Fed. R. Ev. 802*.

Exhibits A and B consist of two memos that Almond allegedly received from ABB Industrial Systems' librarian while he was employed at that company. The body of these memos simply indicates that articles concerning Percy Barnevik, the President and CEO of ABB Limited, are attached. The Court finds that these two exhibits are inadmissible hearsay. Plaintiffs seek to offer the articles into evidence to prove the truth of the matter asserted, namely that the corporate structure of these two companies is such that ABB Limited exercised undue control over ABB Industrial Systems, **[*22]** Inc. The articles are clearly hearsay unless they fall under a recognized exception to the rule.

Although Plaintiffs have not asserted any basis for the admission of these two articles, the Court assumes that Plaintiffs seek to enter them into evidence under *Fed. R. Ev. 801(d)(2)(A)* or (B). These rules provide that a statement is not hearsay if it is "offered against a party" and is that party's own statement, or a statement in which that party has manifested an adoption or belief in its truth. However, these exceptions do not apply in this case. The articles attached to the memos are not written by Percy Barnevik; therefore, they cannot be construed as the party's own statements. Furthermore, even if Percy Barnevik were quoted in the articles, his statements would be inadmissible because they contain double hearsay. Rule 806 states that hearsay within hearsay is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. Therefore, even though, standing alone, Barnevik's alleged statements might be admissible as statements of a party, the repetition of those statements in the articles is clearly hearsay which does not fall under any recognized **[*23]** exception to the rule. *Wilson v. Upjohn Corp., 1992 U.S. App. LEXIS 16655, Nos. 91-3670, 91-3682, 1992 WL 158121* at **4 (6th Cir. July 9, 1992). See also *Larez v. City of Los Angeles, 946 F.2d 630, 642 (9th Cir. 1991)*(noting that admissibility of statements quoted in a newspaper article hinge on two statements -- the actual statement and its later repetition by reporters); *Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993)*(same). Furthermore, even if the attached memo could be construed to show that ABB Industrial Systems, Inc. had manifested an adoption or belief in the truth of the articles, this is irrelevant because the articles are being offered against ABB Limited, not against ABB Industrial Systems, Inc. In order to be classified as nonhearsay, the statement

must be offered against the same party that manifested an adoption or belief in its truth.

Finally, the magazine articles do not fall under the "catch-all" exception to the hearsay rule either. *Federal Rule of Evidence 807* states that statements not specifically covered by another exception, but having equivalent circumstantial guarantees of trustworthiness, may be admissible

> if the court determines **[*24]** that: (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence.

The Court does not find that magazine articles have equivalent circumstantial guarantees of trustworthiness. The authors of the articles were not writing under oath and are not subject to cross examination. There is no way to determine whether statements attributed to Percy Barnevik are true, or whether the authors accurately reported their findings. Furthermore, although the Court gave Plaintiffs additional time to conduct written discovery, Plaintiffs made no effort to do so. Since Plaintiffs made absolutely no effort to procure admissible evidence to support their position, the Court finds that the articles do not fall under the residual exception to the hearsay rule. See *Eisenstadt v. Centel Corp., 113 F.3d 738, 743 (7th Cir. 1997)*. In short, the Court finds that Exhibits A & B must be excluded from **[*25]** consideration because they contain hearsay not subject to any exception.

Exhibits D, E, F, H, and I are copies of magazine articles about the various ABB enterprises from ENR, International Management, Industry Week, Forbes ASAP, and Business Week. These must also be excluded from consideration for the same reasons. The articles themselves are clearly inadmissible hearsay. Again, even if Percy Barnevik were quoted in these articles, this would be considered double hearsay because the articles are written by someone else.

Defendant has not challenged the admissibility of the remaining exhibits. Exhibit C is an article entitled "Strategic Direction," authored by ABB Process Automation Inc., ABB Industrial Systems' predecessor corporation. The Court has carefully read this document and can find nothing in it that supports Plaintiffs' position that ABB Limited directed and controlled ABB Indus-

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 7 of 22

Page 7

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

trial Systems, Inc. in any way that would support the exercise of personal jurisdiction in this case.

Exhibit G is a copy of a one and one-half page memo, again from ABB Industrial Systems' librarian reporting highlights from the 1992 financial report for the ABB Group. The report, prepared [*26] in Switzerland, simply states figures for orders, revenues, and earnings for 1991 and 1992 for the "Industry Segment" and lists revenues and the number of employees for those same years for North America. Again, the Court fails to see how this memo supports Plaintiffs' contention that ABB Limited controlled and directed the activities of ABB Industrial Systems, Inc. The mere fact that a parent corporation keeps statistics on its North American subsidiaries is not at all probative of the issue at hand.

Exhibit J consists of a memo from Peadar Lynch of ABB Process Automation, Inc. and an attached newsletter article initiated from the Stamford, Connecticut headquarters of ABB, Inc. explaining the new pay cycle that will take effect in 1994. It does not even mention ABB Limited. The Court finds that this document is also completely irrelevant and does nothing to support Plaintiffs' view.

Exhibit K consists of a letter from Gerhard Schulmeyer, President and CEO of ABB, Inc., to all ABB employees in the United States. It states that ABB U.S. (also known as ABB Inc.) is now responsible for twenty percent of the revenues of ABB Limited. Significantly, although Schulmeyer attributes part [*27] of the success to the restructuring that has taken place, he does not state that the restructuring was done at the direction of ABB Limited. Exhibit L is a copy of an internal newsletter entitled ABB World. It discusses the company's financial results from 1991. It includes regional reports and financial data. It also contains a segment on the North American region, in which Schulmeyer explains that some restructuring and streamlining has taken place, but, again, nowhere does he state that this was done at ABB Limited's request.

In summary, ABB Limited has presented substantial evidence showing that ABB Limited and ABB Industrial Systems, Inc. are two distinct and separate companies. It has also presented evidence that the decisions to restructure ABB Industrial Systems, Inc. and terminate certain employees were made by the upper level management at ABB Industrial Systems, Inc. and not by ABB Limited. Plaintiffs have failed to present any admissible evidence to the contrary. In short, Plaintiffs have not shown that ABB Limited exercised undue control over the activities of ABB Industrial Systems, Inc. Plaintiffs have therefore failed to establish that this Court has personal jurisdiction [*28] over Defendant ABB Limited. Defendant

ABB Limited's renewed motion to dismiss is therefore granted on the basis of lack of personal jurisdiction.

## III. Motions for Summary Judgment

### A. Summary Judgment Standard

*Federal Rule of Civil Procedure 56(c)* provides:

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"This standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (emphasis in original); *Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).*

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could [*29] return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248.* The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978).* Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467, 7 L. Ed. 2d 458, 82 S. Ct. 486 (1962)* (quoting *Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 88 L. Ed. 967, 64 S. Ct. 724 (1944));* accord *County of Oakland v. City of Berkley, 742 F.2d 289, 297 (6th Cir. 1984).*

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); [*30] Anderson, 477 U.S. at 250.*

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 8 of 22

Page 8

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745, n.11, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983).* In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson, 477 U.S. at 251-52.* Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex, 477 U.S. at 327* (quoting *Fed. R. Civ. P. 1*).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the [*31] light most favorable to the opposing party." *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)* (footnote omitted); accord *Adams v. Union Carbide Corp., 737 F.2d 1453, 1455-56 (6th Cir.),* cert. denied, *469 U.S. 1062, 83 L. Ed. 2d 432, 105 S. Ct. 545 (1984).* Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962); Watkins v. Northwestern Ohio Tractor Pullers Ass'n, 630 F.2d 1155, 1158 (6th Cir. 1980).* Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes, 398 U.S. at 157-60.*

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that [*32] party will bear the burden of proof at trial. *Celotex, 477 U.S. at 322.* The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson, 477 U.S. at 252.*

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Fed. R. Civ. P. 56(e).*

## B. ERISA claims

Plaintiffs Ira Johnson and Brewie Gibson claim that ABB selected them for layoff in order to deprive them of benefits under ABB's pension and employee benefit plans, in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"). Section 510 states: "It shall be unlawful for any person to discharge, fine, suspend, expel, [*33] discipline, or discriminate against a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *29 U.S.C. § 1140.* The statute was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980).*

A plaintiff asserting a § 510 claim must show that the employer "had a specific intent to violate ERISA." *Rush v. United Technologies, 930 F.2d 453, 457 (6th Cir. 1991)* (citing *Dister v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988)*). Absent direct evidence of discriminatory intent, a plaintiff may establish a prima facie case by showing that there was "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043 (6th Cir. 1992).* In order to survive a motion for summary judgment, the plaintiff "must come forward with [*34] evidence from which a reasonable jury could find that defendants' desire to avoid pension liability was a determining factor in plaintiff's discharge." *Id. at 1044* (quoting *Nixon v. Celotex Corp., 693 F. Supp. 547, 555 (W. D. Mich. 1988)*). Although the plaintiff needs to show that interference with his entitlement to benefits was a motivating factor in the decision to terminate him, he need not show that it was the sole purpose. *Humphreys, 966 F.2d at 1043.*

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 9 of 22

Page 9

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

If the plaintiff establishes a prima facie case, raising an inference of illegal action, the employer can rebut the inference by articulating a legitimate non-discriminatory reason for the employee's termination. The plaintiff must then show that the proffered reason was mere pretext either by proving "that the interference with pension benefits was a motivating factor in the employer's actions or proving that the employer's proffered reason is unworthy of credence." Id. See also *Smith v. Ameritech, 129 F.3d 857, 865 (6th Cir. 1997)*(setting forth the analytical framework for a § 510 claim). A plaintiff may prove that the employer's proffered reason is unworthy [*35] of credence in one of three ways as set forth by the Sixth Circuit in *Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078 (6th Cir. 1994)*. The plaintiff must "show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Id. at 1084.* See *Pennington v. Western Atlas, Inc., 202 F.3d 902, 909-10 (6th Cir.), reh'g and sugg. for reh'g en banc denied (2000)*(applying Manzer to § 510 claim). In Humphreys, the Sixth Circuit held the if the termination takes place in close proximity to the time the benefits would have vested, this "provides at least some inference of intentional, prohibited activity." *966 F.2d at 1044.*

Defendant ABB Industrial Systems, Inc. offers its employees a variety of benefits. The company has two retirement plans. "PRISM" is a 401(k) plan which is funded by employee contributions. The company will match 50% of the first 6% of those employee contributions. (Bradley Aff. P 2). Employees are always fully vested in their own contributions, [*36] and are 100% vested in the employer matching contributions after only three years of service. The "Cash Balance Pension Plan" is fully funded by ABB. ABB credits its employees' pension accounts with a certain percentage of their pay each month. (Id. P 10). That percentage rises one-half percent for each five-year age bracket. For example, ABB contributes 4% for those employees age 35 to 39, 4 1/2% for those employees age 40-44, 5% for those employees age 45-49 and so on. (Ex. A to Bradley Aff. at 10).

The "Cash Balance Pension Plan" also has a feature known as the "preserved early retirement provision," available to former members of the pension plans for ABB's predecessor corporations, AccuRay and Combustion Engineering. A former member of the Combustion Engineering pension plan qualifies for "preserved early retirement" if he or she was either 55 years old or had a combination of age and years of service equaling 60 as of December 1, 1988. A former member of the AccuRay plan qualifies for this benefit if he or she was either 55 years old or had a combination of age and years of service equaling 60 as of January 1, 1989. In either case,

employees were eligible for the "preserved [*37] early retirement provision" only if they retired at age 55 or older or were permanently laid off after reaching age 50. (Bradley Aff. P 3).

ABB employees who, at the time they retire, are at least 55 years old, have at least 10 years of service, and have age plus years of service totaling at least 70 are also eligible for the "Retiree Medical Benefit Plan," through which eligible employees may purchase company-subsidized health insurance. (Id. P 4). Finally, the company also offered group medical, vision, and hearing benefit plans.

### 1. Ira Johnson

As noted earlier, Plaintiff Ira Johnson was terminated from his position as a test engineer in November of 1993. He was forty-five years old at the time. He had been employed in the manufacturing area, which was under the leadership of Ken Morris. As a test engineer, Johnson was responsible for testing certain computer equipment and training technicians in its use. As part of its restructuring, ABB decided to outsource the manufacturing of this equipment to Cincinnati Millicron. Since ABB was no longer manufacturing the equipment, it no longer needed anyone to test it. The decision to outsource the manufacturing of the equipment [*38] resulted in Johnson's entire department being eliminated. (Morris Dep. at 93-94, 158). Stan Sammet and Dale Hatchel, two other test engineers, were terminated at the same time for the same reason. (Johnson Dep. at 49, 59, 61). After his termination, Johnson was rehired on a temporary basis, through a company called Tailored Management, to act as a liaison between ABB and Cincinnati Millicron during the transition. However, this temporary position ended after only a few months. n9

n9 Johnson is currently working at Hughes International, but earning substantially less money than he had been earning at ABB. (Johnson Dep. at 73-74).

Defendant contends that Johnson cannot establish a prima facie case because he has no evidence that ABB or his supervisor took the status of his benefits into consideration when they decided to outsource the manufacturing of certain equipment, resulting in the elimination of all test engineer positions within the department. According to Defendant, Johnson has absolutely no proof that [*39] an intent to interfere with Johnson's entitlement to, or attainment of, any benefits was a motivating factor in ABB's decision. The Court agrees.

Ira Johnson claims that he was selected for layoff because ABB sought to cut costs by reducing the benefits

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 10 of 22

Page 10

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

to which he was entitled, but does not clearly state with which benefits ABB allegedly sought to interfere. He was not a participant in the company's medical, vision or hearing benefit plans so they cannot form the basis for Johnson's claim. Mr. Johnson was a participant in the PRISM 401(k) plan and the Cash Balance Pension Plan, and his benefits under both of those plans were 100% vested at the time of his termination. (Johnson Dep. at 143; Bradley Aff. P 5). It is true that if Johnson had remained employed at ABB, additional contributions would have been made to each of these funds and he would have received additional interest on those contributions. However, the fact that he could have accrued additional benefits had he not been terminated is not a sufficient basis for a § 510 claim. *Kelly v. Chase Manhattan Bank, 717 F. Supp. 227, 232 (S.D.N.Y. 1989)*(citing *Dister v. Continental Group, Inc., 859 F.2d 1108, 1111* [*40] (2d Cir. 1988, *Corum v. Farm Credit Servs., 628 F. Supp. 707, 718 (D. Minn. 1986),* and *Baker v. Kaiser Aluminum & Chem. Corp., 608 F. Supp. 1315, 1319 (N.D. Cal. 1984)).*

According to the express terms of the Cash Balance Pension Plan, even if Johnson had been retained, he would never have become eligible for the preserved early retirement feature of the Cash Balance Pension Plan because in December of 1988, he was only forty years old and had only nine years of service with ABB. (Bradley Aff. PP 3, 5). Therefore, Johnson cannot logically argue that ABB terminated him because it sought to interfere with the attainment of benefits pursuant to the "preserved early retirement" provision.

It is true that if Johnson had been ten years older when he was terminated, he would have qualified for the Retiree Medical Benefits Plan. However, since his rights in this plan would not have vested for another decade, in the Court's view, this is insufficient to raise an inference that ABB terminated Johnson to prevent him from participating in this particular plan. The termination was simply not in close enough proximity to the anticipated vesting of this particular [*41] benefit. See *Humphreys, 966 F.2d at 1043-44*.

While questions of intent and motivation are generally considered factual issues precluding summary judgment, Johnson must present some evidence from which a reasonable trier of fact could infer that ABB's decision to terminate him was motivated, at least in part, by a specific intent to interfere with the attainment of his employee benefits. He has failed to do so. As one court has noted, "no ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Titsch v. Reliance Group, Inc., 548 F. Supp. 983, 985 (S.D.N.Y. 1982),* aff'd, *742 F.2d 1441 (2d Cir. 1983).*

Plaintiffs claim that cost savings in terms of employee benefits cannot be the prime factor in an employer's decision to terminate certain employees. In support, Plaintiffs first cite the case of *Inter-Modal Rail Employees Association v. Atchison, Topeka and Santa Fe Railway Co., 520 U.S. 510, 117 S. Ct. 1513, 137 L. Ed. 2d 763 (1997).* In Inter-Modal, the Supreme Court simply held that § 510 prohibits not only the interference with vested benefit rights, [*42] but also with non-vested welfare benefit rights. *Id. at 515.* Quite frankly, the Court does not understand how this case supports Plaintiffs' claims.

Plaintiffs also cite the case of *McLendon v. Continental Can Co., 908 F.2d 1171 (3d Cir. 1990),* for the proposition that cost savings should not be the prime catalyst for layoff decisions. In that case, there was undisputed evidence that the employer had intentionally engaged in a nationwide plan to terminate employees before they became eligible for certain benefits. The district court had noted:

> The Court wishes to emphasize, at the outset, that it finds nothing either illegal or improper in a company estimating its potential pension liabilities in the event of a plant shut down. No competent management would consider such action without doing so. However, the issue presented in this matter is whether avoidance of pension liability was the motivating force in the company's decisions or merely a result of the decisions so made. For the reasons hereinafter set forth, the Court finds that avoidance of pension liability was the prime catalyst for such decisions and so pervaded the thinking and goals [*43] of the company that it affected all of the decisions regarding retention or layoff of employees.

*749 F. Supp. 582, 590 (D.N.J. 1989).* The appellate court affirmed the lower court, finding that the employer had violated § 510 of ERISA by implementing a plan to lay off employees before they became eligible for certain benefits, and granted injunctive relief. *908 F.2d at 1183-84.*

The Court finds that McLendon is distinguishable. The plaintiffs in that case had direct evidence that the company had designed and implemented a "liability avoidance program" to prevent employees from becoming eligible for certain benefits. It was undisputed that this program was a motivating factor in the employer's

Case 1:02-cv-00164-MHW     Document 56-2     Filed 09/28/2005     Page 11 of 22

Page 11

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

decision to terminate certain employees. In the case at hand, there is no evidence that ABB implemented any such program or that avoidance of pension liability "so pervaded the thinking and goals of the company" that it affected all of ABB's decisions concerning which employees to terminate. n10

> n10 Plaintiffs also cite Inter-Modal and McLendon in support of Plaintiff Brewie Gibson's ERISA claim. The Court's discussion of these cases here is equally applicable to Mr. Gibson.

[*44]

The Court finds that Ira Johnson has not presented evidence sufficient to raise an inference that ABB's decision to terminate him was based, even in part, on a desire to interfere with his benefit rights. He has therefore failed to establish a prima facie case under § 510 of ERISA. Even if Johnson could establish a prima facie case, Defendant has articulated a legitimate non-discriminatory reason for Johnson's termination. As part of its restructuring, ABB decided to outsource the manufacturing of certain equipment. The result of this decision was that Johnson's department was completely eliminated, and all of its test engineers that worked on that equipment were terminated. Johnson has presented no evidence that this proffered reason was in any way pretextual. The fact that Johnson's entire department was eliminated makes Johnson's claim extremely weak. Based on the evidence presented, no reasonable trier of fact could conclude that ABB's decision to outsource the manufacturing of this equipment, and its subsequent elimination of an entire department, was motivated, even in part, by a desire to interfere with Mr. Johnson's employee benefits. The Court therefore finds that ABB is [*45] entitled to summary judgment on Ira Johnson's ERISA claim.

## 2. Brewie Gibson

Plaintiff Brewie Gibson was terminated from his position as a mechanical designer in the sensors department of the research and development group at ABB in December of 1992. He had recently spent much of his time working on what was known as "Project Washington." As this project wound down, many employees who had worked on it were terminated as part of ABB's reduction in force. (Pfeifer Dep. at 18-19). Gibson's immediate supervisor was Dan Landis. In 1992, Landis was instructed by his supervisor, Robert Pfeifer, to eliminate four positions within his department. (Landis Dep. at 17-19, 22).

In deciding which employees should be terminated, Landis reviewed the upcoming projects and evaluated his employees based on their product knowledge, design capability, tool utilization, CAD capability, and overall performance. (Landis Dep. at 19). Landis prepared a chart which showed each employee's title, tenure with ABB, compensation, and evaluation in each skill area. (Ex. E to Bradley Aff.; Ex. 16 to Def.'s Mot. Summ. J.). He then ranked the employees, matching their skills with the skills needed for the upcoming [*46] projects. He decided to recommend the four lowest-ranked employees for termination. (Landis Dep. at 16-22). Gibson was one of those four. Although Gibson interviewed for another design position at ABB prior to being notified of his termination, he was not offered that job.

Like Ira Johnson, Gibson argues that ABB's decision to terminate him was based, at least in part, on its desire to avoid paying him certain benefits to which he was entitled. Specifically, it appears that Gibson is claiming that ABB's desire to save money by intentionally interfering with his eligibility for the Cash Balance Pension Plan's "preserved early retirement benefits" and with his "retiree medical benefits" was a motivating factor in the decision to terminate him. (Gibson Aff. P 4). n11

> n11 Defendant objects to this portion of Gibson's affidavit, because he stated at his deposition that he had no personal knowledge of the criteria used to select employees for termination. However, the Court will consider his statement for the limited purpose of ascertaining with which specific benefits Gibson claims ABB intended to interfere.

[*47]

But for the fact that Gibson was only forty-eight years old when he was laid off, he would have been eligible for the "preserved early retirement benefits" provision of the Cash Balance Pension Plan because he had the requisite combination of age plus years of service. His entitlement to this benefit would have vested if he had been at least fifty years old when he was permanently laid off. (Bradley Aff. PP 3, 7). This is clearly Gibson's strongest claim because, had he not been terminated, his entitlement to the "preserved early retirement" benefit would have vested in less than two years.

In Humphreys, the plaintiff was terminated only two months before his pension would have vested. 966 F.2d at 1043-44. The Court found that the plaintiff was able to establish a prima facie case because the close proximity between the vesting date and the date of termination was sufficient evidence of an improper motivation. Id. There does not appear to be a "bright line" test for determining

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 12 of 22

Page 12

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

how much time must pass before the two events are no longer considered to be causally connected. In *Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir.1988),* the [*48] Second Circuit concluded that the plaintiff had "made out a prima facie case sufficient to withstand summary judgment" because his discharge four months and seven days before his rights in an ERISA plan were to vest. *Id. at 1115.* However, other courts, have held that if pension rights will not vest for several more months, no inference of improper motivation arises. *Steele v. City of Bluffton, 31 F. Supp. 2d 1084, 1098 n.9 (N.D. Ind. 1998)*(nine months is too far removed from the employment decision to show specific intent); *Hendricks v. Edgewater, 898 F.2d 385, 389 n. 3, (3d Cir.1990)* (eleven month span between termination and vesting date insufficient to maintain prima facie requirements); *Lerner v. General Electric Co., 1995 U.S. Dist. LEXIS 14374, No. 93-5787, 1995 WL 580041 (E.D.Pa.1995)* (a fourteen month period of time did not support an inference that the discharge was motivated by discriminatory intent). In this Court's view, the fact that Gibson's preserved early retirement benefits would have vested in another one and one-half years is insufficient to raise an inference that ABB's decision to terminate Gibson was motivated, at least in [*49] part, by its desire to interfere with that particular benefit. n12 This is particularly true since Gibson has failed to present any other probative evidence to support his claim.

n12 Even if the Court were to find that Gibson's termination was in "close proximity" to the vesting of his benefits, this would not necessarily make summary judgment inappropriate. In Humphreys, the Court noted that, "while we acknowledged . . . that proximity to vesting may provide enough to support the existence of a prima facie case, once the employer has presented a separate, legitimate reason for the discharge, we do not believe that [monetary] savings and proximity will always be enough to entitle plaintiff to a trial on this type of claim." *966 F.2d at 1044.*

Gibson also claims that the decision to terminate him was based, in part, on a desire to interfere with his entitlement to Retiree Medical Benefits. Gibson was ineligible for these medical benefits because he was only forty-eight years old when he was terminated. [*50] To be eligible, he needed to be at least fifty-five years old. (Gibson Aff. at PP 4, 7). In the Court's view, no inference of an intent to violate ERISA arises in this situation. There is no "close proximity" between the date the Retiree Medical Benefits would have vested and the date Gibson was terminated. No reasonable trier of fact could find that ABB selected Gibson for termination based on a

desire to avoid paying Retiree Medical Benefits seven years down the road. n13

n13 To the extent Gibson claims that ABB sought to interfere with his entitlement to other employee benefits, the Court notes that, at the time he was terminated, Gibson was not a participant in ABB's group medical, vision or hearing benefits plans. Therefore, he cannot assert that ABB terminated him in an effort to interfere with his entitlement to these benefits. Gibson was a participant in both the PRISM 401(k) plan and the Cash Balance Pension Plan and was 100% vested in both plans. (Bradley Aff. P 7). Although he would have had the benefit of additional contributions and interest had he not been terminated, as the Court has already noted, this is an insufficient basis for a § 510 claim.

[*51]

Furthermore, even if Gibson had some evidence that ABB selected him for layoff in order to interfere with certain employee benefit rights, ABB has articulated a legitimate, non-discriminatory reason for its decision. To remain competitive, ABB decided to make a reduction in force. Dan Landis ranked his employees' knowledge and skill, and matched their strengths with the skills needed for upcoming projects. Based on these criteria, Gibson, one of the lowest-ranked employees in his department, was selected for termination.

Gibson has presented little evidence to show that ABB's proffered reasons are pretextual. The proffered reasons clearly have a basis in fact. At his deposition, Gibson admitted that he was more "methodical" and was not nearly as proficient at using CAD-CAM as the other designers. (Gibson Dep. at 169-70, 193-94). Furthermore, in his January 1991 performance evaluation, Don Barger rated Gibson at "Level 3" on a scale of one to six, with six being the best. At this level, "performance requirements are consistently achieved at a minimum acceptable level. Improvement is required." (Ex. 4 to Gibson Dep.). n14

n14 Gibson objected to this ranking since Barger had worked with Gibson for only three months at the time. Gibson speculates that, in preparation for layoffs, ABB was putting pressure on managers to rate older workers poorly. (Gibson Aff. P 11). However, this is pure speculation and Gibson has presented no evidence to corroborate his allegation.

Case 1:02-cv-00164-MHW   Document 56-2   Filed 09/28/2005   Page 13 of 22

Page 13

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

**[*52]**

As evidence of pretext, Gibson points to the fact that, in determining which employees to terminate, Dan Landis prepared an employee ranking chart, which included columns indicating each employee's length of service and current compensation level. (Ex. E to Bradley Aff.). Although this information was undisputably included on the evaluation chart, Landis clearly testified that his decision concerning who should be terminated was based solely on performance criteria. (Landis Dep. at 19-22, 33). Gibson has presented no evidence to the contrary. Absent direct evidence that Landis considered this information in making his decisions, the fact that this information was included on the chart creates no inference of discrimination. *Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 514 (6th Cir. Ohio 1991).*

As further evidence of pretext, Gibson alleges that two younger, less-qualified employees, Rowland Boston and Rodney Jones, were retained in positions for which he was qualified (Gibson Aff. PP 5-6). n15 At the time Gibson was laid off, Boston was allegedly thirty-nine years old and Jones was forty-two years old. (Id.). This argument appears to be more relevant to Gibson's ADEA claim, which the Court has already dismissed. **[*53]** However, to the extent that Gibson is claiming that ABB would have to spend less money providing employee benefits to younger employees, and that this cost savings could be a factor in ABB's decision to terminate him, the Court will discuss it.

n15 Although Gibson claims that Boston and Jones were "less-qualified," the court notes that both of them received equal or better performance ratings than Gibson. (Ex. E to Bradley Aff.).

In the Court's view, in terms of cost savings, ABB had relatively little incentive to terminate Gibson over Boston and Jones. Since ABB's cost for the 401(k) program is based solely on employee contributions, the employees' ages are completely irrelevant. As noted earlier, for the Cash Balance Pension Plan, the company's contributions are based on a percentage of each employee's wages; that percentage rises by only 1/2% for each five-year age bracket. For employees age 35 to 39, the company contributes 4% of each employee's salary. This percentage rises to 4.5% for employees age 40-44, and **[*54]** to 5% for employees age 45-49. (Ex. A to Bradley Aff. at 10). Therefore, the company's contributions to the plan are based on each employee's age and salary. At the time Gibson was terminated, his salary was nearly the same as that of Boston and Jones. Gibson was making $ 33, 835, Boston was making $ 34,353, and Jones was making $ 33,390. (Ex. E to Bradley Aff.). By the Court's

calculations, based on these three employees' ages and salaries, in 1992, ABB's yearly contributions to the pension plan were approximately $ 1,692 for Gibson, $ 1,374 for Boston, and $ 1,503 for Jones.

Even if Gibson could show that Landis was aware of these pension costs, and that they played a factor in his decision to terminate Gibson, a savings of a mere couple of hundred dollars per year is insufficient to raise an inference that ABB selected Gibson for termination based on his pension status. Of the fifteen employees in his department, twelve had salaries higher than Gibson. (Ex. E to Bradley Aff.). If ABB's decision were motivated by a desire to save money on employee benefits, it seems that it would have been more cost-efficient to terminate those employees with higher salaries than Gibson's.

Finally, **[*55]** as evidence of pretext, Gibson points to the fact that two other older, long-term employees in his department were also terminated. (Gibson Aff. P 8). Fred Wolff was in his sixties and Vogel was in his forties. (Gibson Dep. at 127). However, at his deposition, Gibson admitted that he did not know if Fred Wolff was laid off or if he voluntarily retired. (Id.). Gibson may not attempt to create a genuine issue of material fact to defeat summary judgment by making statements in his affidavit contrary to his deposition testimony. *Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir.1986).* Therefore, the Court will not consider Wolff's termination as evidence of pretext. Furthermore, since Gibson does not address the pension status of either Wolff or Vogel, the fact that they were terminated does nothing to support Gibson's claim that ABB selected employees for termination based on a desire to interfere with their entitlement to certain benefits.

In summary, the Court finds that Plaintiff Brewie Gibson has failed to establish a prima facie case of a violation of § 510 of ERISA. He has failed to present sufficient evidence from which a reasonable trier of fact could **[*56]** infer that ABB's decision to terminate Gibson was motivated, at least in part, by ABB's desire to avoid paying certain employee benefits. Even if Gibson had established a prima facie case, ABB has articulated a legitimate, non-discriminatory reason for terminating Gibson. It needed to cut costs, and Gibson was one of the lowest-ranked mechanical designers in terms of skill and performance. Gibson has failed to present sufficient evidence that the proffered reason was pretextual. There being no genuine issues of material fact, Defendant ABB is therefore entitled to summary judgment on Plaintiff Brewie Gibson's ERISA claim.

**C. ADEA claims**

The Age Discrimination in Employment Act ("ADEA") prohibits employers from refusing to hire, discharging, or otherwise discriminating against employ-

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

ees on the basis of age. *29 U.S.C. § 623*(a)(1). A plaintiff asserting an ADEA claim must show that age was a motivating factor in the adverse employment action and that, but for this factor, the plaintiff would not have suffered the alleged adverse employment action. *Phelps v. Yale Security, Inc., 986 F.2d 1020, 1023 (6th Cir. 1993)*(citing *Chappell v. GTE Products Corp., 803 F.2d 261, 265-66 (6th Cir. 1986),* [*57] cert. denied, *480 U.S. 919, 94 L. Ed. 2d 690, 107 S. Ct. 1375 (1987)).*

Plaintiffs may show a discriminatory animus by either direct or circumstantial evidence. "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination." *Chappell, 803 F.2d at 268.* In this case, Plaintiffs have no direct evidence that ABB discriminated against them on the basis of their age. In cases like this, where the plaintiffs have only circumstantial evidence, ADEA claims are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* Under that analysis, a plaintiff must first establish a prima facie case of age discrimination. If he is successful in doing so, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id. at 802.* If the employer articulates such a reason, the plaintiff must then prove by a preponderance of the evidence that the reasons offered were pretextual. *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* [*58] The plaintiff may prove pretext by showing either that: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the discharge; or (3) the proffered reasons were insufficient to motivate the discharge. *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).* In order to establish pretext, a plaintiff must put forth additional evidence other than that used to establish his or her prima facie case. *Id. at 1084-85.*

To establish a prima facie case of age discrimination, normally a plaintiff must show: (1) he was at least forty years old, and was therefore a member of a protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a younger person. *Skalka v. Fernald Envtl. Restoration Mgmt. Corp., 178 F.3d 414, 420 (6th Cir.), reh'g and sugg. for reh'g en banc denied (1999).* However, in the context of a reduction in force, mere termination of a competent employee is not enough to establish a prima facie case of age discrimination. *LaGrant v. Gulf & Western Mfg. Co., 748 F.2d 1087, 1090 (6th Cir. 1984).* As the Sixth [*59] Circuit noted in *Brocklehurst v. PPG Industries, Inc., 123 F.3d 890 (6th Cir. 1997),* "the decision to discharge a qualified, older employee is not inherently suspicious. The decision is readily explainable in terms of the em-

ployer's economic situation. In a RIF, qualified, older employees are going to be discharged." *Id. at 896* (internal citations omitted).

In *Allen v. Diebold, Inc., 33 F.3d 674 (6th Cir. 1994),* the Sixth Circuit noted that "the ADEA was not intended to protect older workers from the often harsh economic realities of common business decisions and the hardships associated with corporate reorganizations, downsizing, plant closings and relocations." *Id. at 677.* "The ADEA only bars discrimination on account of age; it does not place on employers an affirmative obligation to retain older workers whenever a reduction in staff becomes necessary." *Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 517 (6th Cir. 1991).* As long as they do not act with discriminatory intent, employers may eliminate positions, even when the positions are held by older employees. *Id.*

For these reasons, [*60] in cases involving a reduction in force, courts have placed a greater burden on the ADEA plaintiff. *Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir. 1986).* Courts have modified the fourth element of the prima facie case to require plaintiffs to offer some "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Skalka, 178 F.3d at 420* (quoting *Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir.), cert. denied, 498 U.S. 878, 112 L. Ed. 2d 171, 111 S. Ct. 211 (1990)); Godfredson v. Hess & Clark, 173 F.3d 365, 371 (6th Cir. 1999).*

Because the Court's discussion of direct and statistical evidence is equally applicable to all four plaintiffs, the Court will start with those and then discuss the circumstantial evidence presented by each individual plaintiff. As already noted, in this case, none of the plaintiffs asserting ADEA claims have presented any direct evidence of age discrimination. No one from ABB ever told them that they were being terminated because of their age. Although four of the plaintiffs [*61] testified that they had heard rumors of a so-called "40/20" or "50/15" rule, by which employees that were over forty years old and had worked for ABB for at least twenty years, and employees that were over fifty years old and had worked for ABB for at least fifteen years were automatically slated for termination, they admitted that these rumors were never substantiated by ABB management. (Koester Dep. at 161; Johnson Dep. at 150; Almond Dep. at 206-07; Richardson Dep. at 249-50). Koester also admitted that there were several employees still working in his department who fell within the scope of the so-called "rule" and yet were still employed at ABB. (Koester Dep. at 164).

Although plaintiffs claim to have some statistical evidence to support their claims of age discrimination,

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

the Court finds that the statistical evidence they have presented is insufficient to satisfy the fourth prong of the modified prima facie case. Plaintiff Michael Richardson has apparently compiled his own statistical analysis. He claims that in 1992, when 52.9% of the workforce was over age 40, 60% of those terminated were over 40, and in 1993, when 55.9% of the workforce was over 40, 73% of those terminated [*62]  were over 40." (Richardson Aff. P 9). However, since Richardson does not indicate how he arrived at these figures or what factors he took into account, his statistics have little probative value. In *Simpson v. Midland Ross Corporation, 823 F.2d 937 (6th Cir. 1987)*, the Court noted that "for statistics to be valid and helpful in a discrimination case, 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Id. at 944* (internal citation omitted). Richardson's crude statistics do not meet this standard.

Furthermore, Richardson's statistics are company-wide. Since the decision-making process concerning which employees should be laid off varied from department to department, company-wide statistics are not particularly useful. *Carman v. McDonnell Douglas Corp., 114 F.3d 790, 792 (8th Cir. 1997); Mims v. Elec. Data Sys. Corp., 975 F. Supp. 1010, 1018 (E.D. Mich. 1997); Scales v. J.C. Bradford and Co., 925 F.2d 901, 906-07 (6th Cir.1991)*. Even if the Court were to accepted Richardson's statistics as accurate, Plaintiffs have [*63] failed to provide any analysis indicating their significance. In summary, the Court finds that Plaintiffs have failed to present sufficient probative statistical evidence that would give rise to an inference of age discrimination.

On the other hand, Defendant ABB hired statistical experts David Griffin, Ph.D. and Bernard Siskin, Ph.D. to analyze the impact of its layoffs on older workers. They evaluated the layoffs made from 1990-1993. Using the chi-square method, n16 and four different analyses controlling for various factors, ABB's statisticians found no statistically significant evidence of age disparity among the employees selected for layoff. n17 The experts concluded, "it is our opinion that there is no statistical support for a claim that the layoff selections were adverse to 'older' employees. None of the studies prepared revealed a 'statistically significant' pattern of layoff selections by age." (Ex. 12C to Def.'s Mot. Summ. J.).

n16 A chi-square statistical analysis "evaluates the disparity between the expected and observed frequency of a certain outcome" and is useful in determining whether a statistical disparity can be attributed to chance or whether another impermissible factor probably influenced the se-

lection of individuals terminated. *King v. Gen. Elec. Co., 960 F.2d 617, 626 n.5 (7th Cir. 1992)*. If the difference between the expected frequency and the actual frequency of a particular outcome is greater than two or three standard deviations, an inference of discrimination may arise. *Castaneda v. Partida, 430 U.S. 482, 496 n.17, 51 L. Ed. 2d 498, 97 S. Ct. 1272 (1977)*.

[*64]

n17 Griffin and Siskin considered division, exempt status, job family, and job title.

In *EEOC v. McDonnell Douglas Corp., 17 F. Supp. 2d 1048 (E.D. Mo. 1998)*, the court held that in age discrimination cases arising out of a reduction in force, "the most significant statistic is the difference in the percentage of older employees before and after the RIF." *Id. at 1053* (citing *Rose v. Wells Fargo & Co., 902 F.2d 1417, 1423 n. 5 (9th Cir.1990)* and *Holley v. Sanyo Mfg., Inc., 771 F.2d 1161, 1167 (8th Cir.1985)*(no statistical basis for age discrimination claim where percentage of employees in protected class before layoffs was 25.8% and 26.0% after layoffs)). In this case, the percentage of employees older than forty actually rose from 45.6% in 1990 to 62.2% in 1995. (Ex. 12C to Def.'s Mot. Summ. J., Table 2). In addition, the average age of ABB's workforce actually rose from 39.1 to 43.4 from 1990 to 1995. Id. These statistics obviously do considerable damage to Plaintiffs' ADEA claims.

Plaintiffs attack the credibility of ABB's [*65] expert report, claiming that some of the numbers used by the experts are erroneous. For example, Michael Richardson notes that: (1) page 10 of the expert report lists 1,136 employees in 1990, while page 12 lists 1,152; (2) page 13 of the report states that 434 employees were laid off between 1990 and 1993 when, in actuality, there were 439; (3) the 1990 layoff list erroneously includes Diane Walker; (4) the 1990 and 1995 layoff lists erroneously include Michele Scaparrotti; and (5) James Morgan's name is erroneously omitted from the list of terminated employees. (Richardson Aff. P 9). n18 The Court notes that, even if Richardson is correct, the last three alleged errors involve only one employee each and would not significantly affect the outcome of the expert report.

n18 Randy Almond also notes certain discrepancies between the number of employees ABB claims were laid off in 1992 and 1993, and the numbers given in John Cooper's affidavit. (Almond Aff. P 6).

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

In response to Richardson's other attacks, ABB contends [*66] that the first alleged discrepancy arises because employees that transferred into the Columbus facility in 1991, and are included in the table on page 12, were not present at the beginning of 1990, and are therefore not included in the total number of employees listed in the table on page 10. The second alleged discrepancy is explained in the expert report itself, in footnote 6 -- five employees were selected twice for layoffs; therefore, even though layoffs affected only 434 employees, there were 439 layoff "events." Plaintiff has not responded to these seemingly reasonable explanations of the discrepancies. The Court also notes that Plaintiffs have presented no expert witnesses to rebut the report submitted by ABB's expert witnesses.

In summary, none of the Plaintiffs has any direct evidence that he was singled out for termination because of his age. The Court also finds that Plaintiffs have produced no probative statistical evidence to support their claims and have failed to rebut the expert witness report submitted by ABB. In order to establish a prima facie case under the ADEA, each plaintiff must therefore present circumstantial evidence sufficient to satisfy the fourth element. [*67]

**1. Randy Almond**

Plaintiff Randy Almond was terminated from his position as a senior electronics technician in the manufacturing department at ABB in November of 1993. He had been responsible for keeping electronic test equipment in good repair. He was basically on standby and made repairs on an as-needed basis. Almond had consistently received satisfactory performance evaluations.

Almond's supervisor was Ann Vaske, who reported to Ken Morris, the Vice President of Manufacturing. The manufacturing department had been losing money. In an effort to cut costs, the management team decided to restructure various operations and outsource others. (Morris Dep. at 86-95). Several of the employees whose equipment Almond repaired had already been laid off. (Morris Aff. P 7). Vaske and Morris determined that, instead of keeping Almond on standby, it would be more efficient to have the production operators who used the equipment be responsible for their own repairs. (Id.). n19 If complex repairs were needed, an outside contractor could be used. (Vaske Dep. at 66-67). Vaske and Morris therefore decided to eliminate Almond's position.

n19 Almond testified at his deposition that he understood that his work was to be divided among three co-workers. (Almond Dep. at 168). However, in his affidavit, he later claimed that the majority of his responsibilities were taken over by Jim Zumstein, who was thirty-four years old. (Almond Aff. P 11).

[*68]

Defendant ABB admits that Randy Almond has satisfied the first three elements of the prima facie case -- he was over forty years old, he was discharged, and he was qualified for the position of senior electronics technician. However, Defendant claims that Almond cannot satisfy the fourth element because he has no additional direct, circumstantial, or statistical evidence which would tend to establish that ABB singled him out for termination because of his age. Almond admits that he has no direct evidence of age discrimination, (Almond Dep. at 118-120), and the Court has already determined that Plaintiffs have presented no competent statistical evidence which would tend to show that Almond was singled out for termination because of his age.

As circumstantial evidence of age discrimination, he claims that he was the oldest person in his department and the only one selected for layoff. n20 Even assuming *arguendo* that Almond was the oldest person in his department, standing alone, this does not create a reasonable inference that his age was a motivating factor in ABB's decision to terminate him. *Leonard v. Sundstrand Corp., 2000 U.S. App. LEXIS 5245* [*69] at *8, No. 99-1559 (7th Cir. March 23, 2000)(citing *Jackson v. E.J. Brach Corp., 176 F.3d 971, 985-86 (7th Cir. 1999)*(holding that the fact that plaintiff was the only Hispanic manager within the division who was terminated failed to create a genuine issue of pretext)). Morris specifically testified that age was not a factor in the decision to eliminate Almond's position. (Morris Aff. P 8). Furthermore, since Almond was the only one in the department who performed this particular job, he cannot claim that similarly situated younger employees were treated more favorably.

n20 Defendant disputes that Almond was the oldest employee in his department. It points to Delores Parsons, Betty Miller, Ruth Hawthorne, and Lavenia Preston, all of whom were the same age as Almond or older. Almond, however, claims that Parsons and Miller were not in his department, that Hawthorne had already retired when he was terminated, and that Preston may have been younger than he was based on certain documentation in her personnel file. (Almond Aff. P 19).

[*70]

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 17 of 22

Page 17

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

As additional circumstantial evidence of age discrimination, Almond points to the fact that, although he applied for a custom assembler's job at ABB shortly before he was informed of his layoff, Ms. Vaske selected Mike Thompson, a thirty-three year old ABB employee, for the position instead. n21 However, in the Court's view, Vaske's decision to hire Thompson is not necessarily probative evidence of age discrimination.

> n21 Defendant objects to the Court's consideration of Almond's claim that he was wrongfully denied the custom assembler's position since he did not assert this claim in his Complaint or in his OCRC charge. However, the Court does not view this as an additional "claim," but rather as additional circumstantial evidence to support his claim that ABB's decision to terminate him was motivated, at least in part, by his age.

Vaske testified that neither Thompson's age nor Almond's age were factors in her decision to offer Thompson the custom assembler's job. (Vaske Aff. PP 6, 8). Almond admitted at his [*71] deposition that he had no evidence that Vaske chose Thompson because he was younger than Almond. (Almond Dep. at 193-94). Vaske claims that she hired Thompson because he was better qualified. Thompson had worked as a lower level custom assembler for many years and therefore had the necessary skills. (Vaske Aff. P 4). In addition, Thompson had excellent performance reviews and had been awarded the Team Contributor Quality Salute award for 1993. Id.

Almond offers several reasons why Vaske should have offered him the custom assembler's job instead. He claims that he had been with ABB longer than Thompson had, also had good performance reviews, and had some assembly experience. (Almond Aff. PP 15-17). In addition, Almond speculates that he would have required less training than Thompson did. (Almond Aff. P 14). Vaske admitted that Almond might have had the skills necessary to be trained for the position. (Vaske Dep. at 85). However, she claims that ABB typically would "replace assemblers with assemblers," not with technicians or engineers, because assemblers already had the required skills. n22 (Id. at 78). In support of her decision to offer the job to Thompson, Vaske also points [*72] to some of Almond's prior evaluations in which he had been criticized for poor time management, extended breaks, non-job-related conversations, and an inability to prioritize his work. (Vaske Aff. P 7). Particularly when Vaske has set forth several legitimate reasons for her decision, Almond's subjective belief that he was better qualified than Thompson is insufficient to raise an inference of discrimination. See LaGrant, 748 F.2d at 1091. Finally,

even assuming that Vaske knew of Almond's impending layoff when she made her decision, she had no obligation to offer him the custom assembler's job. When economic conditions have caused a reduction in force, generally "an employer has no duty to transfer an employee to another position within the company." Ridenour, 791 F.2d at 57.

> n22 In response, Almond claims that other employees have been moved from non-assembly to assembly positions. (Almond Aff. P 18). However, the Court notes that Vaske did not claim that ABB never replaced assemblers with non-assemblers. She merely testified that other assemblers would be considered first, and typically assemblers were replaced with other assemblers. (Vaske Dep. at 68, 78).

[*73]

The Court finds that Randy Almond has failed to establish a prima facie case of age discrimination because he has not presented any "additional direct, circumstantial, or statistical evidence" tending to indicate that ABB singled him out for termination on the basis of his age. However, even if he had presented such evidence, ABB has offered a legitimate, non-discriminatory reason for selecting Almond for termination. It needed to cut costs and determined that it would be more efficient to have the production operators be responsible for their own repairs, rather than maintaining Almond on a stand-by basis.

Although Almond asserts that the proffered reason is "unworthy of belief," he has presented no additional evidence, other than that already discussed, to support his position that this proffered reason was pretextual. It may be true that Almond was the oldest employee in his department and the only one selected for termination. It may also be true that a younger employee was selected over him for the custom assembler's job. However, in the context of a reduction in force, the mere fact that younger employees were retained and he was terminated is insufficient evidence of age discrimination. [*74] The Court finds that, based on the evidence presented, no reasonable jury could conclude that, but for Almond's age, Vaske and Morris would not have eliminated his position as a senior electronics technician. Defendant ABB is therefore entitled to summary judgment on Randy Almond's ADEA claim.

## 2. Karsten Koester

As noted earlier, Mr. Koester was a senior engineer in the mechanical development and design sub-group of the measurement department in the research and devel-

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

opment group at ABB. Dan Landis was his immediate supervisor. Koester had been working on what was known as the GT caliper project, which was winding down. In 1993, Landis was required to reduce the size of his department. Landis' supervisor, Robert Pfeifer, had instructed him to match his employees' skills with the projects that were scheduled for the coming year. (Pfeifer Dep. at 70). Landis ranked his employees based on their "knowledge of products, performance, design capability, tool utilization, [and] CAD capability." (Landis Dep. at 19). Koester was rated the lowest in the department. For the upcoming projects, Pfeifer and Landis needed engineers that could "crank out drawings and get the parts documentation [*75] prepared." (Pfeifer Dep. at 66). Specifically, he needed engineers that were proficient at CAD-CAM. (*Id. at 72*). Pfeifer testified that "[Koester's] skills were in a much different area." (*Id. at 66*).

Although the ability to use the CAD-CAM system was part of Koester's written job description, and although Koester had taken two introductory CAD-CAM courses in the 1980's, he never applied the training, and admitted that he was the only engineer in his department who did not know how to operate the system. (Koester Dep. at 74, 84-87, 136-37). He still sketched all of his drawings by hand. (*Id. at 76*). Landis had addressed Koester's lack of skill in this area in his October 1992 performance review and warned him that this was a dynamic industry and he needed to become familiar with the computer programs. (Landis Dep. at 69-70). Specifically, Landis told Mr. Koester that he should first familiarize himself with MicroCadds, a less sophisticated computer program. In February of 1993, Koester did meet with a colleague who showed him how to use MicroCadds, (Koester Dep. at 100, 140), but did not tell Landis that he had done so. (Koester [*76] Dep. at 98-99). Koester admittedly made no effort to obtain CAD-CAM training over the next several months. (*Id. at 100*). Based on Landis' employee rankings, Koester was terminated in November of 1993. n23 He was the only employee in his department to be terminated at that time.

n23 After his termination, Koester worked at CyboRobots, and Komar Industries. (Id. at 45-51). He is currently employed at Honda in Marysville. He claims that he has learned the CAD-CAM system at Honda and is using it to generate his designs. (Koester Aff. PP 18-19).

Defendant ABB concedes that Koester can satisfy two elements of a prima facie case of age discrimination because he was over forty years old when he was terminated. However, ABB contends that, since Koester did not know how to use the CAD-CAM system, he was not meeting his employer's legitimate expectations and was therefore not qualified for any of the positions that existed at the time he was terminated. See *Godfredson, 173 F.3d at 372*. [*77] Koester, on the other hand, claims that he was "objectively qualified" for his job in terms of education and training. See *McCrory v. Kraft Food Ingredients, 1996 U.S. App. LEXIS 26305* at *13, No. 94-6505 (6th Cir. Oct. 3, 1996). The Court finds that whether Koester was qualified for his position as a senior engineer is a close question. Despite his inability to use the CAD-CAM system, Koester had successfully worked at ABB for many years and had never received an unsatisfactory performance evaluation. The type of design work Koester had done in the past did not require the use of CAD-CAM; his hand sketched designs had been sufficient. n24 Nevertheless, ABB required its engineers to be proficient at CAD-CAM and Koester was not. It could therefore be said that he was not meeting his employer's legitimate expectations.

n24 However, it does not necessarily follow that Koester's lack of CAD-CAM proficiency was not a legitimate factor to be considered when matching the employees' skills with what was needed for upcoming projects.

[*78]

The Court need not decide whether Mr. Koester was qualified for the position of senior engineer because, even if he was, he cannot satisfy the fourth element of the prima facie case in the context of a reduction in force. Koester is required to present "additional direct, circumstantial, or statistical evidence" of age discrimination. Koester admittedly has no direct evidence of age discrimination, and the Court has already found that the statistical evidence presented by Plaintiffs is not probative.

As circumstantial evidence of age discrimination, Koester points to the fact that he was the oldest person in his department and was selected for termination. However, as noted earlier, standing alone, this is insufficient to raise an inference that he was terminated on the basis of his age rather than his performance. See *Leonard, 2000 U.S. App. LEXIS 5245* at *8. This is particularly true in the context of a huge reduction in force where many younger employees had already been terminated. Koester also points to the fact that three other older employees in his department were terminated or forced to retire the year before he was -- George Vogel, who was forty-seven, [*79] Fred Wolff, who was sixty-four, and fellow plaintiff Brewie Gibson, who was forty-eight. However, even if the Court were to find that this constituted sufficient circumstantial evidence from which a

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 19 of 22

Page 19

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

reasonable jury could infer that ABB's decision to terminate Koester was motivated, at least in part, by his age, Koester has failed to establish that the reasons given by ABB for his termination were pretextual.

ABB claims that Koester was terminated, in large part, because of his lack of CAD-CAM proficiency. His deficiency in this area rendered him a poor match for upcoming projects. (Thornton Dep. at 79). The Court finds that ABB has satisfied its burden of articulating a legitimate, non-discriminatory reason for Koester's termination. The burden then shifts to Koester to show that the proffered reason either had no basis in fact, did not actually motivate his discharge, or was insufficient to motivate his discharge. Koester fails to satisfy this burden.

Koester admits that he was the only employee in his department not proficient at CAD-CAM. (Koester Dep. at 86-87). Koester then attempts to place the blame for his lack of CAD-CAM proficiency on ABB. He claims that he was never assigned **[*80]** a personal computer, did not have an assigned seat at a CAD station, and was not invited to attend CAD system users meetings. (Koester Aff. at PP 13, 20). Koester also claims that Frank Ohlemacher, a younger co-worker, was given six weeks to concentrate exclusively on learning the CAD-CAM system, but he was never offered a similar opportunity. (Id. P 12).

The Court finds that Koester must also shoulder a large portion of the blame for his lack of CAD-CAM proficiency. Even though CAD-CAM proficiency had been a part of his written job description for years, and he knew that he lacked this skill, he did not request any training and made no effort to acquire this skill on his own. (Koester Dep. at 100-109). Pfeifer testified that anyone who requested training on CAD-CAM would have received it. (Pfeifer Dep. at 74). Once pushed, Koester did finally take some steps to learn MicroCadds, but he did not tell Landis about his training. After he learned MicroCadds, many months went by and Koester made no further effort to learn the CAD-CAM system.

Conspicuously absent from Koester's allegations is any claim that ABB's alleged failure to train him on the CAD-CAM system was based on his age. **[*81]** Therefore, to the extent that Koester may be claiming that ABB intentionally failed to train him on CAD-CAM so that it could use this alleged "deficiency" as a pretext for age discrimination, the causal connection is simply not there. The Court finds that even if Koester could establish a prima facie case of age discrimination, he has failed to show that ABB's assertion that he was terminated because he did not have the skills needed for upcoming projects was pretextual. Koester has failed to put forth sufficient evidence from which a reasonable jury

could infer that, but for his age, Koester would not have been selected for termination. Defendant ABB is therefore entitled to summary judgment on Plaintiff Karsten Koester's ADEA claim.

### 3. Michael Richardson

At the time Plaintiff Michael Richardson was terminated in November of 1993, he was working as an order entry clerk in the manufacturing area. As noted earlier, Richardson had previously worked as a master scheduler. In the fall of 1992, when ABB reduced the number of master schedulers, Richardson was one of the employees John Marbry, his supervisor, selected for layoff. However, prior to the effective date of the layoff, **[*82]** Marbry offered Richardson a position as an order entry clerk. (Marbry Aff. P 10).

The manufacturing group at ABB had been losing money. In an effort to break even, the manufacturing management team, headed by Ken Morris, evaluated the volume and nature of work to be done, and decided to restructure certain operations and outsource others. This restructuring resulted in the termination of several employees. (Morris Dep. at 87-95). In 1993, two order entry clerks were working in the manufacturing area, logging orders and creating part numbers -- Michael Richardson, age forty-four, and Wayne Somerfeldt, age thirty-four. John Marbry was their immediate supervisor.

Richardson worked with other purchase order engineers on AccuRay parts, while Somerfeldt worked alone on MOD products. (Richardson Dep. at 227). ABB had already planned to implement a new software program called Socrates that would eliminate the need for these employees to keypunch line items into the computer. (Marbry Aff. P 2). As soon as the new software was implemented, ABB planned to eliminate both of the order entry clerk positions. But in the meantime, Marbry was instructed to eliminate one of the two positions in an **[*83]** effort to cut costs.

Marbry testified that he chose to terminate Richardson because his duties could more easily be redistributed among the four purchase order engineers who worked with him on the AccuRay products. (Marbry Aff. PP 8-9). Each of these purchase order engineers was over forty years old. n25 (Id., Ex. C to Marbry Aff.). Marbry also testified that even though Richardson had more seniority overall, he had worked as an order entry clerk for only about one year. Somerfeldt had performed a similar function for six to eight years. (Marbry Dep. at 23). The month after Richardson was terminated, Somerfeldt, anticipating that his position would also soon be eliminated, applied for and was offered another position within the company. (Somerfeldt Aff. P 1). ABB then reassigned Somerfeldt's duties to Delmas Culp, an ABB employee who was two months shy of forty years old.

Case 1:02-cv-00164-MHW    Document 56-2    Filed 09/28/2005    Page 20 of 22

Page 20

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

(Marbry Dep. at 31). n26 As anticipated, Culp's position as an order entry clerk was eliminated early in 1994. Culp was then moved into a position as an order manager. (Id. at 34, 38).

n25 These employees were Joan Frederick, James Elie, Paul Tritt, and Timothy Ralls. (Marbry Aff. P 9).

[*84]

n26 Although Culp was hired in 1972, two months before Richardson, Culp left the company for ten months in 1976 and then returned; Richardson therefore claims that Culp had less seniority. (Richardson Aff. P 7).

ABB admits that Richardson has satisfied the first three elements of the prima facie case. He was over forty years old, was qualified for his job, and was terminated. However, ABB claims that since Richardson has presented no additional direct, circumstantial, or statistical evidence of discrimination, it is entitled to summary judgment. As previously noted, Richardson has no direct evidence that he was selected for termination because of his age. Furthermore, the Court has found that Plaintiff's statistical evidence is insufficient to raise an inference of discrimination.

When asked at his deposition for the basis for his ADEA claim, Richardson pointed first to the fact that Somerfeldt had been retained instead of him, and second, to the fact that, instead of recalling him when Somerfeldt was transferred, ABB gave the position to Delmas Culp. (Richardson Dep. at 252-57). The simple [*85] fact that Somerfeldt, who was ten years younger than Richardson, was retained, is insufficient to raise an inference of age discrimination in this case. The ADEA does not require employers facing a reduction in force to retain older workers over younger ones. *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991).

ABB has articulated at least two legitimate, non-discriminatory reasons for its decision to terminate Richardson instead of Somerfeldt. Ken Morris testified that in selecting employees for termination as part of the reduction in force, he instructed his managers to first terminate those employees with documented performance problems and then those with the least tenure in that particular job function. (Morris Dep. at 95). It is undisputed that Richardson had worked as an order entry clerk for only about one year, while Somerfeldt had been in that position for six to eight years. Therefore, even though he was older, Richardson had less tenure in that

particular job function. In addition, since Richardson already worked with other purchase order engineers but Somerfeldt worked alone, it was more efficient to redistribute Richardson's job [*86] functions to his colleagues than to completely retrain someone to perform Somerfeldt's job. (Marbry Aff. PP 8-9).

Richardson has failed to offer any evidence from which a reasonable jury could infer that the proffered reasons were pretextual. The factual basis for the proffered reasons is adequately supported by the record, and Richardson has failed to show that the proffered reasons did not actually motivate the discharge or were insufficient to motivate the discharge. n27 Also cutting against Richardson's claim of pretext is the "same actor inference." When the person who made the decision to terminate an employee also hired that employee, no inference of discrimination arises. *Hartsel v. Keys*, 87 F.3d 795, 804 n.9 (6th Cir. 1996). In the fall of 1992, when Richardson was scheduled to be laid off from his job as a master scheduler, John Marbry salvaged his employment, offering him the position of order entry clerk. It is doubtful that just one year later, Marbry's decision to terminate Richardson was motivated by a discriminatory animus.

n27 Richardson claims that he should have been retained because he had a better performance evaluation in 1992 than did Somerfeldt. However, in 1992, Richardson was still a master scheduler and was evaluated in that role. Since he had no evaluation for his new position as an order entry clerk, he cannot compare his past performance evaluations with Somerfeldt's.

[*87]

As to Richardson's claim that ABB should have recalled him to fill the position left vacant by Somerfeldt instead of transferring Delmas Culp, Defendant first argues that the Court should not consider it because Richardson failed to assert a "failure to re-hire" claim in either his Complaint or his OCRC charge. As with the claim of Plaintiff Randy Almond, the Court does not view this as an additional "claim," but rather as additional circumstantial evidence of ABB's alleged tendency to discriminate against older workers.

The Court finds that ABB's failure to recall Richardson to fill the position vacated by Wayne Somerfeldt does not raise an inference of age discrimination. Delmas Culp was almost forty years old when he was selected to fill the position. More significantly, ABB has articulated a legitimate, non-discriminatory reason for not recalling Mr. Richardson. John Marbry testified that when Somerfeldt left his position as an order entry clerk, he had to

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

replace him with another current employee because he was not permitted to add any additional employees to the payroll. (Marbry Dep. at 32-34). Since Richardson was no longer an employee, he could not be considered for the job. [*88] n28 Richardson has failed to produce any evidence that Marbry's proffered reason was pretextual.

> n28 Even if Marbry would have been allowed to rehire Richardson, he had no duty to do so. ABB does not maintain a recall list or have a formal method of recalling employees who had previously been laid off. Those employees must apply for open positions just like anyone else. (Bradley Aff. P 9).

The Court finds that neither ABB's retention of Somerfeldt, nor its failure to recall Richardson constitute sufficient circumstantial evidence to allow a trier of fact to infer that ABB engaged in age discrimination. Richardson has therefore failed to establish a prima facie case under the ADEA. However, even if he had established a prima facie case, ABB would be entitled to summary judgment. ABB has presented legitimate, non-discriminatory reasons for terminating Michael Richardson and for failing to rehire him. Richardson has presented no evidence from which a reasonable jury could find that the proffered reasons had no basis [*89] in fact, did not actually motivate the discharge, or were insufficient to motivate the discharge. Defendant ABB is therefore entitled to summary judgment on Michael Richardson's ADEA claim.

### 4. Ira Johnson

As noted earlier in this Memorandum and Opinion, Plaintiff Ira Johnson was terminated from his position as a test engineer in November of 1993. In an effort to cut costs, ABB had decided to outsource the manufacturing of certain computer equipment. This decision resulted in the elimination of Ira Johnson's entire department; since ABB was no longer manufacturing the equipment, it no longer needed engineers to test it. Ira Johnson was therefore terminated, along with two other test engineers in his department. Johnson claims that the decision to terminate him was motivated, at least in part, by his age.

Defendant admits that Johnson has satisfied the first three elements of a prima facie case of age discrimination. Johnson was over forty years old, was qualified for his position, and was nevertheless terminated. He had consistently received satisfactory performance evaluations. However, ABB claims that Johnson has presented no "direct, circumstantial, or statistical evidence" [*90] sufficient to defeat summary judgment. The Court agrees. As already noted, none of the plaintiffs has any direct evidence of age discrimination, and the statistical evidence presented does not adequately support their claim.

As circumstantial evidence that the decision to terminate him was motivated by a discriminatory animus, Johnson points to the fact that he was the oldest employee in his department at the time he was terminated. However, prior to Johnson's termination, many younger employees had already been terminated as part of the reduction in force. Of greater importance, Johnson's termination must be viewed in its context -- his entire department was eliminated as part of ABB's restructuring, and all three test engineers, regardless of age, lost their jobs at the same time, including Stan Sammet who was only in his thirties. (Johnson Dep. at 49). Under these circumstances, the mere fact that Johnson was the oldest employee in his department does not create a reasonable inference that age was a motivating factor. See *Leonard, 2000 U.S. App. LEXIS 5245* at *8. No reasonable jury could find that ABB chose to outsource the manufacturing of this equipment simply [*91] because it harbored a discriminatory animus toward Mr. Johnson based on the fact that he was forty-five years old.

Johnson also points to the fact that fourteen of the nineteen employees terminated on the same day he was were more than forty years old. (Johnson Aff. P 11). However, a snapshot of the nineteen employees terminated on one particular date, particularly when viewed in the larger context of the hundreds of employees terminated during the five-year reduction in force, is insufficient to create an inference that Johnson was terminated because of his age. As noted earlier, Plaintiffs' experts have presented a detailed statistical analysis showing that ABB's layoffs did not disproportionately affect older employees. Plaintiffs have offered no expert evidence in rebuttal.

Finally, Johnson claims that two younger employees, Jim Seifert, who was forty-two years old, and Bill Seabrook, who was thirty years old, were retained by ABB in positions for which he was qualified. (Johnson Aff. P 7). However, these employees worked in a different department and had a different supervisor. (Bradley Aff. P 6; Johnson Dep. at 51-56). Therefore, they were not similarly situated. Even if Johnson [*92] were qualified to perform their jobs, the ADEA does not require an employer facing a reduction in force to transfer an order employee to another position within the company, *Ridenour, 791 F.2d at 57,* or to retain older workers over younger ones, *Wilson, 932 F.2d at 517.* n29

> n29 Johnson also claims that Steve Harris, another terminated employee whose date of birth is August 1, 1962, was later rehired by ABB. (Id.

2001 U.S. Dist. LEXIS 6507, *; 25 Employee Benefits Cas. (BNA) 2362

at P 10). However, Johnson admitted at his deposition that he was unsure what tasks Harris performed either before he was terminated or after he was rehired. (Johnson Dep. at 146-161). Without more facts from which an inference could be drawn that Harris was treated more favorably than Johnson simply because he was younger, the Court finds this allegation irrelevant to Johnson's claim.

The Court finds that Ira Johnson has failed to establish a prima facie case of discrimination under the ADEA. He has presented no evidence from which a reasonable jury could conclude [*93] that the decision to terminate him was motivated, even in part, by his age. The evidence clearly shows that Johnson was terminated because his entire department was eliminated as a result of ABB's decision to outsource a particular task. There is absolutely no evidence that age was a factor in the decision.

Even if Johnson had established a prima facie case, ABB has articulated a legitimate non-discriminatory reason for the termination. It needed to cut its costs in order to remain competitive. It determined that it would be more cost-effective to purchase certain equipment from another manufacturer rather than manufacturing it itself. Since it no longer manufactured the equipment, it no longer needed any of its test engineers in that department, and decided to terminate them. Like the other plaintiffs, Johnson has failed to produce any evidence that the proffered reason for the termination was pretextual. He has not shown that the proffered reason had no basis in fact, did not actually motivate the termination, or was insufficient to motivate the termination. Defendant is therefore entitled to summary judgment on Ira Johnson's ADEA claim.

## IV. Motion *in Limine* to Exclude [*94] Sullivan's Testimony

Because the Court has granted Defendant's motion for summary judgment in its entirety, Plaintiffs' motion *in limine* to exclude the trial testimony of Defendant's expert witness, Brian Sullivan, is rendered moot.

## V. Conclusion

Plaintiffs have failed to produce any probative evidence indicating that Defendant Swiss corporation ABB Limited controlled and directed the activities of Defendant ABB Industrial Systems, Inc. to such an extent that this Court could assert personal jurisdiction over it. Defendant ABB Limited's Renewed Motion to Dismiss (Record at 42) is therefore **GRANTED.**

Plaintiffs have also failed to present sufficient evidence to create a genuine issue of material fact concerning any of their claims. Based on the evidence presented, no reasonable trier of fact could conclude that ABB's selection of these five plaintiffs for termination as part of a bona fide reduction-in-force was in any way motivated by either a discriminatory animus based on age, or by an intentional desire to interfere with the employees' benefits. For these reasons, Defendant's motions for summary judgment on the claims of Plaintiffs Michael Richardson (Record [*95] at 68), Brewie Gibson (Record at 69), Ira Johnson (Record at 70), Randy Almond (Record at 71), and Karsten Koester (Record at 72) are **GRANTED.** The Clerk is directed to enter judgment in favor of Defendant ABB Industrial Systems, Inc.

Plaintiffs' motion *in limine* to exclude the trial testimony of Brian Sullivan (Record at 75) is **MOOT.**

**IT IS SO ORDERED.**

**John D. Holschuh, Judge**

**United States District Court**

**[X] Decision by Court.** This action was decided by the Court without a trial or hearing.

IT IS ORDERED AND ADJUDGED that defendant ABB Limited's renewed motion to dismiss is GRANTED. Defendant's motions for summary judgment on the claims of plaintiffs Michael Richardson, Brewie Gibson, Ira Johnson, Randy Almond, and Karsten Koester are GRANTED. Plaintiffs' motion in limine to exclude the trial testimony of Brian Sullivan is MOOT.

Date: **March 6, 2001**